UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

VILLAS AT PARKSIDE PARTNERS §
d/b/a VILLAS AT PARKSIDE, *et al.*, §
§
    and §
§
VALENTIN REYES, *et al.*, §   CIVIL ACTION NO. 3:08-CV-1551-B
§
    Plaintiffs, §   (consolidated with NO. 3:03-CV-1615)
§
v. §
§
THE CITY OF FARMERS BRANCH, §
TEXAS, §
§
    Defendant. §

## MEMORANDUM OPINION AND ORDER

In this lawsuit, two groups of plaintiffs bring pre-enforcement constitutional challenges to an

ordinance enacted by the City of Farmers Branch, Texas ("City") that establishes a residential

licensing scheme under which the City would revoke the authorization to occupy rental housing for

individuals that the federal government determined to be "not lawfully present" in the United States.

Both of the plaintiff groups and the defendant City move for summary judgment.  Plaintiffs move for

partial summary judgment and seek a permanent injunction on the grounds that the ordinance is

invalid pursuant to the Supremacy Clause of Article VI of the Constitution, and that it violates the

Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution.

Defendant City moves for summary judgment on the grounds that the plaintiffs lack standing to

challenge the ordinance, and that the ordinance is a valid and constitutional exercise of municipal

authority.  Because each motion depends on the same factual background and resolution of common

questions of law, the Court will consider them together.  Before the Court are (1) Reyes Plaintiffs' motion for partial summary judgment (doc. 92), (2) Defendant City's motion for summary judgment (doc. 93), and (3) Villas Plaintiffs' motion for partial summary judgment (doc. 96).  Upon consideration of the motions and evidence in support, together with arguments, filings and objections of counsel, the Court finds, as a matter of law, that the landlord and tenant plaintiffs have established standing to challenge the ordinance, and that the ordinance is invalid under the Supremacy Clause.  Accordingly, the Court **GRANTS** in part and **DENIES** in part each motion as fully described below.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

The City of Farmers Branch is a home rule municipality in Dallas County, Texas located approximately fifteen miles northwest of Dallas, Texas.  On January 22, 2008, the City adopted Ordinance 2952[1] (the "Ordinance"), which conditions residence in rental housing within the City on obtaining a residential occupancy license issued by the City's building inspector.  The Ordinance declares that the residential occupancy licenses are the type of license or local public benefit for which aliens not lawfully present in the United States are ineligible.  (Ord. 2952, Preamble).  While the building inspector is required to issue a residential occupancy license to all who complete the application and pay the required five dollar fee, he is required – for any applicant who does not declare himself or herself to be a citizen or national of the United States – to verify with the federal

---

[1] The Ordinance is titled "An ordinance providing for residential occupancy licenses; providing for verification of aliens' immigration status with the federal government consistent with federal law; creating offenses; providing for enforcement; providing for judicial review; providing a penalty; providing a severability clause; and providing an effective date."  (Doc. 1, Exhibit 1).

government pursuant to 8 U.S.C. § 1373(c) "whether the occupant is an alien lawfully present in the United States." (Ord. 2952(D)(1)). The Ordinance further sets forth procedures for the building inspector to revoke the residential occupancy license for any alien the federal government determines to be not lawfully present in the United States.[2]

A.    *The City's Prior Enactments*

Ordinance 2952 is the third enactment by the City touching on rental property and illegal immigration, and it follows previous efforts by the City Council to discourage illegal immigration and mitigate its perceived costs. Plaintiffs contend that the context of Ordinance 2952's enactment demonstrates the City's intent to regulate immigration, and argue that statements made by city officials during the series of enactments demonstrate an intent to discriminate against Latinos in Farmers Branch. (*See* doc. 102, pp. 3-5, 41-45; doc. 97, pp. 3-4). The City contends instead that this background evidences an intent to support the objectives of federal immigration law and to return the rule of law to a market traditionally regulated by the states in a way that addresses the secondary effects of illegal immigration. (doc. 114, pp. 31, 36). The Court includes those facts that are either undisputed or a matter of public record.

The series of enactments leading to Ordinance 2952 began with Resolution 2006-099, adopted by the City Council on September 5, 2006. Resolution 2006-099 expressed concern and frustration at the United States government's "failing in the enforcement of the Immigration Act as it relates to the influx of illegal aliens," encouraged the federal government to enforce the immigration laws, and noted that the City was "reviewing the role the City can take to support and

---

[2] The timeline and procedures for enforcement of the Ordinance and the penalties for its violation are more fully discussed in Part I(B) of this Memorandum Opinion.

enforce the United States immigration laws" with an aim towards taking "whatever steps it legally can to respond to the legitimate concerns of [its] citizens."  (Pl. App. pp. 46-49).

On November 13, 2006, the City adopted Ordinance 2892**,** its first attempt to regulate the rental housing market in Farmers Branch with reference to federal immigration standards. Ordinance 2892 directed that "the owner and/or property manager shall require as a prerequisite to entering into any lease or rental arrangement . . . the submission of evidence of citizenship or eligible immigration status for each tenant family."  (doc. 99, Pl.'s Appx. 0041-0043)**.**  That ordinance incorporated the classification system set forth in HUD regulations that govern eligibility of non-citizens for housing assistance and required applicants to submit a citizenship or immigration status certification based on the distinctions and definitions provided in 24 CFR 5.  (*Id.*).  Also on November 13, 2006, the City Council adopted Resolution 2006-130, which declared English to be the official language of the City of Farmers Branch.  (*Id.* at pp. 0045-0048).

Implementation of Ordinance 2892 was enjoined in state court on January 9, 2007 for concerns related to the Texas Open Meetings Act.  On January 22, 2007, the City Council adopted Ordinance 2903, which repealed Ordinance 2892 but proposed substantially similar requirements for residential rental in the City (also dependent upon HUD regulations), and called for an election to allow the voters of Farmers Branch to vote for or against the measure.  (*Id.* at pp. 0057-0065)**.** On May 12, 2007, Farmers Branch voters overwhelmingly approved Ordinance 2903 by a margin of 4,058 "for" and 1,941 "against," and it was to go in effect on May 22, 2007.  A group of plaintiffs that included both owners of apartment complexes and residential tenants challenged the constitutionality of Ordinance 2903 in this court on claims broadly similar to those advanced in the present case.  Judge Lindsay of this Court temporarily enjoined the enforcement of Ordinance 2903

4

on May 21, 2007.[3] After discovery and hearing, the Court permanently enjoined its enforcement on May 28, 2008, finding that Ordinance 2903 was a "regulation of immigration" invalidated by the Supremacy Clause and that it violated the Due Process clause of the Fourteenth Amendment because it was void for vagueness. The Court's reasoning and a description of ordinance 2903 can be found in Judge Lindsay's published opinion, *Villas at Parkside Partners, et al. v. Farmers Branch*, 577 F.Supp.2d 858, 871, 876 (N.D. Tex. 2008).

  B. *Ordinance 2952*

  On January 22, 2008 and in attempt to address concerns raised in the litigation over Ordinance 2903, the City adopted the measure now before the Court, Ordinance 2952.[4] While still establishing a residential occupancy licensing scheme, Ordinance 2952 no longer depends on the HUD regulations relied upon by its predecessors, and it expressly reserves the determination of an applicant's lawful presence or immigration status to the federal government instead of deputizing landlords or local officials. Ordinance 2952 was to go in effect on September 13, 2008. The residential licensing scheme set forth in Ordinance 2952 amends Chapter 26 of the Code of Ordinances of Farmers Branch that regulates single-family rental housing in the City as more fully described below.

  i. <u>Ordinance 2952's Reliance on Federal Law</u>

  The Ordinance is tethered to federal immigration law in several key respects, including its

---

  [3] Case No. 3:06-CV-02371-L, doc. 81.

  [4] The Ordinance was adopted during the course of the previous action before Judge Lindsay. The City requested that the Court consider Ordinance 2952 in its decision in that lawsuit, but the Court declined, noting the late stage of the proceedings and that "there are substantial differences" between the two Ordinances. (doc. 22).

definitions and its source of authority to create what it characterizes to be local benefits that may be properly restricted to those lawfully present in the United States.  The Preamble to Ordinance 2952 begins with reference to 8 U.S.C. 1101, *et seq.*, noting that the statute, together with other federal authority, sets forth the requirements for an alien to be "lawfully present" in the United States. (Ord. 2952, Preamble).  On the premise that those not lawfully present in the United States are, as a matter of law, not lawfully present in the City of Farmers Branch, the Ordinance attempts "to adopt regulations touching on aliens that are consistent with pertinent federal laws." (*Id.*).  The preamble to the Ordinance cites 8 U.S.C. 1621, *et seq.* as the source of authority to restrict the eligibility of certain aliens not lawfully present in the United States for "certain State or local public benefits, including licenses" such as  the residential occupancy licenses created through the Ordinance's operative clauses.  (*Id.*).

Also pointing to the anti-harboring provisions of federal law, the Ordinance states that "Title 8, United States Code, Section 1324(a)(1)(A), prohibits the harboring of aliens not lawfully present in the United States, including, as the courts of the United States have held, the provision of residential accommodations to such aliens." (*Id.*).  The stated intent of the Ordinance is "to enact regulations that are harmonious with federal immigration law and which aid in its enforcement;" the Ordinance defers to federal immigration law and declares that it is "not the intent of the City of Farmers Branch to alter, supplant, disrupt, or interfere with federal immigration law."  (*Id.*). Towards those ends, the Ordinance establishes a residential occupancy license scheme, operated through the City building inspector and enforced by civil and criminal penalty and enforced against both landlords and tenants.  (Ord. 2952, §§ 1(C) (D); 3(C); 5).

     ii.    <u>The License and Application Provisions</u>

6

The Ordinance requires that prior to occupying any rental unit in Farmers Branch, each occupant[5] aged 18 or older must obtain a residential occupancy license.  (*Id.* at § 1(B)(1)).   Where multiple occupants seek to occupy a single rental unit, "each occupant must obtain his or her own residential occupancy license."  (*Id.* at § 1(B)(2)).  A residential occupancy license is specific both to the occupant and the location; "[a]ny relocation to a different leased or rented dwelling unit requires a new residential occupancy license."  (*Id.* at § 1(B)(4)).  The Ordinance applies only to tenancies commencing after the Ordinance goes into effect.  (*Id.* at § 7).

To obtain a residential occupancy license, an applicant must pay a $5 dollar fee to the City and submit an application that includes the information listed in Section 1(B)(5), including "(a) the full legal name of the applicant; (b) mailing address of the occupant; (c) address of the single family residence for which the occupant is applying, if different from the mailing address; (d) name and business address of the lessor; (e) date of the lease or rental commencement; (f) date of birth of the occupant; (g) the occupant's country of citizenship. . ."  Applicants who are United States citizens or nationals must submit a signed declaration to that effect under penalty of perjury.  (*Id.* at § 1(5)(h)).  Applicants who are not United States citizens or nationals must provide "an identification number assigned by the federal government that the occupant believes establishes his or her lawful presence in the United States"[6] or declare that he or she "does not know of any such number."  (*Id.*

---

[5]  Section 1(A)(3) of the Ordinance states: "'Occupant' means a person, age 18 or older, who resides at a single family residence.  A "temporary guest" of an occupant is not an occupant for the purposes of this section."

[6]  The provision provides a non-exclusive list of such numbers, stating "examples include, but are not limited to: resident alien card number, visa number, "A" number, I-94 registration number, employment authorization number, or any other number on a document issued by the U.S. Government."  (*Id.* at § 1(5)(i)).

at § 1(5)(i)).  The City building inspector is directed to issue a residential occupancy license to every prospective occupant who pays the five dollar fee and submits a completed application; "[t]he building inspector shall not deny a residential occupancy license to any occupant who submits a completed application and pays the application fee."  (*Id*. at § 1(B)(6)).  Though the Ordinance's application and fee requirements apply to all prospective rental occupants, For those applicants who declared themselves to be citizens or nationals of the United States, the City takes no further action. (*Id*. at  § 1(D)).

      iv.    <u>Enforcement and Penalties</u>

Under the enforcement provisions set forth in Section 1(D) of the Ordinance, scrutiny of an alien's entitlement to a residential occupancy license begins only after the license is issued. "Promptly after issuance of a residential occupancy license" to an alien, the building inspector is directed to "verify with the federal government whether the occupant is an alien lawfully present in the United States."  (*Id*. at § D(1)).  The Ordinance's enforcement provisions depend on a response from the federal government, to which the City contends it is entitled pursuant to 8 U.S.C. § 1373(c).  (*Id*.).  To aid the government in its verification of the applicant's lawful status, the City building inspector "shall submit to the federal government the identity and status information contained on the application. . . along with any other information requested by the federal government."  (*Id*.).

The Ordinance does not specify the method by which the City is to verify an applicant's status with the federal government[7] and instead conditions the City's enforcement upon receipt of

---

    [7]  Plaintiffs argue that neither of the mechanisms that the City described in the course of discovery – verification through the Systematic Alien Verification for Entitlements (SAVE) program and direct

a report from the federal government that the "occupant is an alien not lawfully present in the United States." (*Id.*).   An inconclusive response will not trigger revocation:   If the federal government is unable to "conclusively verify or ascertain the immigration status of the occupant," The City is to "take no further action until" it receives "final verification." (*Id.* at § 1(D)(3)). If the federal government reports that the occupant is not lawfully present, the building inspector is directed to send the occupant a "deficiency notice" informing the occupant of the government's report and stating that, on or before the 60th day after that notice, he or she may obtain a correction of the government's records by providing additional information to the City or to the federal government. (*Id.* at § 1(D)(2)).

After 60 days have passed, the building inspector is directed to "again make an inquiry to the federal government to "verify or ascertain the citizenship or immigration status of the occupant." (*Id.* at § 1(D)(4)). If after that inquiry, the "federal government reports that the occupant is an alien who is not lawfully present in the United States," the building inspector shall send a revocation notice to both the occupant and the lessor, which operates to revoke the occupancy license fifteen days later. (*Id.*).   Upon revocation of an occupant's residential occupancy license, the landlord is required to "diligently pursue such steps as may be required under the applicable law and lease provisions[8] to terminate the lease or tenancy." (*Id.* at § 1(C)(7)).   The building inspector is directed

inquiry to the Dallas Office of ICE – provide a definitive conclusion regarding an applicants lawful presence, as opposed to his or her immigration status or eligibility for certain categories of benefits. (*See, e.g.*, doc. 97, pp. 7-8; doc. 102, pp. 13-14). The City argues that both methods of inquiry can accurately verify an applicant's status, and that the Ordinance is structured to allow the federal government the flexibility to respond in any manner consistent with 8 U.S.C. 1373(c). (*See, e.g.*, doc. 114, pp. 16-20).

[8]   The Ordinance requires landlords to include a provision in each lease incorporates the Ordinance's requirement for a residential occupancy license.   "It shall be a lessor to lease a single family residence without including in the terms of the lease a provision stating that occupancy of the premises by

to suspend the rental license of any landlord who knowingly allows an occupant to occupy a rental unit without a valid residential occupancy license or otherwise violates Section 1(C)(7) of the Ordinance.. (*Id.* at § 1(D)(5-7)).  Suspension of a landlord's rental license, which may be appealed to the City Council, carries a an additional cost beyond any penalties imposed: "[d]uring the period of suspension, the landlord shall not collect any rent, payment, fee, or any other form of compensation from, or on behalf of, any occupant or tenant in the single family residence." (*Id.* at § 1(D)(6)).

Section (1)(E), entitled of the Ordinance, entitled "Judicial Review," outlines procedures by which a landlord or occupant may challenge a deficiency notice or a revocation notice.  (*Id.* at § 1(D)).  A landlord or tenant may seek review by "filing suit against the building inspector in a court of competent jurisdiction in Dallas County, Texas." (*Id.* at § 1(D)(1)).  The suit may challenge both the building inspector's compliance with the Ordinance and the federal government's determination of whether the occupant is lawfully present in the United States.[9]  (*Id.* at § 1(E)(3)).  A suit filed within the fifteen day period following the issuance of a revocation letter will operate to stay revocation or eviction until the resolution of the suit.  (*Id.* at § 1(D)(2)).

C.     *Procedural History*

---

a person, age 18 or older, who does not hold a valid residential occupancy license constitutes an event of default under the lease." (Ordinance, § 1(C)(6)).

[9]  The question of whether the alien is lawfully present in the United States is to "be determined under federal law."  The reviewing court, however, is required to "take judicial notice of any verification of the citizenship or immigration status of the occupant previously provided by the federal government," and would be "bound by any conclusive determination of immigration status by the federal government." (*Id.* at § 1(E)(4-5)).  Further, the Ordinance establishes a "rebuttable presumption" that the "most recent determination of the immigration status of an individual by the federal government" reflects the occupant's immigration status.  (*Id.* at § 1(E)(5)).

Two plaintiff groups,[10] comprised of lessors and lessees of rental property in Farmers Branch,

brought this pre-enforcement constitutional challenge to Ordinance 2952.  After hearing, this Court

granted Plaintiffs' application for Temporary Restraining Order on September 12, 2008 and issued

a preliminary injunction on September 22, 2008.  (doc. 21; doc. 33).  On June 4, 2009, the Court

held a hearing on the pending motions for summary judgment.

## II.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when the pleadings and record evidence show that there

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(c); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

Only disputes about material facts will preclude a grant of summary judgment, and "the substantive

law will identify which facts are material."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

The burden is on the summary judgment movant to prove that no genuine issue of material

fact exists.  *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990).  Where the non-

movant bears the burden of proof at trial, the movant need not support its motion with evidence

negating the non-movant's case.  Rather, the movant may satisfy its burden by pointing to the

absence of evidence to support an essential element of the non-movant's case.  *Id.*; *Little*, 37 F.3d at

1075.

---

[10] The plaintiff groups initially filed separate actions, *Valentin Reyes, et al. v. The City of Farmers Branch*, Civil Action No. 3:08-CV-1615-B (brought by the "Reyes Plaintiffs"), and *Villas at Parkside Partners, et al., v. The City of Farmers Branch*, Civil Action No 3:08-CV-1551-B (brought by the "Villas Plaintiffs").  The Court consolidated those actions on September 16, 2008.  (doc. 22).  The identities of the plaintiffs and the factual background related to their claims and injuries are contained in the Court's standing analysis, Part III(A) of this Memorandum Opinion.

Once the Movant has met its initial burden, the non-movant must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' or by only a 'scintilla of evidence.'" *Id.* (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, the non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 587 (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). The non-moving party must show that the evidence is sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). In determining whether a genuine issue exists for trial, the Court will view all of the evidence in the light most favorable to the non-movant. *Id.* at 301. The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

## III.

## ANALYSIS

Plaintiffs seek summary judgment and a permanent injunction on the enforcement of Ordinance 2952, arguing that the Ordinance is preempted by federal law and invalid under the Supremacy Clause and that it violates Plaintiffs' rights to due process and equal protection of the law. (doc. 102, pp. 1-2; doc. 97, pp. 1-2). Defendant moves for summary judgment on grounds that the Ordinance is a valid exercise of municipal authority and that Plaintiffs cannot establish standing to assert their constitutional challenges. (doc. 94, pp. 1-2). Because the Court's authority to adjudicate this matter depends on whether the Plaintiffs have established standing to assert each

12

claim, the Court turns first to Defendant's arguments challenging standing.

A.      *Plaintiffs' Standing to Challenge Ordinance 2952*

"Standing and ripeness are prerequisites to the exercise of federal jurisdiction." *Texas Midstream Gas Svcs., LLC v. City of Grand Prairie*, 2008 WL 5000038, at *1 (N.D. Tex Nov. 25, 2008) (citations omitted); *See also Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 ("Federal courts cannot consider the merits of a case unless it presents an 'actual controversy' as required by Art. III of the Constitution. . ."). "Standing involves constitutional limitations on federal court jurisdiction and prudential limits on its exercise." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). The doctrine of standing "requires federal courts to satisfy themselves that 'the plaintiff has alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction." *Summers v. Earth Island Institute*, 129 S.Ct. 1142, 1149 (2009) (quoting *Warth*, 422 U.S. at 498-99)) (emphasis in original). *See also Holy Spirit Ass'n for the Unification of World Christianity v. Hodge*, 582 F. Supp. 592, 595 (N.D. Tex. 1984) (requirement of a personal stake assures "that concrete adverseness which sharpens the presentation of issues upon which the Court so largely depends for illumination of difficult constitutional questions.").

The "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (U.S. 1992). "First, the plaintiff must have suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" *Id.* Second, plaintiffs must show "a causal connection between the injury and the conduct complained of – the injury has to be 'fairly traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court.'" *Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26,

13

41-42)).  Third, plaintiffs must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.*  "The injury required for standing need not be actualized.  A party facing prospective injury has standing to sue where the threatened injury is " real, immediate, and direct."  *Davis v. FEC*, 128 S.Ct. 2759, 2768 (2008).

"Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church and* State, 454 U.S. 464, 464 (1982).  A plaintiff must assert his own legal rights and "cannot rest his claim to relief on the legal rights or interests of third parties."  *Id.* (quoting *Warth* 422 U.S. at 499).  The Court may not adjudicate "'abstract questions of wide public significance' which amount to 'generalized grievances.'"  *Id.*  Finally, the plaintiffs' complaint must fall within "the zone of interest to be protected or regulated by the statute or constitutional guarantee in question."  *Id* (quoting *Ass'n of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153 (1970)).  "Where a party champions his own rights, and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met."  *Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 80-81 (1978).

Plaintiffs, who invoked this Court's jurisdiction, bear the burden of establishing these elements.  *Id.*  Plaintiffs must establish standing for "each type of relief sought."  *Summers*, 129 S.Ct. at 1149 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).  "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof."

14

*Lujan*, 504 U.S. at 561.  At the summary judgment stage, Plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true."  *Id.* (citing Fed. R. Civ. P. 56(e)).

The plaintiffs in this action include both tenants and landlords in Farmers Branch.  The Villas Plaintiffs are made up of three partnerships that own and operate apartment complexes in Farmers Branch[11] and Mary Miller Smith, a tenant in a rental apartment in Farmers Branch who is a U.S. citizen and a former member of the Farmers Branch City Council.  (doc. 97, p. 2).  The Reyes Plaintiffs are individuals who own or lease rental property in Farmers Branch.  Valentin Reyes owns a single family home in Farmers Branch and pays his mortgage in part with money he receives from renting his home to tenants.  (doc. 102, pp. 9-10).  Alicia Garcia, Aide Garza, and Ginger Edwards are Latinas and U.S. Citizens who are tenants in rental apartments in Farmers Branch.  (*Id.* at p. 10).  Ms. Garcia and Ms. Garza occupy their apartments on month-to-month leases.  (*Id.*).  Jose Arias, also a tenant in a residential rental apartment complex in Farmers Branch, is Latino and is not a U.S. Citizen, though he has an application for legal permanent resident status pending with the United States Citizenship and Immigration Services ("USCIS").  (*Id.*).

The City argues that neither the landlord plaintiffs nor the tenant plaintiffs have satisfied constitutional or prudential standing requirements.  (doc. 94, pp. 5-14).  The City's position focuses first on the "injury in fact" prong, arguing that Plaintiffs' asserted injuries are legally insufficient and

---

[11]  These partnerships are 1) Villas at Parkside Partners ("Villas"), which owns and operates a 207-unit apartment complex located at 4000 Park Side Center Blvd, 2) Lakeview at Parkside Parnters ("Lakeview"), which owns and operates a 573-unit apartment complex located at 3950 and 3990 Spring Valley Rd., and 3) Chateau Ritz Partners ("Chateau"), which owns and operates a 161-unit apartment complex located at 4040 Spring Valley Rd.  (doc. 1, pp. 3-4; doc. 97, pp. 2-3).

that they are hypothetical or conjectural rather than "actual and imminent."  (*Id.* at pp. 7-9).

> i.    Tenant Plaintiffs' Standing

The City contends that the tenant plaintiffs have not established a sufficient  injury-in-fact and that their claimed injuries depend on speculation.  First, the City argues that tenants who are U.S. citizens do not stand in jeopardy of being denied a residential occupancy license, because the Ordinance requires the building inspector to "immediately issue" a license without scrutinizing an applicant's assertion of citizenship. (*Id.* at p. 7).   The City dismisses Plaintiffs' concerns over uncertainty in the terms of the Ordinance, such as "temporary guest," on the grounds that the Ordinance does not penalize tenants who reside with unlicensed individuals, as opposed to landlords who rent to them.  (*Id.*).  The City argues that the only tenant plaintiff who is not a U.S. citizen, Jose Arias, cannot assert an "injury in fact" because it believes him to be "an alien lawfully present in the United States"[12] who would not be denied a residential occupancy license under scheme established by the Ordinance.  (*Id.* at p. 8).

The City further contends that the tenant plaintiffs' claimed injuries are not sufficiently imminent to confer standing because they will not be required to apply for residential occupancy licenses unless and until they move and establish a new lease that commences after the Ordinance becomes effective.  (*Id.* at p. 9; doc. 149, p. 1).  The City argues that the tenant plaintiffs' intentions to continue renting in Farmers Branch or to have visitors for extended periods are not the sort of

---

[12] The City bases its conclusion on evidence that Mr. Arias has a Social Security Number and has an I-495 Application to Register Permanent Residence or Adjust Status pending with the USCIS.  (*Id.* at p. 8).  Though the USCIS has not yet made a determination on Mr. Arias's application, the City contends that it has asserted "control" over the application such that he would be "considered to be lawfully in the United States during the pendency of that application."  (*Id.* at p. 9).

"firm intentions" that satisfy constitutional standing requirements. (doc. 94, p. 9; doc. 149, pp. 3-4). The City also challenges the causal connection between Mr. Arias's injury and enforcement of the Ordinance, arguing that any injury depends on the independent action of the federal government, which must make a determination regarding his status before the City could revoke his residential occupancy license. (*Id.*).

Plaintiffs respond that the Ordinance directly regulates their behavior, imposes concrete costs, and threatens repetitive penalties such that their injuries satisfy the requirements of standing. (doc. 111, pp. 22-26; doc. 117, pp. 5-7; doc. 163, pp. 1-5). The U.S. Citizen tenants contend that even if they would not be denied a residential occupancy license, they would nonetheless be required to apply, pay a fee, and "register" under the regime. (doc. 117, p. 7). Each tenant plaintiff has testified that he or she intends to continue to reside in rental property in Farmers Branch after the Ordinance would become effective and that they would be required to obtain a residential occupancy permit to renew their leases or move within the city. Plaintiffs Garcia and Garza also contend that they reside in rental units pursuant to month-to-month tenancies, making the application and payment provisions potentially frequently recurring injuries. (doc. 111, p. 22). The tenant plaintiffs further argue that the Ordinance, despite the City's claims to the contrary, will subject them to "criminal liability" and "fines of up to $500 per day" if they allow a visitor to stay with them beyond what the Ordinance permits, but does not define, in its "temporary guest" provision. (*Id.* at p. 23).[13] Even absent criminal sanctions, Plaintiffs argue that the Ordinance requires that their leases be

---

[13] The tenant plaintiffs each argue that they do not understand the term "temporary guest," and that they fear having guests stay with them as a result. They point to testimony that they routinely have guests stay with them for various lengths of time that may potentially violate the Ordinance. (doc. 163, p. 2).

modified to track the Ordinance's provisions, and that violation of those provisions would constitute default under the lease.  (*Id.*; doc. 117, p. 7).  Plaintiff Jose Arias additionally contends that enforcement of the Ordinance would create a risk that the City would conclude that he was not lawfully present[14] despite his adjustment application with the USCIS.  (*Id.*).

The Court finds that the tenant plaintiffs have satisfied their burden and established standing in this summary judgment context to assert their claims under the Supremacy Clause and those other claims rooted in their own – as opposed to third parties' – burdens and potential liability under the Ordinance.  "When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue." *Lujan*, 504 U.S. at 561.  It is undisputed that Ordinance 2952 is directed to tenants in rental property in Farmers Branch, requiring action on their part and conditioning lawful occupancy upon compliance with its terms.  The tenant plaintiffs are in a fundamentally different legal position than were the plaintiffs in *Lujan* or *Summers*, who challenged the application of regulations to other parties in far-flung locations that could only speculatively affect them.  *See Summers*, 129 S.Ct. at 1149 ("[t]he regulations under challenge here neither require nor forbid any action on the part of respondents.").  Because they are the objects of the Ordinance's requirements, Plaintiffs have provided evidence of sufficient harm to their own

---

[14] Mr. Arias argues that the City's witness testified variously that he was lawfully present and that he was not lawfully present, making the confusion more than a hypothetical fear.  (doc. 111, p. 23).  The City argues that it believes Mr. Arias to be lawfully present and that his claimed injury is dependent upon the speculation that the City would find otherwise when enforcing the Ordinance.  (doc. 94, p. 9; doc. 149, pp. 4-5).  The Court will need not resolve the ultimate question of Mr. Arias's status to determine the threshold question of standing.  *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006).

financial and property interests, as well as to those interests protected by the Supremacy Clause, to establish the required "injury in fact."

The injuries alleged by the tenant plaintiffs are sufficiently concrete, actual, and imminent to satisfy the injury-in-fact prong despite the pre-enforcement nature of this suit[15] and the intervening steps that must occur before a determination is made regarding an applicant's status under the Ordinance.  Where the "impact of the regulation is direct and immediate and [Plaintiffs] allege an actual, well-founded fear that the law will be enforced against them," the standing requirements are satisfied.  *Gray v. City of Valley Park*, 567 F.3d 976, 984 (8th Cir. 2009).  Plaintiffs' injuries are not rendered speculative or conjectural simply because a fine or license revocation can only occur following a series of intermediate steps; upon enforcement, a resident will be immediately obliged to comply with the Ordinance.  As a result, their injuries are "fairly traceable" to the planned enforcement.  *See Am. Forest & paper Ass'n v. EPA*, 137 F.3d 291, 296-97 (5th Cir. 1998) ("Permit holders' imminent need to comply, coupled with EPA's frank announcement of its intentions, belies the agency's claim that any injury is speculative."); *520 S. Michigan Ave. Assocs. v. Devine*. 433 F.3d 961, 962 (7th Cir. 2006) ("The Hotel's use of replacement workers that may have been referred by employment agencies is enough to show that a genuine controversy exists, because it is caught between the need to comply with the state law and the desire to reduce the cost of its operations.").

The tenant plaintiffs have also satisfied the prudential requirements of standing as a matter of law.  Each tenant's claim is grounded in the burdens and risks he or she faces as a residential

---

[15] "Ordinarily we wait until a rule has been applied before granting review; this prudential concern loses force, however, when the question presented is purely legal."  *Am. Forest & paper Ass'n v. EPA*, 137 F.3d 291, 296-97 (5th Cir. 1998) (citing *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987)).

tenant in Farmers Branch.  Because plaintiffs may not rest their claims "on the legal rights and interests of third parties," when considering the tenant plaintiffs' claims, the Court will not evaluate the potential application of the Ordinance to individuals whose immigration status presents different issues[16] than those presented by the parties before the Court.  *Valley Forge Christian Coll.*, 454 U.S at 464.  Finally, the plaintiffs complaint falls within the zone of interest to be protected by the constitutional guarantee of the Supremacy Clause and Plaintiffs need not assert a right protected by another statute. *Planned Parenthood of Houston & S.E. Texas v. Sanchez*, 403 F.3d 324, 332 (5th Cir. 2005) ("in this type of action, it is the interests protected by the Supremacy Clause, not by the preempting statute, that are at issue.").

The tenant plaintiffs have presented competent summary judgment evidence of concrete injury that is traceable to the Ordinance and that would be redressed through the relief sought.  Their injuries are neither generalized nor dependent upon the interests of third parties.  Though the City disputes the legal implications of the asserted injuries, the Court need not resolve disputed issues of fact or make credibility determinations to resolve the standing question as a matter of law.  Accordingly, The Court **DENIES** the City's motion for summary judgment on the grounds that the tenant plaintiffs lack standing.

ii.    Landlord Plaintiffs' Standing

The City also challenges the ability of the remaining plaintiffs, all landlords in Farmers Branch, to establish standing.  Characterizing the landlord plaintiffs' alleged injuries as "cost of

---

[16] For instance, the Court need not resolve how the Ordinance may treat an alien with Temporary Protected Status, as no plaintiff claims to be in that position.  Plaintiffs' claims can be fully evaluated without resort to hypothetical cases; Plaintiffs themselves have presented competent and undisputed summary judgment evidence of their own injury.

compliance" and "inconvenience," the City argues that the potential injury constitutes only *de minimus* injury insufficient to satisfy the constitutional requirement for actual injury. (doc. 94, p. 11). The City further argues that Plaintiff Reyes's asserted injury is conjectural because any concern that the Ordinance would jeopardize his ability to rent to potential tenants in the future could only be realized after his current tenants left. (*Id.* at p. 12). More broadly, the City argues that none of the landlord plaintiffs "alleges that he has ever leased to an alien who is not lawfully present in the United States, or that he is likely to do so in the future," such that the penalties set forth in the Ordinance would threaten their operation. (*Id.* at p. 13). Finally, the City contends that the landlord plaintiffs do not meet the prudential standing requirements because landlords are not "within the zone of interest protected by federal immigration law." (*Id.*).

The landlord plaintiffs argue that the enforcement of the Ordinance would directly lead to substantial "financial and legal burdens" that satisfy the standing requirements. (doc. 117, p. 5). They contend that the Ordinance would subject them and their tenants to repetitive fines and penalties and may lead to suspension of the their business license and ability to collect rent from any tenants. (*Id.*). Further, the landlord plaintiffs argue that, even absent enforcement, the Ordinance would cause competitive harm to their business on account of real or perceived delays and fees associated with the application process. (*Id.*).

The Court agrees that the landlord plaintiffs have provided evidence of harm sufficient to establish their standing to assert their claims grounded in the Supremacy Clause and the alleged vagueness of the Ordinance. There is no dispute that the penalties, including potential revocation of a landlord's business license, are directed to those in the landlord plaintiff's position. Plaintiffs have demonstrated, through competent summary judgment evidence, "a realistic danger of

21

sustaining a direct injury as a result of the [ordinance's] operation or enforcement." *Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988) (quoting *Babbit v. Farm Workers*, 442 U.S. 289, 298 (1979)). Plaintiffs presented evidence that enforcement of the Ordinance would add costs beyond the minor administrative burden of providing notice and receiving the required information, including evidence that the larger complexes would need to hire additional staff to manage the new requirements and one tenant's estimation of a 30% loss in business to other communities not affected by the Ordinance. (doc. 98, pp. 13-16). The Court need not resolve disputes over the precise measure of harm to find that the landlord tenants have satisfied their burden to show an injury-in-fact, as the "[r]egulation's validity could be assessed without knowing the precise means and expense of compliance." *Devine*, 533 F.3d at 963 (citing *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 538 U.S. 59 (1978)); *see also Chamber of Commerce v. Edmondson*, 2010 WL 354353 (10th Cir. Feb. 2, 2010) (finding standing of an organization whose members had adduced evidence of prospective "economic injuries in the form of implementation and training expenses" and the cost of non-compliance.).

The landlord plaintiffs' injuries are grounded in evidence that each plaintiff provides rental property to tenants whose immigration status they do not know and the projected impact that enforcement would have on their ability to do business in the future. That the plaintiffs have not yet been subject to those costs or penalties does not defeat their standing to assert a pre-enforcement challenge. *Id.* ("Courts frequently engage in pre-enforcement review based on the potential costs that compliance (or bearing a penalty) causes.").

Like the tenant plaintiffs, the landlord plaintiffs have satisfied the prudential requirements of standing to assert their preemption and vagueness claims, because those claims are grounded in

22

Plaintiffs' challenge to the application of the Ordinance to them and are based upon evidence of their own injuries. *Sanchez*, 403 F.3d at 432. The plaintiffs in this action do not assert claims based on generalized or ideological grievances of others; rather they point to concrete injuries to their own interests. Based on undisputed and admissible evidence, the Court may conclude as a matter of law that landlord plaintiffs have established standing to assert those claims. As a result, the landlord plaintiffs have met their burden of showing that summary judgment for the City is inappropriate. *Little*, 37 F.3d at 1075. The landlord plaintiffs have not, however, established eligibility to assert the equal protection or other challenges that depend on injury to third parties. To assert a claim on behalf of third parties, a plaintiff must show "(1) the litigant suffered an injury in fact that gave him a sufficiently concrete interest in the outcome of the issue in dispute; (2) the litigant has a close relation to the third party; and (3) there 'must exist some hindrance to the third party's ability to protect his or her own interests.'" *Bonds v. Tandy*, 457 F.3d 409, 416 n. 11 (5th Cir. 2006) (quoting *Powers v. Ohio*, 499 U.S. 400 (1991)). Plaintiffs have not provided evidence of a "genuine obstacle" to such parties asserting their own rights. *Id.* The Court finds that the injuries resulting directly from the planned enforcement of the Ordinance is sufficient to confer standing. *See Gray v. City of Valley Park*, 567 F.3d 976, 984-85 (8th Cir. 2009) ("assuming for the purposes standing that the City would enforce violations of the law in question because the City vigorously defended the ordinance and never suggested that it would refrain from enforcement."). As a result, The Court **GRANTS** in part and **DENIES** in part the City's motion for summary judgment on the grounds that the landlord plaintiffs lack standing.

      B.    *Preemption of Ordinance 2952*

      Plaintiffs' first substantive challenge to Ordinance 2592 is rooted in the Supremacy Clause

and federal preemption. (doc. 102, p. 14; doc. 97, p. 12). The Supremacy Clause of the Constitution states that "This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby . . ." U.S Const., Art VI, cl. 2. "A fundamental principle of the Constitution is that Congress has the power to preempt state law," and federal preemption may be express or implied. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citations omitted). Preemption is "compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982). Where express or implied federal preemption occurs, the Supremacy Clause invalidates local regulations that "interfere with or are contrary to" federal law. *Gibbons v. Ogden*, 22 U.S. 1, 82 (1824); *see also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 ("any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to a federal law, must yield.").

Arguing that the Ordinance creates classifications and procedures that are inconsistent with federal law, Plaintiffs contend that it is an impermissible "regulation of immigration," and that it is preempted under the doctrines of field and conflict preemption, as more fully discussed below. (doc. 102, p. 14; doc. 97, p. 15). In contrast, the City argues that the Ordinance is not preempted because it merely adopts federal standards, and contends that a presumption against preemption should protect the Ordinance from pre-enforcement invalidation. (doc. 114, pp. 2-3).

The parties present starkly differing characterizations of the Ordinance: Plaintiffs argue that the Ordinance is the latest in a series of attempts by the City to regulate the presence of illegal aliens; the City counters that the Ordinance, though touching on immigration, is instead a regulation of rental housing. The Court's analysis turns not on the characterizations by the parties,

24

rather on analysis of the language of the Ordinance in light of the governing legal standards.  The Court finds that the Ordinance is sufficiently dependent upon federal immigration law[17] that a presumption against preemption does not apply.  A presumption against preemption applies where Congress attempts to regulate "in a field which the States have traditionally occupied."  *U.S. v. Locke,* 529 U.S. 89, 108 (2000).   On the contrary, where a local measure regulates in an "area where there has been a history of significant federal power . . . [n]o artificial presumption aids" the Court in determining the appropriate scope of a local regulation.  *Id.*  Nevertheless, the Supreme Court has never held that any local enactment "which in any way deals with aliens" must be *per se* preempted.  *De Canas v. Bica*, 424 U.S. 351, 355 (1976).   The Court must therefore, unaided by any presumption,[18] evaluate whether Ordinance 2952 may be enforced consistent with the existing federal statutory and regulatory framework.   Plaintiffs may bring a facial[19] preemption challenge where, as here, the Court can resolve the issue by evaluating federal law and the challenged local

---

[17]  *See supra* Section I(B)(i) and Ord. at seventh "whereas" clause ("it is the intent of the City of Farmers Branch to enact regulations that are harmonious with federal immigration law and which aid in its enforcement.").  The Preamble to the Ordinance unambiguously references federal immigration law and an intent to operate within the federal immigration framework.  The Ordinance arose, in part, from frustration over federal handling of immigration.  *See* Res. 2006-099, *supra*.

[18]  The court in *Lozano v. City of Hazleton* reached the same conclusion.  496 F.Supp. 2d 477, 581 n. 41 (M.D. Pa. 2007) ("Immigration is an area of law where there is a history of significant federal presence and where the States have not traditionally occupied the field. . . Therefore, we do not apply the presumption against preemption.") *See also Chicanos por la Causa, Inc. v. Napolitano*, 558 F.3d 856, 864 (9th Cir. 2009) (noting "conversely, we do not assume non-preemption 'when the State regulates an area where there has been a history of significant federal presence.").

[19]  The City argues that the standard set forth in *United States v. Salerno*, 481 U.S. 739, 745 (1987) governs all facial challenges.  (doc. 114, p. 1-3).  That case noted that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  481 U.S. at 745.  While Plaintiffs dispute the applicability of *Salerno*, the Court finds that for purposes of the preemption challenge, that standard is met because Plaintiffs challenges the City's very authority to enact the Ordinance and contend the Ordinance is preempted all its applications.

regulation, together with the relevant legal authority. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 911 F.2d 993, 998 (5th Cir. 1990).

The governing standard for application of the federal preemption doctrine in cases implicating immigration is set forth in *De Canas v. Bica*, 424 U.S. 351 (1976). In its decision evaluating the City's prior enactment, this Court concluded that *De Canas* created "three tests for determining whether a state immigration law or regulation is preempted by federal law:

> Under the first test, the Court must determine whether a state statute is a regulation of immigration. Since the power to regulate immigration is unquestionably exclusively a federal power, any state statue which regulates immigration is constitutionally prescribed.

> Under the second test, even if the state law is not an impermissible regulation of immigration, it may still be preempted if there is a showing that it was the clear and manifest purpose of Congress to effect a complete ouster of state power – including state power to promulgate laws not in conflict with the federal laws with respect to the subject matter which the statute attempts to regulate. In other words, a statute is preempted where Congress intended to occupy the field which the statute attempts to regulate.

> Under the third test, a state law is preempted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Stated differently, a statute is preempted under the third test if it conflicts with federal law making compliance with both state and federal law impossible.

*Villas at Parkside Partners v. City of Farmers Branch*, 577 F.Supp.2d 858, 866-867 (N.D. Tex. 2008) (citations omitted). The latter two tests are forms of implied preemption. If any of the three tests are satisfied, the local regulation must yield to federal law. *Id.*

i.      Preemption as "Regulation of Immigration"

"Power to regulate immigration is unquestionably exclusively a federal power." *De Canas*, 424 U.S. at 354. Federal supremacy is rooted in the Constitution, which grants Congress authority to "establish an uniform Rule of Naturalization." U.S. Const. art. 1 § 8, cl 4. By longstanding rule, because the regulation of immigration is "a power affecting international relations," it "is to be

regulated by treaty or by act of Congress." *Fong Yue Ting v. United States*, 149 U.S. 698, 713 (1893). The Supreme Court has "long recognized the preeminent role of the Federal Government with respect to the regulation of aliens within our borders," *Toll v. Moreno*, 458 U.S. 1, 10 (1982), and it is well settled that "the authority to control immigration is vested solely in the Federal government." *Traux v. Raich*, 239 U.S. 33, 421 (1915). Moreover, "the States enjoy no power with respect to the classification of aliens," a power that is "committed to the political branches of the Federal Government." *Plyler v. Doe*, 457 U.S. 202, 225 (1982) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 61 (1941); *Matthews v. Diaz*, 426 U.S. 67, 81 (1976)). Though the federal government's exclusive authority undoubtedly encompasses the "power to exclude or expel aliens," the parties dispute the extent of preemptive force of federal law beyond that power, and offer differing views regarding whether the Ordinance creates classifications of aliens or otherwise constitutes a regulation of immigration.

The Supreme Court set forth the bounds of the term "regulation of immigration" in *De Canas*, noting that "standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." 424 U.S. at 355. *De Canas* does not require invalidation of all enactments "which in any way deal[] with aliens" and a local regulation is not a preempted regulation of immigration simply because "it has some purely speculative and indirect impact on immigration." *Id.* In *De Canas*, the Supreme Court upheld a California statute that "adopt[ed] federal standards in imposing criminal sanctions against state employers who knowingly employ aliens who have no federal right to employment within the country." *Id.* Federal preemption is instead is reserved for local enactments that directly impact

27

immigration or impermissibly classify aliens.

The City argues that the Ordinance is not a regulation of immigration because it adopted federal standards that it contends resolve whether an individual is "lawfully present" or "not lawfully present." The City further contends that its decisions to issue deficiency notices or penalties under the Ordinance are wholly dependent upon immigration information received from the federal government.[20] (doc. 114, pp. 4-5). The City argues that the Ordinance does not create or modify any classifications for aliens, but rather relies on existing categories created by federal law. (*Id.* at 11-15). Specifically, the City argues that the term "lawfully present" includes a variety of immigration statuses that can be ascertained through the SAVE database or inquiry with the ICE District Office. (*Id.*, p. 14). Plaintiffs argue to the contrary that the Ordinance does not rely on "appropriate standards for the treatment of an alien subclass," and instead creates its own classification of aliens not eligible for rental housing. (doc. 137, p. 7; doc. 102, p. 14). Plaintiffs further contend that the Ordinance's standards do not correspond to an established federal immigration status, and instead bypasses the "complex system of federal classification and discretion" governing removal. (doc. 102, pp. 17-20).

Arguing that *De Canas* narrowly defined what constitutes a "regulation of immigration," the City contends that the Ordinance does not attempt to determine who should or should not be admitted into the country or impose any "condition under which aliens may remain in the United States." (*Id.*). Instead, the City argues that the Ordinance merely denies rental housing in Farmers

---

[20] The City contends that the Ordinance prohibits local, as opposed to federal determination of an alien's status: "The building inspector shall not attempt to make an independent determination of any occupant's lawful or unlawful presence in the United States." (*Id.* at p. 10; Ord. §§ 26-79(D)(3), 26-119 (D)(3)).

Branch to those unlawfully present in the United States, which the City argues only has an indirect impact on immigration and which imposes only a minor inconvenience. (*Id*.). Plaintiffs contend that the Ordinance imposes an additional condition not found in federal law upon those who wish to remain in Farmers Branch. (doc. 136, p. 3).

Pointing to authority under 8 U.S.C. § 1621, the City contends its licensing scheme is more appropriately characterized as a provision of a local benefit. (*Id*. at p. 6). The City asserts that the Ordinance imposes conditions not on immigration or remaining in the country, but instead only on residence in rental housing in Farmers Branch, which it contends may be appropriately considered a public benefit. (*Id*.). Arguing that the residential occupancy licenses are analogous to driver's licenses, the City insists that its inquiries to the federal government, pursuant to 8 U.S.C. § 1373(c) are intended to "provide proof of eligibility" for "state and local public benefits." (*Id*.; *see, also id*. at pp. 8, 18 (discussing use of SAVE database to verify eligibility for driver's licenses). While admitting that the Ordinance "might have direct effect of encouraging the illegal alien to reside outside of Farmers Branch," the City argues that any impact on the alien's decision to remain in the United States would be speculative. (*Id*. at 11). Plaintiffs argue that the Ordinance does not regulate any recognized "public benefit," and instead would locally deny "entrance and abode" to those whose lawful presence cannot be confirmed. (doc. 102, pp. 19, 29). Plaintiffs further argue that the Ordinance allows the City to use a query response[21] from the federal government as a substitute for

---

[21] Plaintiffs also contend that the federal government's responses, whether communicated through SAVE or the ICE District Office would not conclusively determine whether an individual was "lawfully present in the United States," as required by the Ordinance. (doc. 102, pp. 23-25). *See also* 65 Fed. Reg. 58,301 ("A Systematic Alien Verification for Entitlements (SAVE) response showing no Service record on an individual or an immigration status making the individual ineligible for a benefit is not a finding of fact or conclusion of law that the individual is not lawfully present."). The City argues to the contrary that the federal government's response would enable the building inspector, without making any

formal removal proceedings to remove certain aliens from Farmers Branch (doc. 102, p. 23; doc. 97, p. 13).

The Court concludes that the Ordinance, though grounded in federal immigration classifications, is an invalid regulation of immigration because it uses those classifications for purposes not authorized or contemplated by federal law. Though the Ordinance's requirements do not solely apply to aliens or certain classes of aliens, they impose additional local restrictions based on federal immigration classifications on those who wish to remain in Farmers Branch. Local regulation that conditions the ability to enter private contract for shelter on federal immigration status is of a fundamentally different nature than the sorts of restrictions on employment or public benefits that have been found not to be preempted regulations of immigration.[22] Restrictions on residence directly impact immigration in a way that restrictions on employment or public benefits do not. The City may "neither add to nor take from the conditions imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states." *De Canas*, 424 U.S. at 358 (quoting *Takahashi v. Fish & Game Comm'n*, 334 U.S. 10, 419 (1948)). The City may not impose "an 'auxiliary burden upon the entrance or residence of aliens' that was never contemplated by Congress." *Toll*, 458 U.,S. at 12 (quoting *Graham v. Richardson*, 403 U.S. 365, 379 (1971)).

In light of the broad federal "authority to control immigration – to admit or exclude aliens,"

---

discretionary decisions, to reach the required conclusion. (doc. 114, pp. 16-18).

[22] *See Chicanos por la Causa*, 558 F.3d at 866 (ordinance that conditions business licenses on compliance with federal employment regulations not preempted); *Equal Access Educ. v. Merten*, 305 F.Supp.2d 585, 602-03 (E.D. Va. 2004) (ordinance denying admission to state universities was not preempted). In contrast, no federal court has approved a local measure conditioning residence on federal immigration status.

a local regulation is not saved simply because it adopt some federal standard, whether or not that federal standard was designed to classify aliens for the purpose advanced by the local ordinance. *Traux v. Raich*, 239 U.S. 33, 42 (1915).   The federal government, which has broad authority regarding the classification of aliens, has created a variety of classifications for different purposes, including, for example, admission and removal, provision of public benefits, and eligibility for employment.[23]  The City, in contrast, has no such authority.  *Hines*, 312 U.S. at 65; *Matthews*,   The context and limits of the federal scheme provides the limit to local action based on that federal classification.  "But if the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction."  *Plyler v. Doe*, 457 U.S. 202, 219 (1981) (citing *De Canas*, 424 U.S. 351)[24].  The City has provided no federal direction or source of authority for application of an immigration status report provided pursuant to 8 U.S.C. § 1373(c) may be applied in the context of licensing access to all rental housing in a municipality.  Instead, the City building inspector would deduce from the federal government's report which alien, classified for a different purpose, may be denied housing in Farmers Branch.  It is undisputed that the City's actions related to residential occupancy licenses depend directly on responses given, in some form or another, by the federal government based on

---

[23] *See,* e.g., 8 U.S.C. § 1229a (admission and removal);  8 U.S.C. § 1641 (qualified alien for purposes of public benefit);  8 U.S.C. § 1324a (qualified alien for purposes of employment).

[24] Though *Traux*, 239 U.S. at 42 and *Takahashi*, 334 U.S. at 420 both involved local restrictions on aliens who were legally in the United States, nothing in those opinions limits federal supremacy regarding classification of aliens for particular purposes, or otherwise provides authority for local classification of aliens.  Further, cases involving classifications of aliens for employment purposes, based on federal classifications and verification schemes for that purpose are not analogous to the case before the Court.  *See Villas*, 577 F.Supp.2d at 865 (discussing *Gray v. Valley Park,* 2008 WL 294294 (E.D. Mo. Jan. 31, 2008) and *Arizona Contractors Ass'n, Inc. v. Candelaria*, 534 F.Supp.2d 1036 (D. Ariz. 2008)).

immigration classifications adopted for other purposes.[25]  By depending on determinations made under an inapplicable federal standard, the Ordinance, as this Court has previously concluded, constitutes an improper regulation of immigration.  *Villas*, 577 F.Supp.2d at 869.  Absent authority, the City may not extend the reach of federal immigration classifications without creating an impermissible regulation of immigration.

The City's attempt to characterize a residential occupancy license as a "public benefit" for which it may require proof of eligibility pursuant to 8 U.S.C. § 1625 does not validate its classification or avoid the conclusion that the Ordinance is a regulation of immigration.  (doc. 114, p. 6).  Federal law authorizes the City to limit provision of certain State and local "public benefits" defined in 8 U.S.C. § 1621 to enumerated categories of aliens described in that section.  That section defines public benefits to include professional licenses, commercial licenses and a host of other forms of assistance (such as food assistance or unemployment benefits) authorized by or appropriated from funds of a State or local government.  8 U.S.C. § 1621(c)[26].  The statutory definition cannot, simply by virtue of the inclusion of the term "license," be interpreted to include purely private contracts for shelter or other necessities.  The federal government has not authorized or contemplated classification of aliens for that purpose, and instead allowed local discretion to limit eligibility for particular types of benefits.  For similar reasons, the City's analogy to drivers licenses is inapposite.

---

[25]  The evidentiary disputes related to the method by which the federal government would respond to the City's inquiries are immaterial to the Court's determination.  Regardless of the form of the government's response, the propriety of the use of federal standards to deny residential occupancy licenses may be determined as a matter of law under the governing authority interpreting *De Canas*.  *See supra*, not3 21 (discussing the parties' positions on the response by the federal government).

[26]  Other statutes establishing housing related benefits include 42 U.S.C. §§ 1436a(a)(3), (6) (federal housing assistance) and § 4605 (federal relocation assistance).

(doc. 114, pp. 8-9).  While a number of states condition the issuance of certain drivers licenses upon receiving verification through SAVE, this practice is expressly authorized by the REAL ID Act and federal regulations, which lists eligible statuses.  6 C.F.R. § 37.13.  Neither those provisions nor 8 U.S.C. § 1621(c) support the proposition that the City may condition residence in rental housing upon a report from the federal government, and the City can point to no enabling legislation that establishes an analogous cooperative program (such as exists in the context of employment, benefits, or identification) that arguably relates to the private market for rental housing.

      ii.    <u>Implied Preemption</u>

      The latter two tests set forth in *De Canas* incorporate the principles of implied preemption, which require the displacement of local law though not expressly prohibited by federal statute. *Villas*, 577 F.Supp.2d at 866-67.  "Even without an express provision for preemption, we have found that state law must yield to a congressional Act in at least two circumstances.  When Congress intends to "occupy the field," state law in that area is preempted.  And even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute."  *Crosby*, 530 U.S. at 372 (citations omitted).  Conflict preemption occurs where the local law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" or it is "impossible for a . . . party to comply with both state and federal law."  *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 899 (2000).[27]  Though, as a matter of law, the Ordinance is preempted as a regulation of immigration, for purposes of completeness the Court will consider the

---

    [27] The Court will consider field and conflict preemption together.  *See English v. Gen'l Elec. Co.*, 496 U.S. 72, 79 n.5. (1990) (The concepts are not "rigidly distinct."  "Indeed, field pre-emption may be understood as a species of conflict pre-emption: a state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation.").

parties' remaining preemption arguments.

Plaintiffs argue that the Ordinance both conflicts with and intrudes on fields fully occupied by federal law, including removal of aliens, provision of benefits[28], and establishment of penalties for harboring.  (doc. 117, pp. 20-22; doc. 125, pp. 2-8; doc. 136, pp. 11-13).  The City argues that federal law in each of these categories allows for local regulation or concurrent enforcement in accordance with federal standards.  (doc. 114, pp. 27-39).

The Court concludes that the Ordinance, in addition to constituting a prohibited regulation of immigration, is preempted by the INA, which provides the exclusive means for removing aliens or adjudicating their status for that purpose.  8 U.S.C. § 1229a(a)(3).  A local regulation may not – though it may share a common goal with federal law – interfere with Congress's chosen methods. *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 766-67 (10th Cir. 2010) (citing *Crosby*, 530 U.S. at 379).  While the Ordinance does not purport to remove[29] aliens from the United States, it regulates local residence based on federal classifications in a manner that directly affects the uniform enforcement of immigration laws.  As discussed above, immigration, including "regulation of aliens

---

[28] In light of the Court's conclusion that the residential occupancy licenses do not satisfy the requirements of 8 U.S.C. § 1621(c), the City's claimed source of authority, further discussion of whether other local regulation in the field of public benefits would be preempted is not necessary. *See, supra,* Part III(B)(i),

[29] Though the Ordinance does not order people to leave the City or render their presence illegal, it does effectively deny residence by prohibiting rental or remaining in the City as a long-term guest.  As described above, this regulation has more than a "speculative and indirect impact on immigration." *De Canas*, 424 U.S. at 355.  On the contrary, the Ordinance has a direct, though imperfect, effect on alien residence within the City. *See* 8 U.S.C. § 1229a(a)(1) ("An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien.") and 8 U.S.C. § 1229a(a)(3) (such proceeding before the immigration judge shall be the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States.").

within our borders," is a field in which the federal interest is dominant.  *See, supra* Part III(B)(i); *Hines*, 312 U.S at 62; *Toll*, 458 U.S. at 9.

The federal government has enacted a comprehensive regime for adjudicating an individual's right to remain in the country.  8 U.S.C. 8 U.S.C. § 1101 *et seq*.; *Plyler*, 457 U.S. at 225 ("Congress has developed a complex scheme governing admission to our Nation and status within our borders.").  This complex scheme is structured, in part, to allow federal discretion and to permit in appropriate circumstances a legal adjustment in an alien's status.  Through this process, "an illegal entrant might be granted federal permission to continue to reside in this country, or even to become a citizen" though he or she was initially subject to deportation.  *Plyler*, 457 U.S. at 226.  In evaluating implied preemption, "the entire scheme of the statute must of course be considered," and a local law must yield where it "stands as an obstacle to the accomplishment and execution of the full purposes of Congress."  *Crosby*, 530 U.S. at 373 (quoting *Hines*, 312 U.S. at 67).   "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Id*.  The Court need not resolve disputed facts or evaluate the status of any particular individual to determine that Ordinance stands as an obstacle to the uniform application of federal immigration law advanced through the procedures set forth in the INA.[30]  This is not to say that an alien's status is indeterminable absent a determination from an

---

[30]  The City has no authority to design an alternative path for determining an alien's eligibility for residence.  Because Congress has prescribed the appropriate process for evaluating an alien's residency rights, the City's attempt is preempted.  Accordingly, it also improper for the City to attempt to vest judicial review of those decisions on state courts.  *See* Ordinance at §§ 1(D); (E).  *See Hazleton*, 496 F.Supp.2d at 538 ("[T]he Pennsylvania courts do not have the authority to determine an alien's immigration status.  Such status can only be determined by an immigration judge.  Once again the IIRA seeks to provide a remedy in a court that lacks jurisdiction.  This procedure does not comport with the requirements of due process.").

immigration judge;[31] only that the decision to deny an alien residence on the basis of that classification rests exclusively with the federal government. *See Plyler*, 457 U.S. at 236 ("[T]he structure of the immigration statuses makes it impossible for the State to determine which aliens are entitled to residence, and which eventually will be deported." (Blackmun, J., concurring)).

The Ordinance is not saved because it is intended to and may have the effect of discouraging activity prohibited by the INA's anti-harboring provisions, 8 U.S.C. § 1324(a)(1)(A). Local enforcement based on federal classifications, preempted as described above, remains at foundation of the Ordinance. This is not a situation where the City is aiding in the enforcement of federal immigration law based on federal standards through the means set forth by federal law; rather, the City is attempting to enforce its own scheme that incorporates federal standards for purposes not contemplated by Congress. The City may take appropriate action to enforce the nation's immigration laws, but it may not, even if it were to incorporate the proper standard, independently enforce its own immigration rules. *See Lynch v. Cannatella,* 810 F.2d 1363, 1371 (allowing local detention of aliens pending federal removal).

Plaintiffs have met their burden of establishing that there are no genuine issues as to any material fact and that they are entitled to summary judgment on the issue of preemption. The material facts are uncontested and the Court may conclude as a matter of law, without resolving disputed facts, that the Ordinance is preempted both as a "regulation of immigration" and under the doctrine of implied preemption. As a result, The Court **GRANTS** the Plaintiffs' motions for summary judgment on the grounds that the Ordinance is invalid pursuant to the Supremacy Clause.

---

[31] *See Plyler*, 457 U.S. at 226 (noting that all who enter the United States unlawfully are subject to deportation).

C.      *Remaining Claims and Injunctive Relief*

Plaintiffs ask the Court to permanently enjoin the City from enforcing the Ordinance. (doc. 97, pp. 45-48).   Injunctive relief is available where plaintiffs can show "(1) actual success on the merits; (2) an irreparable injury if the injunction is not granted; (3) injury to the plaintiff[s] if the injunction is not granted outweighs the injury to the defendant if it is granted; and (4) the granting of the permanent injunction will not disserve the public interest." *H & A Land Corp. v. City of Kennedale*, 2005 WL 723690 at * 10 (N.D. Tex. March 29, 2005) (quoting *Harris County v. Carmax Auto Superstores, Inc.*, 177 F.3d 306, 312 (5th Cir. 1999)).

Plaintiffs have succeeded on the merits of their claims that the Ordinance is preempted, having established entitlement to summary judgment on those claims.   The Court finds that Plaintiffs have also established the remaining elements required for a permanent injunction.   "A party may be irreparably injured in the face of the threatened enforcement of a preempted law." *Villas*, 577 F.Supp.2d at 877 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)). The Court may enjoin state officers "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution." *Id.*   The injuries described in Part III(A) of this memorandum opinion, including loss of business for the landlord plaintiffs and uncertainty regarding the legal status of the tenant plaintiffs and their guests, are of the sort this Court previously recognized as harms that may not be remedied by monetary damages. *Id.* (citing *Enterprise Int'l. Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 472073 (5th Cir. 1985)).   Further, the balance of hardships and the public interest favor  preserving the uniform application of federal immigration standards.   As a

37

result, the Court **GRANTS** Plaintiffs' request for permanent injunction of Ordinance 2952.

The Ordinance fundamentally depends on classification and evaluation of federal immigration standards adopted for different purposes.  Because the Court finds that the Ordinance is preempted in its entirety and that preemption provides sufficient basis to grant the requested injunctive relief, the Court will not evaluate the remaining due process, equal protection, or statutory claims.  *See United Trasnp. Union v. Foster*, 205 F.3d 851, 862-63 (Considering remaining arguments applicable to portion of statute that was not preempted); *Rollins Envtl. Servs. v. St. James Parish*, 775 F.2d 627, 637 (5th Cir. 1985) (enjoining preempted ordinance without resolving remaining claims).

## IV.

## CONCLUSION AND PERMANENT INJUNCTION

For the reasons stated above, the Court **GRANTS** in part and **DENIES** in part the motions for summary judgment before the Court (docs. 92, 93, and 96) and permanently enjoins enforcement of Ordinance 2952.  The Court concludes as follows:

(1) The tenant plaintiffs have established standing to assert claims based on their burdens and potential liability under the Ordinance.  The Ordinance directs the tenant plaintiffs to take specific action, imposes concrete cost, and threatens penalty, including the potential loss of their residences.  Because the tenant plaintiffs have established standing to assert the claims resolved by this Memorandum Opinion and Order, including the claims brought pursuant to the Supremacy Clause of the United States Constitution, the Court **DENIES** in part the City's motion for summary judgment. (doc. 93).

(2) The landlord plaintiffs have also established standing to assert claims based on their

38

burdens and potential liability under the Ordinance.   Like the tenant plaintiffs, the landlord plaintiffs' conduct is directly regulated by the Ordinance.   Their standing is grounded in the costs and obligations of compliance, the competitive harm to their businesses, and the threatened repetitive penalties established by the Ordinance.   As a result, the landlord plaintiffs have established standing to assert their claims grounded in their own interests, including those protected by the Supremacy Clause of the United States Constitution.   The Court therefore **DENIES** in part the City's motion for summary judgment (doc. 93) to the extent it is grounded in challenge to the landlord plaintiffs' standing to raise those claims.

(3) The landlord plaintiffs have not established standing to assert claims on behalf of third parties, including those due process and equal protection claims grounded in injuries to tenants not before the Court.   The Court **GRANTS**, in this part only, the City's motion for summary judgment. (doc. 93).

(4) Ordinance 2952 is a regulation of immigration and is preempted by the Supremacy Clause of the United States Constitution because the authority to regulate immigration is exclusively a federal power.   The Ordinance applies federal immigration classifications for purposes not authorized or contemplated by federal law.   As a result, the Ordinance creates an additional restriction on alien residence in the City.   The direct regulation of private contract for shelter based on inapplicable federal classifications constitutes an impermissible regulation of immigration.   Accordingly, the Court **GRANTS** Plaintiffs' motions for partial summary judgment (docs. 92, 96) on the grounds that the Ordinance is preempted as a regulation of immigration.

(5) Ordinance 2952 is impliedly preempted by the INA because it interferes with Congress's chosen method for removal of illegal aliens and interferes with the uniform application of the

nation's immigration laws.  The INA provides the exclusive procedures for removing aliens or adjudicating their status for that purpose.  The comprehensive federal scheme reflects Congress's balancing of competing concerns and is structured, in part, to allow federal discretion and to permit in appropriate circumstances a legal adjustment in an alien's status.  Ordinance 2952 directly and substantially regulates alien residence in the City and stands as an obstacle to the uniform federal enforcement.  Accordingly, the Court **GRANTS** Plaintiffs' motions for partial summary judgment (docs. 92, 96) on the grounds that the Ordinance is impliedly preempted by the INA.

(6) Because preemption pursuant to the Supremacy Clause of the United States Constitution provides sufficient grounds to enjoin the enforcement of Ordinance 2942 in all applications, the Court declines to consider the remaining claims asserted in the motions for summary judgment or partial summary judgment (docs. 92, 93, and 96).

As a result, the Court **ORDERS** that the City of Farmers Branch, Texas, and its officers, agents, servants, employees, representatives, and attorneys are hereby permanently enjoined and prohibited from effectuating or enforcing Ordinance 2952.

**SO ORDERED**

Signed: March 24, 2010

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

40