## Costs Listing

Costs dated from Jan 1 1900 thru Feb 28 2010

8001 / 152 STOREFRONT (MLK) / Villas

| Auth. By | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | Balance | Tran. # |
|----------|-----------|------------|------------|-----------|----------|------|--------|--------|---------|---------|

**Cost Type**

**Scanning (1) (Cont.)**

| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978511 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978512 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 2978513 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978514 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 277.00 | 0.10 | 27.70 | Draft Bill | | 2978515 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978519 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 11.00 | 0.10 | 1.10 | Draft Bill | | 2978520 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978521 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 2978522 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978523 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 2978524 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978527 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 2978528 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978529 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 329.00 | 0.10 | 32.90 | Draft Bill | | 2978530 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978531 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 281.00 | 0.10 | 28.10 | Draft Bill | | 2978532 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978533 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 215.00 | 0.10 | 21.50 | Draft Bill | | 2978534 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978535 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 301.00 | 0.10 | 30.10 | Draft Bill | | 2978536 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978537 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 286.00 | 0.10 | 28.60 | Draft Bill | | 2978538 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978539 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 178.00 | 0.10 | 17.80 | Draft Bill | | 2978540 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 2978541 |
| | SCANING | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978542 |

**Costs Listing**

8001 / 152 STOREFRONT (MLK) / Villas

**Costs dated from Jan 1 1900 thru Feb 28 2010**

| Cost Type | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Auth. By | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | Balance | Tran. # |

**Scanning (1)  (Cont.)**

| | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | | Tran. # |
|---|---|---|---|---|---|---|---|---|---|---|
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978543 |
| SCANNING | | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978612 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 6.00 | 0.10 | 0.60 | Draft Bill | | 2978613 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978614 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 4.00 | 0.10 | 0.40 | Draft Bill | | 2978615 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978616 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 5.00 | 0.10 | 0.50 | Draft Bill | | 2978617 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978618 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 2/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2978619 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/4/2009 | Scanning (1) | 29.00 | 0.10 | 2.90 | Draft Bill | | 2980400 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/4/2009 | Scanning (1) | 10.00 | 0.10 | 1.00 | Draft Bill | | 2980408 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/4/2009 | Scanning (1) | 186.00 | 0.10 | 18.60 | Draft Bill | | 2980413 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/4/2009 | Scanning (1) | 4.00 | 0.10 | 0.40 | Draft Bill | | 2980415 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/5/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2980537 |
| IMAGING | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/5/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 2980538 |
| IMAGING | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/5/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2980539 |
| IMAGING | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/5/2009 | Scanning (1) | 161.00 | 0.10 | 16.10 | Draft Bill | | 2980540 |
| IMAGING | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/5/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2980541 |
| IMAGING | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/5/2009 | Scanning (1) | 630.00 | 0.10 | 63.00 | Draft Bill | | 2980542 |
| IMAGING | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/5/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2980543 |
| IMAGING | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/5/2009 | Scanning (1) | 902.00 | 0.10 | 90.20 | Draft Bill | | 2980544 |
| IMAGING | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/5/2009 | Scanning (1) | 477.00 | 0.10 | 47.70 | Draft Bill | | 2980545 |
| IMAGING | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984292 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 10.00 | 0.10 | 1.00 | Draft Bill | | 2984293 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984294 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 5.00 | 0.10 | 0.50 | Draft Bill | | 2984295 |
| Client Documents | | | | | | | | | | |

APP0626

**Bricker & Brewer**

**Costs Listing**

Costs dated from Jan 1 1900 thru Feb 28 2010

8001 / 152  STOREFRONT (MLK) / Villas

| Cost Type | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Auth. By | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | Balance | Tran. # |
| **Scanning (1)  (Cont.)** | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984296 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 2984297 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984298 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 2984299 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984300 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 5.00 | 0.10 | 0.50 | Draft Bill | | 2984301 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984302 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 2984303 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984304 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 4.00 | 0.10 | 0.40 | Draft Bill | | 2984305 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984306 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 197.00 | 0.10 | 19.70 | Draft Bill | | 2984307 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984308 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984309 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984310 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984311 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984312 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984313 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984314 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 6.00 | 0.10 | 0.60 | Draft Bill | | 2984315 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984316 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984317 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984318 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 2984319 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984320 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 2984321 |
| | Client Documents | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984322 |
| | Client Documents | | | | | | | | | |

APP0627

Report Run: 3/30/2010  4:55:44PM
By: Amy M. Hall

Case 3:08-cv-01551-B   Document 182-8   Filed 04/08/10   Page 4 of 105   PageID 11239

Brickel & Brewer

Page 4 of 119
ProVantage WIP 11

**Costs Listing**

**Costs dated from Jan 1 1900 thru Feb 28 2010**

8001 / 152  STOREFRONT (MLK) / Villas

| Cost Type | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Auth. By | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | Balance | Tran.# |

**Scanning (1) (Cont.)**

| | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | Balance | Tran.# |
|---|---|---|---|---|---|---|---|---|---|---|
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 5.00 | 0.10 | 0.50 | Draft Bill | | 2984323 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984324 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 2984325 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984326 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 2984327 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984328 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 2984329 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984330 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 106.00 | 0.10 | 10.60 | Draft Bill | | 2984331 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984332 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 2984333 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984334 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 5.00 | 0.10 | 0.50 | Draft Bill | | 2984335 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2984336 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/17/2009 | Scanning (1) | 27.00 | 0.10 | 2.70 | Draft Bill | | 2984337 |
| Client Documents | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/24/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2986369 |
| SCANNING | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/24/2009 | Scanning (1) | 94.00 | 0.10 | 9.40 | Draft Bill | | 2986370 |
| SCANNING | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/24/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 2986371 |
| SCANNING | | | | | | | | | | |
| | DWM | 3/27/2009 | 3/24/2009 | Scanning (1) | 67.00 | 0.10 | 6.70 | Draft Bill | | 2986372 |
| SCANNING | | | | | | | | | | |
| | DWM | 4/28/2009 | 4/13/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3055589 |
| IMAGING SCANNING | | | | | | | | | | |
| | DWM | 4/28/2009 | 4/13/2009 | Scanning (1) | 11.00 | 0.10 | 1.10 | Draft Bill | | 3055590 |
| IMAGING SCANNING | | | | | | | | | | |
| | DWM | 4/28/2009 | 4/13/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3055591 |
| IMAGING SCANNING | | | | | | | | | | |
| | DWM | 4/28/2009 | 4/13/2009 | Scanning (1) | 19.00 | 0.10 | 1.90 | Draft Bill | | 3055592 |
| IMAGING SCANNING | | | | | | | | | | |
| | DWM | 4/28/2009 | 4/13/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3055593 |
| IMAGING SCANNING | | | | | | | | | | |
| | DWM | 4/28/2009 | 4/13/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3055594 |
| IMAGING SCANNING | | | | | | | | | | |
| | DWM | 4/28/2009 | 4/13/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3055595 |
| IMAGING SCANNING | | | | | | | | | | |

APP0628

**Costs Listing**

Costs dated from Jan 1 1900 thru Feb 28 2010

8001 / 152  STOREFRONT (MLK) / Villas

**Cost Type**

| Auth. By | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | Balance | Tran.# |
|---|---|---|---|---|---|---|---|---|---|---|
| **Scanning (1)** | **(Cont.)** | | | | | | | | | |
| | DWM | 4/28/2009 | 4/13/2009 | Scanning (1) | 12.00 | 0.10 | 1.20 | Draft Bill | | 3055596 |
| | IMAGING SCANNING | | | | | | | | | |
| | DWM | 4/28/2009 | 4/13/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3055597 |
| | IMAGING SCANNING | | | | | | | | | |
| | DWM | 4/28/2009 | 4/13/2009 | Scanning (1) | 6.00 | 0.10 | 0.60 | Draft Bill | | 3055598 |
| | IMAGING SCANNING | | | | | | | | | |
| | DWM | 5/27/2009 | 4/13/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3107997 |
| | IMAGING 900-828NING | | | | | | | | | |
| | DWM | 5/27/2009 | 4/13/2009 | Scanning (1) | 11.00 | 0.10 | 1.10 | Draft Bill | | 3107998 |
| | IMAGING 900-828NING | | | | | | | | | |
| | DWM | 5/27/2009 | 4/13/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3107999 |
| | IMAGING 900-828NING | | | | | | | | | |
| | DWM | 5/27/2009 | 4/13/2009 | Scanning (1) | 19.00 | 0.10 | 1.90 | Draft Bill | | 3108000 |
| | IMAGING 900-828NING | | | | | | | | | |
| | DWM | 5/27/2009 | 4/13/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3108001 |
| | IMAGING 900-828NING | | | | | | | | | |
| | DWM | 5/27/2009 | 4/13/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3108002 |
| | IMAGING 900-828NING | | | | | | | | | |
| | DWM | 5/27/2009 | 4/13/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3108003 |
| | IMAGING 900-828NING | | | | | | | | | |
| | DWM | 5/27/2009 | 4/13/2009 | Scanning (1) | 12.00 | 0.10 | 1.20 | Draft Bill | | 3108004 |
| | IMAGING 900-828NING | | | | | | | | | |
| | DWM | 5/27/2009 | 4/13/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3108005 |
| | IMAGING 900-828NING | | | | | | | | | |
| | DWM | 5/27/2009 | 4/13/2009 | Scanning (1) | 6.00 | 0.10 | 0.60 | Draft Bill | | 3108006 |
| | IMAGING 900-828NING | | | | | | | | | |
| | DWM | 4/28/2009 | 4/14/2009 | Scanning (1) | 155.00 | 0.10 | 15.50 | Draft Bill | | 3055689 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 4/28/2009 | 4/14/2009 | Scanning (1) | 5.00 | 0.10 | 0.50 | Draft Bill | | 3055690 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 4/28/2009 | 4/14/2009 | Scanning (1) | 12.00 | 0.10 | 1.20 | Draft Bill | | 3055691 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 4/28/2009 | 4/14/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 3055692 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 4/28/2009 | 4/14/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3055693 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 4/28/2009 | 4/14/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 3055694 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 4/28/2009 | 4/14/2009 | Scanning (1) | 9.00 | 0.10 | 0.90 | Draft Bill | | 3055695 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 4/28/2009 | 4/14/2009 | Scanning (1) | 7.00 | 0.10 | 0.70 | Draft Bill | | 3055696 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 4/28/2009 | 4/14/2009 | Scanning (1) | 7.00 | 0.10 | 0.70 | Draft Bill | | 3055697 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 5/27/2009 | 4/14/2009 | Scanning (1) | 155.00 | 0.10 | 15.50 | Draft Bill | | 3108097 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 5/27/2009 | 4/14/2009 | Scanning (1) | 5.00 | 0.10 | 0.50 | Draft Bill | | 3108098 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 5/27/2009 | 4/14/2009 | Scanning (1) | 12.00 | 0.10 | 1.20 | Draft Bill | | 3108099 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 5/27/2009 | 4/14/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 3108100 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 5/27/2009 | 4/14/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3108101 |

APP0629

## Costs Listing

### Costs dated from Jan 1 1900 thru Feb 28 2010

8001 / 152 STOREFRONT (MLK) / Vilias -

| Cost Type | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Auth. By | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | Balance | Tran. # |

**Scanning (1) (Cont.)**

| | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | Balance | Tran. # |
|---|---|---|---|---|---|---|---|---|---|---|
| | DEPOSITION | | | | | | | | | |
| | DWM | 5/27/2009 | 4/14/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 3108102 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 5/27/2009 | 4/14/2009 | Scanning (1) | 9.00 | 0.10 | 0.90 | Draft Bill | | 3108103 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 5/27/2009 | 4/14/2009 | Scanning (1) | 7.00 | 0.10 | 0.70 | Draft Bill | | 3108104 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 5/27/2009 | 4/14/2009 | Scanning (1) | 7.00 | 0.10 | 0.70 | Draft Bill | | 3108105 |
| | DEPOSITION | | | | | | | | | |
| | DWM | 4/28/2009 | 4/18/2009 | Scanning (1) | 52.00 | 0.10 | 5.20 | Draft Bill | | 3057008 |
| | INCOMING MAIL | | | | | | | | | |
| | DWM | 4/28/2009 | 4/18/2009 | Scanning (1) | 206.00 | 0.10 | 20.60 | Draft Bill | | 3057009 |
| | INCOMING MAIL | | | | | | | | | |
| | DWM | 4/28/2009 | 4/18/2009 | Scanning (1) | 52.00 | 0.10 | 5.20 | Draft Bill | | 3057010 |
| | INCOMING MAIL | | | | | | | | | |
| | DWM | 4/28/2009 | 4/18/2009 | Scanning (1) | 46.00 | 0.10 | 4.60 | Draft Bill | | 3057011 |
| | INCOMING MAIL | | | | | | | | | |
| | DWM | 5/27/2009 | 4/18/2009 | Scanning (1) | 52.00 | 0.10 | 5.20 | Draft Bill | | 3109416 |
| | INCOMING MAIL | | | | | | | | | |
| | DWM | 5/27/2009 | 4/18/2009 | Scanning (1) | 206.00 | 0.10 | 20.60 | Draft Bill | | 3109417 |
| | INCOMING MAIL | | | | | | | | | |
| | DWM | 5/27/2009 | 4/18/2009 | Scanning (1) | 52.00 | 0.10 | 5.20 | Draft Bill | | 3109418 |
| | INCOMING MAIL | | | | | | | | | |
| | DWM | 5/27/2009 | 4/18/2009 | Scanning (1) | 46.00 | 0.10 | 4.60 | Draft Bill | | 3109419 |
| | INCOMING MAIL | | | | | | | | | |
| | DWM | 4/28/2009 | 4/24/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 3058484 |
| | Client Documents | | | | | | | | | |
| | DWM | 4/28/2009 | 4/24/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 3058638 |
| | Client Documents | | | | | | | | | |
| | DWM | 4/28/2009 | 4/24/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3058639 |
| | Client Documents | | | | | | | | | |
| | DWM | 4/28/2009 | 4/24/2009 | Scanning (1) | 13.00 | 0.10 | 1.30 | Draft Bill | | 3058640 |
| | Client Documents | | | | | | | | | |
| | DWM | 5/27/2009 | 4/24/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 3110892 |
| | Client Documents | | | | | | | | | |
| | DWM | 5/27/2009 | 4/24/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 3111046 |
| | Client Documents | | | | | | | | | |
| | DWM | 5/27/2009 | 4/24/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3111047 |
| | Client Documents | | | | | | | | | |
| | DWM | 5/27/2009 | 4/24/2009 | Scanning (1) | 13.00 | 0.10 | 1.30 | Draft Bill | | 3111048 |
| | Client Documents | | | | | | | | | |
| | MXC | 6/15/2009 | 4/27/2009 | Scanning (1) | -630.00 | 0.10 | -63.00 | Draft Bill | | 3144453 |
| | Credit for duplicate scan charge. | | | | | | | | | |
| | DWM | 5/27/2009 | 4/29/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3111967 |
| | Client Documents | | | | | | | | | |
| | DWM | 5/27/2009 | 5/11/2009 | Scanning (1) | 117.00 | 0.10 | 11.70 | Draft Bill | | 3114526 |
| | Memorandum | | | | | | | | | |
| | DWM | 5/27/2009 | 5/11/2009 | Scanning (1) | 87.00 | 0.10 | 8.70 | Draft Bill | | 3114527 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/11/2009 | Scanning (1) | 93.00 | 0.10 | 9.30 | Draft Bill | | 3114528 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/11/2009 | Scanning (1) | 124.00 | 0.10 | 12.40 | Draft Bill | | 3114529 |
| | Memorandum | | | | | | | | | |

APP0630

Baker & Brewer
**Costs Listing**

ProVantage WIP 11

**Costs dated from Jan 1 1900 thru Feb 28 2010**

8001 / 152 STOREFRONT (MLK) / Villas -

| Cost Type | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Auth. By | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | Balance | Tran. # |
| Scanning (1) (Cont.) | | | | | | | | | | |
| | DWM | 5/27/2009 | 5/11/2009 | Scanning (1) | 77.00 | 0.10 | 7.70 | Draft Bill | | 3114530 |
| | Memorandum | | | | | | | | | |
| | DWM | 5/27/2009 | 5/11/2009 | Scanning (1) | 117.00 | 0.10 | 11.70 | Draft Bill | | 3114531 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/11/2009 | Scanning (1) | 124.00 | 0.10 | 12.40 | Draft Bill | | 3114532 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/11/2009 | Scanning (1) | 87.00 | 0.10 | 8.70 | Draft Bill | | 3114533 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/11/2009 | Scanning (1) | 117.00 | 0.10 | 11.70 | Draft Bill | | 3114534 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/11/2009 | Scanning (1) | 87.00 | 0.10 | 8.70 | Draft Bill | | 3114535 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/11/2009 | Scanning (1) | 87.00 | 0.10 | 8.70 | Draft Bill | | 3114619 |
| | Memorandum | | | | | | | | | |
| | DWM | 5/27/2009 | 5/11/2009 | Scanning (1) | 93.00 | 0.10 | 9.30 | Draft Bill | | 3114620 |
| | Memorandum | | | | | | | | | |
| | DWM | 5/27/2009 | 5/11/2009 | Scanning (1) | 45.00 | 0.10 | 4.50 | Draft Bill | | 3114873 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/12/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3115204 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/12/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3115205 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/12/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3115206 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/12/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3115207 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/12/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3115208 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/12/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3115209 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/12/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3115210 |
| | Legal Research | | | | | | | | | |
| | DWM | 5/27/2009 | 5/27/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3118862 |
| | Client Documents | | | | | | | | | |
| | DWM | 5/27/2009 | 5/27/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 3118863 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 5/28/2009 | Scanning (1) | 62.00 | 0.10 | 6.20 | Draft Bill | | 3173903 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/2/2009 | Scanning (1) | 42.00 | 0.10 | 4.20 | Draft Bill | | 3174658 |
| | Document Production | | | | | | | | | |
| | DWM | 6/29/2009 | 6/2/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 3174768 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176613 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 13.00 | 0.10 | 1.30 | Draft Bill | | 3176614 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176615 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 38.00 | 0.10 | 3.80 | Draft Bill | | 3176616 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176617 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 5.00 | 0.10 | 0.50 | Draft Bill | | 3176618 |

APP0631

## Costs Listing

### Costs dated from Jan 1 1900 thru Feb 28 2010

8001 / 152 STOREFRONT (MLK) / Villas

**Cost Type**

| Auth. By | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | Balance | Tran. # |
|----------|-----------|-----------|-----------|-----------|----------|------|--------|--------|---------|---------|
| **Scanning (1) (Cont.)** | | | | | | | | | | |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176619 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 8.00 | 0.10 | 0.80 | Draft Bill | | 3176620 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176621 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 11.00 | 0.10 | 1.10 | Draft Bill | | 3176622 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176623 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 16.00 | 0.10 | 1.60 | Draft Bill | | 3176624 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176625 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 72.00 | 0.10 | 7.20 | Draft Bill | | 3176626 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176627 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 47.00 | 0.10 | 4.70 | Draft Bill | | 3176628 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176629 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 33.00 | 0.10 | 3.30 | Draft Bill | | 3176630 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176631 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 11.00 | 0.10 | 1.10 | Draft Bill | | 3176632 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176633 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 3176634 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176635 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 3176636 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176637 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 11.00 | 0.10 | 1.10 | Draft Bill | | 3176638 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176639 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 4.00 | 0.10 | 0.40 | Draft Bill | | 3176640 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176641 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 3176642 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176643 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 3176644 |
| | Client Documents | | | | | | | | | |

APP0632

**Costs Listing**

Costs dated from Jan 1 1900 thru Feb 28 2010

8001 / 152 STOREFRONT (MLK) / Villas

| Cost Type | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Auth. By | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | Balance | Tran. # |
| **Scanning (1) (Cont.)** | | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176645 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 8.00 | 0.10 | 0.80 | Draft Bill | | 3176646 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176647 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 21.00 | 0.10 | 2.10 | Draft Bill | | 3176648 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176649 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 6.00 | 0.10 | 0.60 | Draft Bill | | 3176650 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176651 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 3176652 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176653 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 3176654 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176655 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 3176656 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176657 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176658 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176659 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 3.00 | 0.10 | 0.30 | Draft Bill | | 3176660 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176661 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 13.00 | 0.10 | 1.30 | Draft Bill | | 3176662 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176663 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 16.00 | 0.10 | 1.60 | Draft Bill | | 3176664 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176665 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 3176666 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176667 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 7.00 | 0.10 | 0.70 | Draft Bill | | 3176668 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176669 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 8.00 | 0.10 | 0.80 | Draft Bill | | 3176670 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176671 |

APP0633

Report Run: 3/29/2010 4:55:14 PM
By: Amy M. Hall

Case 3:08-cv-01551-B   Document 182-8   Filed 04/08/10   Page 10 of 105   PageID 11245

Bickel & Brewer

Page 92 of 119

ProVantage WIP 11

**Costs Listing**

Costs dated from Jan 1 1900 thru Feb 28 2010

8001 / 152 STOREFRONT (MLK) / Villas

| Cost Type | | | | | | | | | | |
|-----------|--------------|------------|------------|-----------|----------|------|--------|----------|---------|---------|
| Auth. By | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | Balance | Tran. # |

**Scanning (1) (Cont.)**

| | SCANNING | | | | | | | | | |
|---|-----------|-----------|----------|---------------|--------|------|-------|-----------|---|---------|
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 209.00 | 0.10 | 20.90 | Draft Bill | | 3176672 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176673 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 235.00 | 0.10 | 23.50 | Draft Bill | | 3176674 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176675 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 93.00 | 0.10 | 9.30 | Draft Bill | | 3176676 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176677 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 61.00 | 0.10 | 6.10 | Draft Bill | | 3176678 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176679 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 351.00 | 0.10 | 35.10 | Draft Bill | | 3176680 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176681 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 322.00 | 0.10 | 32.20 | Draft Bill | | 3176682 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3176683 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/8/2009 | Scanning (1) | 69.00 | 0.10 | 6.90 | Draft Bill | | 3176684 |
| | SCANNING | | | | | | | | | |
| | DWM | 6/29/2009 | 6/12/2009 | Scanning (1) | 161.00 | 0.10 | 16.10 | Draft Bill | | 3178107 |
| | Client Documents | | | | | | | | | |
| | DWM | 6/29/2009 | 6/17/2009 | Scanning (1) | 25.00 | 0.10 | 2.50 | Draft Bill | | 3179765 |
| | Document Production | | | | | | | | | |
| | DWM | 6/29/2009 | 6/17/2009 | Scanning (1) | 25.00 | 0.10 | 2.50 | Draft Bill | | 3179767 |
| | Document Production | | | | | | | | | |
| | DWM | 6/29/2009 | 6/26/2009 | Scanning (1) | 590.00 | 0.10 | 59.00 | Draft Bill | | 3181887 |
| | Document Production | | | | | | | | | |
| | DWM | 6/29/2009 | 6/26/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3181888 |
| | Document Production | | | | | | | | | |
| | DWM | 7/27/2009 | 7/2/2009 | Scanning (1) | 5.00 | 0.10 | 0.50 | Draft Bill | | 3208970 |
| | Client Documents | | | | | | | | | |
| | DWM | 7/27/2009 | 7/2/2009 | Scanning (1) | 21.00 | 0.10 | 2.10 | Draft Bill | | 3209037 |
| | Client Documents | | | | | | | | | |
| | DWM | 7/27/2009 | 7/6/2009 | Scanning (1) | 31.00 | 0.10 | 3.10 | Draft Bill | | 3209202 |
| | Client Documents | | | | | | | | | |
| | DWM | 7/27/2009 | 7/7/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3209386 |
| | Correspondence | | | | | | | | | |
| | DWM | 7/27/2009 | 7/8/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3209299 |
| | Correspondence | | | | | | | | | |
| | DWM | 8/27/2009 | 8/21/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3248653 |
| | Client Documents | | | | | | | | | |
| | DWM | 12/27/2009 | 12/4/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3378030 |
| | SCANNING | | | | | | | | | |
| | DWM | 12/27/2009 | 12/4/2009 | Scanning (1) | 10.00 | 0.10 | 1.00 | Draft Bill | | 3378031 |
| | SCANNING | | | | | | | | | |

Report Run: 3/30/2010 4:55:44PM
By: Amy M. Hall

Case 3:08-cv-01551-B   Document 182-8   Filed 04/08/10   Page 11 of 105   PageID 11246

Brickel & Brewer

Page 9 of 119
ProVantage WIP 11

**Costs Listing**

Costs dated from Jan 1 1900 thru Feb 28 2010

8001 / 152 STOREFRONT (MLK) / Villas

### Cost Type

| Auth. By | Entered By | Entry Date | Tran. Date | Cost Type | Quantity | Rate | Amount | Status | Balance | Tran. # |
|---|---|---|---|---|---|---|---|---|---|---|
| **Scanning (1) (Cont.)** | | | | | | | | | | |
| | DWM | 12/27/2009 | 12/15/2009 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3380939 |
| | MARCUS WHITMORE DEPO | | | | | | | | | |
| | DWM | 2/24/2010 | 2/5/2010 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3442081 |
| | SCANNING | | | | | | | | | |
| | DWM | 2/24/2010 | 2/5/2010 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3442082 |
| | SCANNING | | | | | | | | | |
| | DWM | 2/24/2010 | 2/5/2010 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3442083 |
| | SCANNING | | | | | | | | | |
| | DWM | 2/24/2010 | 2/5/2010 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3442084 |
| | SCANNING | | | | | | | | | |
| | DWM | 2/24/2010 | 2/5/2010 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3442085 |
| | SCANNING | | | | | | | | | |
| | DWM | 2/24/2010 | 2/5/2010 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3442086 |
| | SCANNING | | | | | | | | | |
| | DWM | 2/24/2010 | 2/5/2010 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3442087 |
| | SCANNING | | | | | | | | | |
| | DWM | 2/24/2010 | 2/5/2010 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 3442088 |
| | SCANNING | | | | | | | | | |
| | DWM | 2/24/2010 | 2/5/2010 | Scanning (1) | 1.00 | 0.10 | 0.10 | Draft Bill | | 3442089 |
| | SCANNING | | | | | | | | | |
| | DWM | 2/24/2010 | 2/5/2010 | Scanning (1) | 2.00 | 0.10 | 0.20 | Draft Bill | | 3442090 |
| | SCANNING | | | | | | | | | |
| **Totals for Scanning (1)** | | | | | 32,094.00 | | 3,209.40 | | | |

APP0635

# EXHIBIT
# 8

APP0636

Anne Pickett - S&A Strategic Business Consulting

77089

06/10/09

| Date | Invoice | | Invoice Amount | Amount Paid |
|------|---------|---|----------------|-------------|
| 05/22/2009 | | 205 | 3,500.00 | 3,500.00 |
| | Professional Services/Dallas/CDB | | | |

**S&A Strategic Business Consulting**                          # INVOICE
*Worksite Compliance Solutions*

732 Cimarron Trail                                    INVOICE #205
Irving, TX 75063                                      DATE: MAY 22, 2009
Phone 972 200-7978  Fax 972 782-9398

**TO:**                          **FOR:**
                                 Farmers Branch Litigation
Bickel & Brewer
1717 Main Street
Dallas, TX  75201
214 653-4817

| DESCRIPTION | HOURS | RATE | AMOUNT |
|---|---|---|---|
| 3/26/09  Discussion of litigation and need for testimony | 1 | $250 | $250 |
| 4/6/09  Research and review of materials | 2 | $250 | $500 |
| 4/9/09  Meeting to prepare for deposition | 1 | $250 | $250 |
| 4/10/09  Deposition | 7 | $250 | $1,750 |
| 4/15/09  Review of deposition/prepare errata sheet | 2 | $250 | $500 |
| 4/18/09  Errata sheet notarized and faxed | 1 | $250 | $250 |
| | | TOTAL | $3,500 |

ENTERED
BY
MAY 2 7 2009
EML

Make all checks payable to Anne Pickett
Total due in 15 days. Overdue accounts subject to a service charge of 1% per month.

**Thank you for your business!**

APP0638

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **VILLAS AT PARKSIDE PARTNERS d/b/a VILLAS AT PARKSIDE, LAKEVIEW AT PARKSIDE PARTNERS, LTD. d/b/a LAKEVIEW AT PARKSIDE, CHATEAU RITZ PARTNERS d/b/a CHATEAU DE VILLE, and MARY MILLER SMITH,** | §<br>§<br>§<br>§<br>§<br>§<br>§ | |
| **Plaintiffs,** | §<br>§ | **CIVIL ACTION NO. 3:08-CV-1551** |
| **v.** | §<br>§ | |
| **THE CITY OF FARMERS BRANCH, TEXAS,** | §<br>§<br>§ | |
| **Defendants.** | § | |

### DECLARATION OF JACK G. B. TERNAN IN SUPPORT OF VILLAS PLAINTIFFS' APPLICATION FOR ATTORNEYS' FEES AND COSTS

1.      My name is Jack G. B. Ternan.  I am fully competent and qualified in all respects to make this Declaration.  The facts set forth herein are true and correct and, unless otherwise qualified, are within my personal knowledge.

2.      I make this Declaration in support of the application of Villas at Parkside Partners d/b/a Villas at Parkside, Lakeview at Parkside Partners, Ltd. d/b/a Lakeview at Parkside, Chateau Ritz Partners d/b/a Chateau De Ville, and Mary Miller Smith (collectively, the "Villas Plaintiffs") to recover reasonable costs and attorneys' fees in the above-captioned action.

3.      I am an attorney licensed by the Supreme Court of Texas in 2007 and am admitted to practice before the United States District Court for the Northern District of Texas.

APP0639

A.    **Educational Background**

4.      I graduated from Plano East Senior High School in 2000 with a class rank in the top twenty in a class of over one thousand and obtained a diploma from the International Baccalaureate Diploma Program.

5.      In 2004, I graduated from Georgetown University with a Bachelor of Arts degree. While attending Georgetown, I worked as a network administrator, served as chair of the Georgetown University Student Association, and was a member of the Philodemic Debate Society, one of the oldest collegiate debate societies in the United States.

6.      In 2007, I graduated with honors from the University of Texas School of Law. While at the University of Texas, I served as a senior editor of the *Texas Review of Law and Politics* and interned at the Texas Supreme Court.

B.    **Litigation Experience**

7.      While in law school, I participated in the Blackstone Fellowship Program organized by the Alliance Defense Fund and spent a summer assisting two attorneys with religious liberty litigation.  I also spent a year as the sole law clerk for a solo practitioner and assisted him with legal research, drafted pleadings and correspondence, and attended hearings and trial.

8.      On September 4, 2007, I became an associate with Bickel & Brewer.  Since starting with Bickel & Brewer, I have averaged over 2,750 billable hours per year, drafted and filed pleadings and motions, appeared and argued in court, taken dozens of depositions, negotiated with opposing counsel, and been the lead attorney on a case that I filed, prosecuted, and settled for over one million dollars in compensation.  I have been involved with complex litigation in a variety of practice areas including antitrust, employment, civil rights, government,

**DECLARATION OF JACK G. B. TERNAN IN SUPPORT OF**
**VILLAS PLAINTIFFS' APPLICATION FOR ATTORNEYS' FEES AND COSTS**          **Page 2**

APP0640

securities, wills/trusts/estates, guardianship, intellectual property, malicious prosecution, construction, and commercial contract/tort disputes.

9.      Demand for my services exceeds my personal capacity.  I anticipate that I will work over 2,750 billable hours in this calendar year.

10.     Based on conversations with members of my law school graduating class and other young associates at other firms, I believe that during my tenure at Bickel & Brewer, I have gained experience with a number of tasks that is not typical of young associates.

11.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 8, 2010.

Jack G. B. Ternan

**DECLARATION OF JACK G. B. TERNAN IN SUPPORT OF**
**VILLAS PLAINTIFFS' APPLICATION FOR ATTORNEYS' FEES AND COSTS**                    **Page 3**
5213036.1
8001-152

APP0641

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VILLAS AT PARKSIDE PARTNERS d/b/a | § | |
| VILLAS AT PARKSIDE, LAKEVIEW AT | § | |
| PARKSIDE PARTNERS, LTD. d/b/a | § | |
| LAKEVIEW AT PARKSIDE, CHATEAU | § | |
| RITZ PARTNERS d/b/a CHATEAU DE | § | |
| VILLE, and MARY MILLER SMITH, | § | |
| | § | CIVIL ACTION NO. 3:08-CV-1551-B |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| THE CITY OF FARMERS BRANCH, | § | |
| TEXAS, | § | |
| | § | |
| Defendants. | § | |

**<u>Declaration of Frank Finn</u>**

I, Frank Finn, by this Declaration and Opinion, declare as follows:

**A.   Statement of opinions to be expressed and the basis and reasons therefore:**

1.      I submit this Declaration and opine on behalf of Plaintiffs herein, Villas at Parkside Partners d/b/a Villas at Parkside, Lakeview at Parkside Partners, Ltd. d/b/a Lakeview at Parkside, Chateau Ritz Partners d/b/a Chateau de Ville, and Mary Miller Smith ("Plaintiffs") and Plaintiffs' attorneys, Bickel & Brewer Storefront, P.L.L.C.

2.      I have been requested by Plaintiffs' counsel to review and to opine on the reasonableness, necessity, fairness and propriety of legal services, and fees, incurred by Plaintiffs and the reasonableness of and the conformity with legal standards in the State of Texas and this area of the fees and expenses necessary to the prosecution of this case.

3.      This cause has now been concluded and the Court must determine the fees and expenses to be awarded Plaintiffs.  Plaintiffs have requested that they be awarded reasonable

**Declaration of Frank Finn — Page 1**

attorneys' fees and expenses pursuant to 42 U.S.C. § 1988(b) and all other applicable statutes along with expenses as found and determined by the Court. I express no opinion herein regarding expenses.

4.     I am aware of hourly rates of the more successful lawyers in constitutional cases and in corporate cases such as "take or pay" cases in the Dallas/Fort Worth area and the rates of the law firm of Bickel & Brewer in this matter are consistent with and comparable to the hourly rates being charged by other lawyers in other firms. I understand that a successful divorce attorney meeting with sizable estate matters is now charging up to $1,000 per hour. Successful Plaintiffs' lawyers in Dallas County are now regularly charging $650 to $750 per hour. In fact, I am now charging $750 per hour when involved in constitutional cases of high volatility and renown.

5.     I have relied upon the following data as furnished by Plaintiffs and other information in forming my opinions stated above and herein.

6.     All pleadings and submissions on file in this case constituting three thick and large notebooks now brought current and to this date.

      a.     Reports of Bickel & Brewer of hours and rates for attorneys all brought to date;

      b.     Reports of Bickel & Brewer of hours and rates and expenses and the charges for legal assistants and consultants all brought to date;

      c.     The curriculum vitae and biographical material describing the background training and experience of the listed attorneys;

      d.     The docket sheet;

      e.     The oral depositions taken in this case;

      f.     The Court's Memorandum Opinion and Order of forty pages which clearly but succinctly captures the complexity of this matter and the need for the good lawyering that was brought to bear.

**Declaration of Frank Finn — Page 2**

7.      A review and analysis of Plaintiffs' Complaint and Jury Demand as filed herein and particularly, the stated "Factual Background" indicating the legal acumen of the pleaders and likewise indicating the importance and complexity of this suit.  A review of the docket sheet of this cause reveals that the cause was filed on September 3, 2008, and concluded by Final Judgment on March 25, 2010, with 179 separate filings noted on the docket.

8.      A review of the transcript of proceedings on Temporary Restraining Order dated September 12, 2008 reflects the Court's opinion of this case: "This is an important question, and I greatly appreciate the zealousness with which both sides have argued and briefed and obviously take this case."  (Page 118, Transcript of Proceedings, Temporary Restraining Order, September 12, 2008).

9.      Twenty-six (26) oral depositions were taken by the parties in this cause.

10.     Those cases which might be of service to the Court regarding a determination with regard to attorneys' fees are attached hereto.

11.     Calculating attorneys' fees involves a two-step process.  The Court initially calculates the "lodestar" fee by multiplying the reasonable number of hours expended on the case by the reasonable hourly rates for the participating attorneys.  *Migis v. Pearle Vision*, 135 F.3d 1041, 1047 (5th Cir. 1998), *citing Louisiana Power & Light Co. v. Kellstrom*, 50 F3d 319, 324 (5th Cir. 1995).  The Court then determines if this lodestar figure should he adjusted upward or downward based on the twelve (12) factors outlined in *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714 (5th Cir. 1974); Strategies for damages and attorneys' fees in 2010, Texas Bar CLE, Chapter 17, p. 3.

12.     It is my opinion that all of the legal services rendered on behalf of Plaintiffs to the date of the conclusion of this matter have been and are necessary to the prosecution of this case

**Declaration of Frank Finn — Page 3**

APP0644

and all of the time spent to date in the prosecution of this case has been reasonably incurred and necessary considering the nature and complexity and importance of this cause.  Plaintiffs, as to the main relief sought, have prevailed.

13.     Not all of the Plaintiffs' attorneys fees in this cause are sought by Plaintiffs (the same being approximately $1,263,000 in fees).  Instead, Plaintiffs have obviously endeavored to minimize fees and expenses for the purposes of this Report and have requested the recovery of some of the time and fees only of C. Dunham Biles; Jack Ternan; and James S. Renard in the amount of $750,000.00.

14.     By omitting the fees of all but the listed attorneys and by reducing the fees of those three attorneys in their effort to recover attorneys' fees, Plaintiffs reduce the amount sought to $750,000, a reduction of approximately $400,000.

15.     The three attorneys representing Plaintiffs herein enumerated above have worked and charged fees at the rates indicated below for the total hours reflected below.

**2008**

| Professional | Rate | Hours | Amount |
|---|---|---|---|
| C. Dunham Biles | 550.00 | 101.4 | $55,770.00 |
| C. Dunham Biles | 575.00 | 333.0 | $191,475.00 |
| Jack Ternan | 275.00 | 47.3 | $13,007.50 |
| Jack Ternan | 375.00 | 229.2 | $85,950.00 |
| James S. Renard | 800.00 | 201.8 | $161,440.00 |
| | | | |
| **Total:** | | **912.7** | **$507,642.50** |

**Declaration of Frank Finn — Page 4**

APP0645

**2009**

| Professional | Rate | Hours | Amount |
|---|---|---|---|
| C. Dunham Biles | 575.00 | 437.4 | $251,505.00 |
| Jack Ternan | 375.00 | 418.4 | $156,900.00 |
| Jack Ternan | 425.00 | 16.2 | $6,885.00 |
| James S. Renard | 800.00 | 60.5 | $48,400.00 |
| | | | |
| **Total:** | | **932.5** | **$463,690.00** |

**Summary**

| Professional | Hours | Amount |
|---|---|---|
| 2008 | 912.7 | $507,642.50 |
| 2009 | 932.5 | $463,690.00 |
| **Total:** | **1,845.2** | **$971,362.50**[1] |
| | | |
| **Average:** | **526.43 per hr.** | |

The hourly rates indicated above, in my opinion, are reasonable, appropriate and fair for this area, and for the legal services rendered on behalf of Plaintiffs. Such have been necessary to the prosecution of this case, and all of the time reflected above in the prosecution of this case has

---

[1] Seeking only $750,000, the hourly rate would be $406.46.

**Declaration of Frank Finn — Page 5**

been reasonably incurred and necessary, again, considering the nature and complexity of this lawsuit and its outcome, significance and notoriety.  With $750,000 as to the total fee sought, the hourly rate charged is $406.46 per hour.

16.     I am aware of the Johnson Factors and Analyses in cases involving civil rights announced by Justices Thornberry, Ainsworth and Roney in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), and explained and utilized again in the holdings of Chief Judge Edith Jones in *McClain v. Lufkin Industries, Inc.*, 519 F.3d 264 (5th Cir. 2008).  A copy of those opinions are attached for the Court's ready reference.  My thoughts, opinions and recommendations herein are offered for the Court's information and use as the Court sees appropriate.

17.     For the Court's information relative to the three attorneys whose time and fee is reduced herein to $750,000, I attach copies of appropriate vitas.

18.     I am personally acquainted with and aware of the qualifications of the lawyers at Bickel & Brewer and of Bickel & Brewer Storefront, P.L.L.C.

19.     I have found no evidence that Plaintiffs' counsel herein has received any reimbursement as to the bills that I examined and reviewed and the amounts sought by their Motion.  Fees and expenses and charges are, in my opinion, fair, appropriate and were necessary for the period in question and were and are reasonable fees in the Dallas-Fort Worth metroplex for cases of this type and complexity.  The case was obviously one of notoriety and great political importance  The hourly rates listed above are reasonable and are really on the low side of the prevailing hourly rates in the Dallas-Fort Worth metroplex for attorneys of like or similar qualifications and experience handling similar work.

**Declaration of Frank Finn — Page 6**

**B.    The following documents were relied upon in forming the above opinions and providing the basis for the factual assertions made.**

I have relied upon the following data or other information in forming my opinions stated above:

20.    All of the pleadings and submissions on file in this case constituting three thick and large notebooks; and

21.    Reports of Bickel & Brewer of hours and rates and expenses and the charges for legal assistants and consultants;

22.    The CV's and biographical data material describing the background, training and experience of the listed attorneys;

23.    The Docket Sheet of this cause.

**C.    Qualifications of Expert Witness.**

24.    I am an attorney in good standing in the State Bar of Texas and have been practicing trial law in Texas since 1956. I have practiced in most areas of the State of Texas and in other states. My practice has been primarily focused on the area of civil trial work. I have worked on behalf of both plaintiffs and defendants and have handled thousands of civil cases and tried hundreds of them in the Dallas/Fort Worth venue, both state and federal. I have served in the management of a large firm with a large trial practice. I am active in the Dallas Bar and its committees.

25.    I report to the Court and claim 54 years as a practicing trial attorney in the State of Texas. I am a member of the Federal Bar for the Northern District of Texas. I am active in my practice of the law and know of no impediment to my participation in this cause upon the call and request of the Plaintiffs' attorneys herein, Bickel & Brewer Storefront, P.L.L.C, of Dallas, Texas and Bickel & Brewer for the Plaintiffs.

**Declaration of Frank Finn — Page 7**

26.      My current Curriculum Vitae is attached and my State Bar of Texas number is
07028000.

**D.      Compensation to be paid for this study and testimony.**

27.      My expert opinions are given in my capacity as a practicing attorney at law and
Of Counsel, licensed on April 23, 1956.  I will bill my time to Bickel & Brewer Storefront at a
rate of $750.00 per hour.  I now have 10.0 hours invested in this endeavor.

28.      I declare under the penalty of perjury under the laws of the United States of
America that the foregoing is true and correct.

_Frank Finn_

Frank Finn
Attorney and Counselor
State Bar No. 07028000

One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas  75201-2533
214-969-1265
Fax:  214-999-9152

**Declaration of Frank Finn — Page 8**

APP0649

B

[8] Ormet's alternate contention that the jury's damage award was clearly erroneous bears no more fruit than its procedural contest. Ormet's argument, in essence, is that the jury's award of damages was irrational because it was not based on substantial evidence and was excessive because it gave Pendarvis credit for construction of the second road as damage when it should more appropriately have been counted as an improvement to the land. We are not persuaded of the merits of this argument.

With regard to rationality, our review of the record discloses that there was substantial evidence in support of the jury's award. Testimony was presented that supported the argument that Pendarvis constructed the second road and alternate fence solely because of the injunction, and that the cost of doing so was $48,000. The jury was free to accept this testimony, and it cannot be said that its verdict was wholly without support.

With regard to excessiveness, this court has stated that "[o]nly where [a jury verdict] is 'so large as to shock the judicial conscience, so gross or inordinately large as to be contrary to right reason, so exaggerated as to indicate bias, passion, prejudice, corruption, or other improper motive' will we reverse [it] for excessiveness." *Ham Marine*, 72 F.3d at 462 (quoting *Calderera v. Eastern Airlines, Inc.*, 705 F.2d 778, 783 (5th Cir. 1983)). Such was clearly not the case here. Although Ormet argues somewhat persuasively that the addition of the second permanent road constituted an improvement to Pendarvis's land, this interpretation of the evidence was far from the only inference to be drawn from the record as a whole. Indeed, the record does not disclose any conclusive evidence on this contention, and the jury could just as reasonably have concluded that the addition of the second road added a trivial or indeterminate amount to the value of the land, or that any addition was equally balanced by other detriments. The decision to disregard this factor was at any rate not such as to "shock the judicial conscience," and we can find no error on this basis.

V

In conclusion, we find that Ormet's legal arguments are not sustained by either statute or case law, and that its evidentiary objection to the damage award is not sufficient to overcome the presumption in favor of the jury's verdict. The judgment of the district court is therefore

AFFIRMED.



Melissa MIGIS, Plaintiff–Appellee, Cross–Appellant,

v.

PEARLE VISION, INC., Defendant–Appellant, Cross–Appellee.

No. 96–11406.

United States Court of Appeals, Fifth Circuit.

March 10, 1998.

Former employee brought Title VII pregnancy discrimination action against former employer. The United States District Court for the Northern District of Texas, Jeff A. Kaplan, United States Magistrate Judge, entered judgment for former employee, and subsequently awarded her attorney fees, 944 F.Supp. 508. Parties appealed. The Court of Appeals, Reavley, Circuit Judge, held that: (1) finding that employer terminated employee due to pregnancy was supported by the evidence; (2) employee used reasonable diligence in mitigating damages; (3) District Court did not abuse its discretion in awarding employee $5,000 in compensatory damages for mental anguish; (4) District Court failed to give adequate consideration to result obtained relative to attorney fee award, and to result obtained relative to result sought; (5) District Court did not abuse its discretion in awarding employee costs of pursuing unsuccessful claim that employer

discriminated against her in failing to offer her new position; and (6) District Court did not abuse its discretion in denying cost of videotaped deposition.

Affirmed in part, reversed in part, and remanded.

Rhesa Hawkins Barksdale, Circuit Judge, concurred in part, dissented in part, and filed opinion.

**1. Civil Rights ⇐387**

Finding that employer terminated employee due to her pregnancy was supported by the evidence, including evidence that manager was "excited" that employee took disability leave rather than maternity leave because he thought employer had greater latitude to eliminate her job if she took disability leave. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**2. Federal Courts ⇐858**

District court's findings in Title VII case are subject to clearly erroneous standard of review. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**3. Federal Courts ⇐845**

Where district court's finding is based on its decision to credit testimony of one witness over that of another, that finding, if not internally inconsistent, can virtually never be clear error.

**4. Civil Rights ⇐402**

District court did not clearly err in determining that employee used reasonable diligence in mitigating Title VII damages, even though her new employer told her she could start work two weeks after it offered her employment but she did not do so for over one month; employee stated that she canceled day care after leaving previous job, that finding new day care was strenuous process, and that she started to work immediately upon arranging day care. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**5. Civil Rights ⇐402**

Employee seeking damages under Title VII has duty to mitigate his or her damages by using reasonable diligence to obtain substantially equivalent employment. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**6. Civil Rights ⇐377.1, 389**
   **Federal Courts ⇐871**

Whether employee seeking damages under Title VII has used reasonable diligence to mitigate damages is question of fact subject to review for clear error, and burden is on employer to prove failure to mitigate. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**7. Civil Rights ⇐403**

District court did not abuse its discretion in awarding $5,000 in compensatory damages for mental anguish to employee in Title VII pregnancy discrimination action; employee testified that termination was major inconvenience, and that she suffered low self-esteem, financial hardships with new baby, major stress, crying, and sleeplessness. 42 U.S.C.A. § 1981a(a)(1), (b)(3)(D); Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**8. Federal Courts ⇐813**

Review of mental anguish damages in Title VII case is for abuse of discretion. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**9. Federal Civil Procedure ⇐2737.4**

In calculating attorney fees, district court first calculates "lodestar" fee by multiplying reasonable number of hours expended on case by reasonable hourly rates for participating lawyers, and then considers whether lodestar figure should be adjusted upward or downward depending on circumstances of case.

**10. Federal Civil Procedure ⇐2737.4**

Factors which court should look to in adjusting lodestar amount for purposes of attorney fees calculation are: (1) time and labor required for litigation; (2) novelty and difficulty of questions presented; (3) skill required to perform legal services properly; (4)

**MIGIS v. PEARLE VISION, INC.**    **1043**
Cite as 135 F.3d 1041 (5th Cir. 1998)

preclusion of other employment by attorney due to acceptance of case; (5) customary fee; (6) whether fee is fixed or contingent; (7) time limitations imposed by client or circumstances; (8) amount involved and result obtained; (9) experience, reputation, and ability of attorneys; (10) undesirability of case; (11) nature and length of professional relationship with client; and (12) awards in similar cases.

**11. Federal Courts** ⇐830, 878

Court of Appeals reviews district court's initial determination of reasonable attorney hours and rates for clear error, and its application of *Johnson* factors for adjusting lodestar amount for abuse of discretion.

**12. Federal Civil Procedure** ⇐2737.4

In attorney fee calculation, some of the *Johnson* factors for adjusting lodestar amount are subsumed in initial lodestar calculation and should not be double counted.

**13. Civil Rights** ⇐418

District court abused its discretion in Title VII action by failing to give adequate consideration to result obtained relative to attorney fee award, and to result obtained relative to result sought; court's award of $81,000 in fees was over six and one-half times the amount of damages awarded, and employee alleged four acts of discrimination on account of sex and/or pregnancy but prevailed only as to one act, and only as to pregnancy. Civil Rights Act of 1964, § 706(k), as amended, 42 U.S.C.A. § 2000e–5(k).

**14. Civil Rights** ⇐418

Where recovery of private damages is purpose of civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to amount of damages awarded as compared to amount sought.

**15. Civil Rights** ⇐418

Where employee has achieved only partial or limited success in Title VII action, product of hours reasonably expended on litigation as a whole times reasonable hourly rate may result in excessive attorney fees; this will be true even where employee's claims were interrelated, nonfrivolous, and raised in good faith. Civil Rights Act of

1964, § 706(k), as amended, 42 U.S.C.A. § 2000e–5(k).

**16. Federal Civil Procedure** ⇐2723
    **Federal Courts** ⇐830

District court has broad discretion in taxing costs, and Court of Appeals will reverse only upon clear showing of abuse of discretion.

**17. Federal Civil Procedure** ⇐2723

District court has wide discretion with regard to costs and may order each party to bear his or her own costs.

**18. Civil Rights** ⇐409

District court did not abuse its discretion in awarding employee costs of pursuing unsuccessful Title VII claim that employer discriminated against her in failing to offer her new position; district court disallowed substantial portion of costs requested, and, even assuming it was feasible to segregate costs according to the two claims presented by employee, employer's refusal to rehire employee was arguably of evidentiary value to claim on which she prevailed, i.e., discriminatory termination. Civil Rights Act of 1964, § 706(k), as amended, 42 U.S.C.A. § 2000e–5(k).

**19. Civil Rights** ⇐409

District court did not abuse its discretion in denying cost of videotaped deposition to successful Title VII plaintiff; even if statute providing for award of fees for stenographic transcript could be interpreted to include videotapes, plaintiff did not show that videotape of her own deposition, in addition to transcript, was necessarily obtained for use in case, as required by such statute. 28 U.S.C.A. § 1920(2)

———

Kenneth H. Molberg, Wilson, Williams, Molberg & Mitchell, Dallas, TX, for Migis.

Bennee Beth Jones, Larry George Cassil, Wilson, Elser, Moskowitz, Edelman and Dicker, Dallas, TX, William Louis Davis, Clark, West, Keller, Butler & Ellis, Dallas TX, for Pearle Vision, Inc.

Appeals from the United States District Court for the Northern District of Texas.

Before REAVLEY, BARKSDALE and STEWART, Circuit Judges.

REAVLEY, Circuit Judge:

The court below entered a judgment in favor of Melissa Migis on her claim of pregnancy discrimination under Title VII, 42 U.S.C. §§ 2000e *et seq.* Defendant Pearle Vision, Inc. appeals on various grounds, and Migis cross appeals on an item of costs. We reverse the award of attorney's fees, and remand for further proceedings. Otherwise we affirm.

## A.  *Liability for Pregnancy Discrimination*

[1–3] Pearle Vision argues that the trial court erred in denying its motion for judgment and finding that Pearle Vision had discriminated against Migis on the basis of her pregnancy.[1] Title VII prohibits employer discrimination against an individual because of such individual's sex. 42 U.S.C. § 2000e–2(a)(1). The term "because of sex" includes "because of . . . pregnancy, childbirth, or related medical conditions." *Id.* § 2000e(k).

While Pearle Vision presented a substantial case that Migis's termination was not based on her pregnancy, but instead was part of an ongoing, large-scale reduction in force, we cannot say that the district court's finding of discrimination was clearly erroneous. The evidence in support of that finding includes the following.

Migis was a programmer/analyst in the corporate systems group of Pearle Vision's information services department. For three years she received positive employee evaluations, indicating that her work was fully satisfactory though not exceptional. Migis learned that she was pregnant in January of 1994. She told her immediate supervisor, Mark McQuay, but asked that McQuay keep

the knowledge of her pregnancy to himself. Migis was concerned "because of all the women that were being let go and all the discrimination which was taking place at the time." She also wanted to wait until Mike Maher, a vice president, was transferred back to the United Kingdom in March, because she considered Maher a sexist. Management became aware of Migis's pregnancy in March or April.

Due to pregnancy complications related to her diabetes and on the advice of her physician, Migis began working half days, and on April 6 went on temporary disability. She intended to return to work, and so informed McQuay.

McQuay reported to Glenn Graves, the director of information services, who in turn reported to Colin Heggie, a senior vice president. In February management began discussions of a staff reduction in the corporate services group. McQuay testified that management decided to terminate Randy Ragsdale, a senior programmer/analyst, and Tracy Culpepper, a programmer/analyst. Confidential memoranda from Graves to Heggie also reflect this decision. McQuay testified that he had recommended that Migis be retained because of her performance, and that there was no reason she could not be promoted to senior programmer/analyst.

Kelly Keahon, the head of the human resources department, advised Graves to clearly state and document for Heggie the anticipated personnel actions. While Graves testified that management had decided to eliminate three positions in the corporate systems group, his memos reflect that only two positions, held by Ragsdale and Culpepper, were to be eliminated. In addition, an

---

1. By agreement the case was tried to a United States magistrate judge under 28 U.S.C. § 636(c). Upon the entry of judgment by the magistrate, the parties were entitled to appeal the judgment to this court "in the same manner as an appeal from any other judgment of a district court." *Id.* § 636(c)(3). The district court's findings in this Title VII case are subject to the clearly erroneous standard of review. *EEOC v. Clear Lake Dodge,* 60 F.3d 1146, 1151 (5th Cir. 1995). "A finding is 'clearly erroneous' when although there is evidence to support it, the re-

viewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "Where the court's finding is based on its decision to credit the testimony of one witness over that of another, 'that finding, if not internally inconsistent, can virtually never be clear error.'" *Schlesinger v. Herzog,* 2 F.3d 135, 139 (5th Cir.1993) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985)).

APP0653

organizational chart has handwritten notes by Graves indicating that staffing in the corporate systems group was to be reduced by one senior programmer/analyst and one programmer/analyst. Graves did not tell McQuay that Migis, in addition to Ragsdale and Culpepper, was slated for termination.

McQuay testified that Graves drew a distinction between maternity leave and disability leave, and was of the view that Migis had taken the latter. McQuay stated that Graves was "excited" that Migis was on disability leave because he thought Pearle Vision had greater latitude to eliminate the job if the latter type of leave was taken. Graves denied making such a statement, but the magistrate judge found McQuay's testimony more credible on this point.

Migis gave birth in September, and on October 4 Migis met with Graves regarding her return to work. She was told that her position had been eliminated. The magistrate judge found that a senior programmer position in the corporate systems group was retained, and that a new position for a junior programmer in that group was created. The court credited McQuay's testimony that Migis was qualified for a senior programmer position.

Graves told Migis that there was an opening for a programmer in the product support group of the information services department. This position went to Susan Marshall, who was not pregnant and had worked for Pearle Vision as a contract employee since September. Graves testified that members of the product support group were opposed to bringing Migis into their group because of her work ethic and judgment. He stated that he and the head of the product support group did not "attempt to determine [Migis's] qualifications in relationship to the qualifications or in comparison to the qualifications of Susan Marshall."

Given this and other evidence, the magistrate judge concluded that Pearle Vision's proffered reasons for eliminating Migis's job were pretextual, and that Pearle Vision had discriminated against Migis on the basis of her pregnancy when it terminated her. While Pearle Vision offered evidence to the contrary, including plausible explanations for the documents discussed above, we are not persuaded that the district court clearly erred in finding a Title VII violation.

## B.  *Back Pay Damages*

Pearle Vision challenges the back pay awarded to Migis. Migis was formally notified of her termination on November 7, 1994, when she received a separation agreement which she refused to sign. Her compensation from Pearle Vision ceased on November 25. She received an offer of employment from another company on December 19, but did not begin employment there until January 23, 1995. The court awarded back pay for the period between November 25 and January 23.

[4–6]  Pearle Vision argues that the back pay should only cover the period from November 25 to December 19, the date of Migis's new job offer. A Title VII plaintiff has a duty to mitigate her damages by using reasonable diligence to obtain substantially equivalent employment. *Sellers v. Delgado College*, 902 F.2d 1189, 1193 (5th Cir.1990). Whether the plaintiff has engaged in such an effort is a question of fact subject to review for clear error, and the burden is on the employer to prove failure to mitigate. *Id.*

Migis testified that her new employer told her she could start two weeks after the December 19 offer. However, she explained that she canceled her day care after she lost her job at Pearle Vision. She described finding new day care as a "very strenuous process" and stated that she went to work immediately once she arranged for the care of her daughter. The district court did not clearly err in finding that Migis could not secure suitable child care until January 23, and had accordingly used reasonable diligence in mitigating her damages.

## C.  *Compensatory Damages*

[7]  Pearle Vision also challenges the district court's award of $5000 in compensatory damages. Where, as here, the employer has more than 500 employees, Title VII claimants may recover compensatory damages of up to $300,000. 42 U.S.C. §§ 1981a(a)(1) & (b)(3)(D). The statute describes such com-

pensatory damages as including damages for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." *Id.* § 1981a(b)(3).

[8] Our review of mental anguish damages is for abuse of discretion. *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 940 (5th Cir.1996), *cert. denied*, — U.S. ——, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997). In *Patterson*, we reversed awards of mental anguish damages granted to two plaintiffs suing under Title VII and 42 U.S.C. § 1981. We held that awards under the two statutes are governed by the same rules, and that mental anguish damages cannot be recovered absent "some specific discernable injury to the claimant's emotional state." *Id.* In *Patterson*, one of the plaintiffs, Patterson, testified that her firing "emotionally scarred her and resulted in unemployment for almost one year." *Id.* Noting the lack of medical evidence or corroborating testimony, we held that Patterson had not offered sufficient competent evidence to support the award of mental anguish damages, since "[n]o evidence suggests that Patterson was humiliated or subjected to any kind of hostile work environment." *Id.* at 941. The second plaintiff, Brown, suing for racial discrimination, testified that the work environment was "unbearable" and was "tearing my self-esteem down," that he was subjected to racial epithets, and that he felt "frustrated" and "real bad" at being judged for the color of his skin. *Id.* at 939. Noting the lack or corroborating testimony or medical evidence, we found the evidence insufficient to sustain an award for emotional damages, since "[n]o evidence suggests that Brown suffered from sleeplessness, anxiety or depression." *Id.* at 939. The court further noted that immediately after his constructive discharge Brown obtained new employment at a higher wage. *Id.* at 939–40.

*Patterson* did not hold that medical evidence or corroborating testimony is always required for an award of mental anguish damages. Instead we stated that some other circuits "have recognized that a claimant's testimony alone *may* not be sufficient to support anything more than a nominal dam-

age award," and that *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), "requires a degree of specificity which *may* include corroborating testimony or medical or psychological evidence in support of the [mental anguish] damage award." *Id.* at 938, 940 (emphasis added).

*Patterson* also quoted at length an EEOC policy statement which recognizes that emotional harm may manifest itself "as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive fatigue, or a nervous breakdown." *Id.* at 939 (quoting EEOC POLICY GUIDANCE No. 915.002 § II(A)(2), at 10–12 (July 14, 1992)).

In *Farpella–Crosby v. Horizon Health Care*, 97 F.3d 803 (5th Cir.1996), the plaintiff prevailed on a Title VII hostile work environment claim. We upheld an award of compensatory damages. The plaintiff testified that she felt "very embarrassed, very belittled," "very disgusted," "hopeless," "about two inches high," and "started to feel pretty stupid," as a result of a superior's harassment. *Id.* at 809. She stated that the work environment was "very stressful" and that she was "embarrassed every time [she] went in there." A friend testified that she and plaintiff began to go everywhere together, believing that there was "safety in numbers." *Id.* Discussing and distinguishing *Patterson*, we held this evidence sufficient to support an award of compensatory damages, since the jury could conclude that plaintiff "suffered emotional harm that manifested itself as humiliation and stress." *Id.*

The evidence of mental anguish testimony in the pending case consisted solely of Migis's testimony. She testified that her termination, which came without warning, was "a major inconvenience," and that she suffered low self-esteem "not only from not having worked but from getting terminated and not offered a position that I thought I was qualified for. . . ." With her new baby she suffered financial hardships. She stated that she suffered "almost what I would call stress attacks or anxiety attacks," marital hardship, and "major stress," as well as "lot[s] of crying, sleeplessness."

"Judgments regarding noneconomic damages are notoriously variable." *Forsyth v. City of Dallas,* 91 F.3d 769, 774 (5th Cir. 1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997). We conclude that the award of compensatory damages was within the court's discretion. As explained above, *Patterson* recognizes that mental anguish damages may be appropriate where the plaintiff suffers sleeplessness, anxiety, stress, marital problems, and humiliation, and does not always require that the plaintiff offer medical evidence or corroborating testimony in addition to her own testimony. *Farpella–Crosby,* too, accepts that stress and humiliation can support an award of mental anguish damages. Migis's testimony of anxiety, sleeplessness, stress, marital hardship and loss of self-esteem was sufficiently detailed to preclude us from holding that the district court abused its discretion in its award of compensatory damages.

### D. *Attorney's Fees*

Pearle Vision challenges the district court's award of approximately $81,000 in attorney's fees to Migis. Migis had requested approximately $110,000 in fees. Under Title VII the court "may allow the prevailing party . . . a reasonable attorney's fee. . . ." 42 U.S.C. § 2000e–5(k).

**[9, 10]** The calculation of attorney's fees involves a well-established process. First, the court calculates a "lodestar" fee by multiplying the reasonable number of hours expended on the case by the reasonable hourly rates for the participating lawyers. *Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 324 (5th Cir.1995). The court then considers whether the lodestar figure should be adjusted upward or downward depending on the circumstances of the case. *Id.* In making a lodestar adjustment the court should look to twelve factors, known as the *Johnson* factors, after *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). The factors are: (1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the

skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Id.* at 717–19.

**[11, 12]** We review the district court's initial determination of reasonable hours and reasonable rates for clear error, and its application of the *Johnson* factors for abuse of discretion. *Louisiana Power & Light,* 50 F.3d at 324, 329. Some of these factors are subsumed in the initial lodestar calculation and should not be double counted. *Shipes v. Trinity Industries,* 987 F.2d 311, 320 (5th Cir.1993).

We have explained that, of the *Johnson* factors, the court should give special heed to the time and labor involved, the customary fee, the amount involved and the result obtained, and the experience, reputation and ability of counsel. *Von Clark v. Butler,* 916 F.2d 255, 258 (5th Cir.1990). The Supreme Court has twice made clear that "the most critical factor" in determining the reasonableness of a fee award in a civil rights suit "is the degree of success obtained." *Farrar v. Hobby,* 506 U.S. 103, 114, 113 S.Ct. 566, 574, 121 L.Ed.2d 494 (1992) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983)).

**[13]** The magistrate judge recognized the above procedure, and entered a careful and thorough order analyzing Migis's fee request and Pearle Vision's objections.[2] The court noted that the suit was hotly contested and that Pearle Vision amassed over $200,000 in attorney's fees.[3] The court reduced the lodestar amount it calculated by ten percent based on the results obtained.[4] Neverthe-

---

**2.** *Migis v. Pearle Vision, Inc.,* 944 F.Supp. 508 (N.D.Tex.1996).

**3.** *Id.* at 514.

**4.** *Id.* at 516.

less, we conclude that the court did not give adequate consideration to the eighth *Johnson* factor, the amount involved and the result obtained.

By any fair measure, Migis's success relative to the relief she sought was limited. She proceeded to trial on the dual claims that Pearle Vision discriminated against her in terminating her position and in failing to hire her for the opening in the product support group. The district court only found discrimination as to the termination. Further, her complaint alleged four acts of discrimination against Migis "on account of her sex and/or pregnancy," including her discharge, Pearle Vision's failure to allow her to return to work, discrimination in the terms, conditions, and privileges of her employment, and retaliation. Migis prevailed only on the first theory, and only on the basis of pregnancy discrimination. As indicated in interrogatory answers, she sought recovery of back pay and benefits of $25,000, and punitive and compensatory damages of $300,000.[5] At trial she asked for $50,000 in compensatory damages. The court awarded her only $7,233.32 in back pay, $5000 in compensatory damages, and no punitive damages.[6]

**[14, 15]** Migis argues that in addition to the award of damages, "[s]he received, importantly, a finding and declaration by the court that she had been discriminated against on the basis of pregnancy." The judgment indeed declares that Pearle Vision discriminated against her. However, the Supreme Court has held that such a declaration does not alter the rule that the plaintiff's monetary success in a private civil rights suit must be the primary determinant of the attorney's fee. "Where recovery of private damages is the purpose of . . . civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought." *Farrar*, 506

U.S. at 114, 113 S.Ct. at 575 (quoting *City of Riverside v. Rivera*, 477 U.S. 561, 585, 106 S.Ct. 2686, 2700, 91 L.Ed.2d 466 (1986) (Powell, J., concurring)). Migis also argues that this is not a case where the plaintiff's suit can be segregated into discrete claims, because all of her contentions involved a common core of facts, and because she only prosecuted a single, discrete claim of pregnancy discrimination. Even if Migis's characterization is correct, where "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." *Hensley*, 461 U.S. at 436, 103 S.Ct. at 1941.

The attorney's fee award was over six and one-half times the amount of damages awarded. Migis sought over twenty-six times the damages actually awarded. Regardless of the effort and ability of her lawyers, we conclude that these ratios are simply too large to allow the fee award to stand. We hold that the district court abused its discretion by failing to give adequate consideration to the result obtained relative to the fee award, and the result obtained relative to the result sought. We therefore reverse the award of attorney's fees and remand the case for a new determination of fees consistent with this opinion.

*E. Costs*

Pearle Vision and Migis complain of the district court's award of costs. Migis requested costs of $6400.64. The district court awarded costs of $4297.32. It disallowed the witness and process fees for certain witnesses, the cost of plaintiff's videotaped deposition, and costs associated with computerized legal research, couriers, postage and copying.

---

5. Although Migis sought $300,000 in compensatory damages and $300,000 in punitive damages, she correctly points out that by statute the sum of these two cannot exceed $300,000. 42 U.S.C. § 1981a(b)(3)(D).

6. The court also awarded prejudgment interest of $1058.17 and post-judgment interest at a speci-

fied rate, but we see no relevance to these awards. The award of interest is automatic and bears no relation to the effort or skill of the attorneys or any other *Johnson* factor. It merely adjusts the damage award to reflect the time value of money.

[16, 17] The district court has broad discretion in taxing costs, and we will reverse only upon a clear showing of abuse of discretion. *Alberti v. Klevenhagen,* 46 F.3d 1347, 1358 (5th Cir.1995). The trial court "has wide discretion with regard to the costs in a case and may order each party to bear his own costs." *Hall v. State Farm Fire & Cas. Co.,* 937 F.2d 210, 216 (5th Cir.1991).

[18] Pearle Vision argues that the district court should have disallowed Migis's costs associated with pursuing her unsuccessful claim that Pearle Vision discriminated against her in failing to offer her a new position. The district court disallowed a substantial portion of the costs Migis requested. Even assuming that it is feasible to segregate costs by the two claims Migis prosecuted, Pearle Vision's refusal to rehire her in a new position was arguably of evidentiary value to the claim on which she did prevail—discrimination in her termination—even if the refusal to rehire her was not itself found to be a separate Title VII violation. We cannot say that the court abused its discretion in awarding the costs that it did.

[19] Migis complains that the court erred in denying her the cost of her videotaped deposition. The deposition was transcribed by a court reporter and videotaped. Pearle Vision provided Migis a copy of the transcript. Migis requested and paid for a copy of the videotape. As to deposition fees, 28 U.S.C. § 1920(2) only allows for the recovery of "[f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case." There is no provision for videotapes of depositions. Even if the statute can be interpreted to include such copies, Migis does not show that the videotape of her own deposition, in addition to the transcript, was "necessarily obtained for use in the case." We see no abuse of discretion in denying this cost.

For the foregoing reasons, the district court's award of attorney's fees is reversed, and the case is remanded for a redetermination of attorney's fees. In all other respects the judgment is affirmed.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

RHESA HAWKINS BARKSDALE, Circuit Judge, concurring in part and dissenting in part:

LET US CONSIDER THE REASON OF THE CASE. FOR NOTHING IS LAW THAT IS NOT REASON.

SIR JOHN POWELL, LORD RAYMOND'S REPORTS (1765) VOL. 2, P. 911.

In truth, the issues in this case are quite unextraordinary; the majority has disposed of them most efficiently. On the surface, for a case of this type, this is as it should be. This is especially true for the attorney's fee question, which, as is well-established, should not result in a second litigation and take more time and effort (*and paper*) than the litigation on the merits. So, on the surface, all is well.

But, lurking beneath this placid surface is an ever-expanding, ever-growing, ever-devouring two-headed monster: over-reaching Title VII litigation and concomitant fee awards. Here, out of a plethora of claims, Migis succeeded on only one, recovering little more than the rejected pre-trial settlement offer. And, to add insult to injury, her award is dwarfed by the fee awarded her attorney. As the majority notes, "Migis sought over twenty-six times the damages actually awarded" and her "attorney's fee award was over six and one-half times the amount of damages awarded". Maj. Op. at 1048. Obviously, something is amiss. *Reason,* and *reasonableness,* have been lost in the shuffle.

In sum, a person terminated in violation of Title VII, but who found other work almost immediately at a higher compensation, received only approximately $7,200 in back pay and benefits and only $5,000 in compensatory damages (and, in fact, those emotional distress damages should *not* have been awarded), but rejected a $10,000 settlement offer along the way. To top it off, under the Title VII fee-shifting provisions, her lawyer was awarded $81,000! A fee of $81,000, when damages total only approximately $12,000 and when a settlement offer of $10,000 is rejected four months before trial is more than sufficient cause for taking a close, close look not only at this case, but also at the

Case 3:08-cv-01551-B   Document 182-8   Filed 04/08/10   Page 35 of 105   PageID 11270

system and procedures behind it. Where is *reason*? Where is *reasonableness*?

Certainly, every case is different. Certainly, Title VII fee-shifting serves a purpose. And, certainly, different factors prompt different damages and fee awards. For the latter, the lodestar, with its adjustment procedure, *if applied properly*, should ensure an acceptable result—a fee that, as required by Title VII, is "*reasonable*". But, I fear that this procedure is being applied in keeping with the times, with the idea that nothing deserves something, and, especially in that regard, that lawyers must be handsomely rewarded, notwithstanding that their labors bore little, if any, fruit. This concern is particularly true when rejection of a pretrial settlement offer almost equal to the total damages is added to the mix. *Reason* and *reasonableness* are missing in action.

Excess has become an art form. This case, being a splendid—better yet, sad—example, presents issues that demand far more relief and adjustment than my able panel colleagues are willing to accord. Therefore, I must respectfully dissent and hope that this alarm, sounded at considerable, but necessary, length, will reach some ears and, perhaps, help restore reason to the damages and fees awarded in cases of this type. *Reason* can be restored. *Reasonableness* can be achieved.

On the issues, I concur as to liability, back pay, and denial of the cost of a copy of Migis' deposition videotape. But, because the evidence and our precedent do not support an award of more than nominal compensatory damages for emotional distress, I dissent from affirming the $5,000 compensatory damages award. And, although I concur in reversing the attorney's fee award and remanding for further proceedings, I cannot agree either with the refusal to require reduction of the lodestar for time spent on unsuccessful claims and in pursuit of irrelevant evidence, or with awarding costs connected with that pursuit.

To assist with focusing on my disagreement and concerns, a restatement of the factual and procedural history is required.

## I.

Pearle employed Migis in January 1991 as a Programmer/Analyst in the Corporate Systems Group, part of the Information Services Department, at Pearle's headquarters in Dallas, Texas. In early 1994, Migis' diabetic condition complicated her pregnancy; on the advice of her physician, she began working half-days in late March. In early April, her physician certified that Migis was unable to work due to her physical condition; shortly thereafter, she requested, and was granted, a leave of absence.

Migis gave birth to her child on 8 September. Two weeks later, her doctor authorized her to return to work on 7 November. In early October, Migis met with Glenn Graves, director of Migis' department, who informed her that her position had been eliminated, but that he would ascertain whether she would be qualified for a position in the Product Support Group of the same department. However, Migis was not offered that position; her employment with Pearle ceased effective 11 November 1994.

At the time her position was eliminated, Migis' annual salary was $40,000. On 19 December, just shy of six weeks after her employment ended with Pearle, Migis accepted employment with CompuCom; but, she did not begin work there until approximately a month later, 23 January 1995. At CompuCom, Migis held the position of programmer/analyst, at a higher annual salary ($43,-840), plus a five percent pay-on-performance bonus. (About a year after she began, her annual salary increased approximately $4,000, to $47,800, plus retaining the five percent pay-on-performance bonus.)

In February 1995, less than a month after beginning at CompuCom, Migis filed this action against Pearle, claiming that it discriminated and/or retaliated against her on account of her sex and/or pregnancy by discharging her; failing to allow her to return to work; discriminating against her in the terms, conditions, and privileges of her employment; and retaliating against her. She sought to have Pearle permanently enjoined from discriminating against her in violation of Title VII; a declaratory judgment that its practices were in violation of Title

APP0659

VII; reinstatement, back pay, and/or front pay; compensatory and exemplary damages; attorney's fees; costs; and pre—and post—judgment interest. The parties consented to trial before a magistrate judge.

At her three-day bench trial in June 1996, Migis dropped her claims for reinstatement and front pay. The magistrate judge ruled that Pearle violated Title VII when it eliminated Migis' position in the Corporate Systems Group; but, that she failed to prove discrimination in connection with Pearle's subsequent decision not to hire her for the position in the Product Support Group. (*Migis does not challenge the latter ruling.*)

Migis was granted declaratory relief and awarded $7,233.32 in back pay and benefits, $5,000 in compensatory damages, and $1,058.17 for prejudgment interest. The court declined to award punitive damages. And, following a separate hearing on Migis' request for approximately $110,000 in attorney's fees and $6,400 in costs, she was awarded approximately $81,000 and $4,300, respectively. *Migis v. Pearle Vision, Inc.,* 944 F.Supp. 508, 517–18 (N.D.Tex.1996).

### II.

#### A.

According to Pearle, the evidence demonstrates that Migis' position, along with all other Programmer/Analyst positions in the Corporate Systems Group, was eliminated as part of a reduction in force. Notwithstanding my concurrence on liability, recitation of the facts bearing on liability is necessary to explain the basis of my disagreement on the compensatory damages, attorney's fee, and cost issues.

Needless to say, the magistrate judge's finding of a Title VII violation is reviewed under the clearly erroneous standard. FED. R.CIV.P. 52(a); *see E.E.O.C. v. Clear Lake Dodge,* 60 F.3d 1146, 1151 (5th Cir.1995). And, it is more than well-established that "a finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Id.* (quoting *Cupit v. McClanahan Contractors,* 1 F.3d 346, 348

(5th Cir.1993), *cert. denied,* 510 U.S. 1113, 114 S.Ct. 1058, 127 L.Ed.2d 378 (1994)). "We are not permitted to re-weigh the evidence on appeal simply because we disagree with the choices made by the district court." *Id.* (citing *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). "But we will overturn the district court where there is only one permissible view of the weight of the evidence." *Id.*

The record supports the finding that Migis' pregnancy was a substantial factor in eliminating her position. For example, after Migis went on leave of absence in April, memoranda dated 24 May and 22 July from Graves, director of the Information Services Department, to Colin Heggie, chief financial officer, state that two positions would be eliminated from the Corporate Systems Group; and that the targeted positions were a Senior Programmer/Analyst position held by Randy Ragsdale and a Programmer/Analyst position held by Tracy Culpepper, both males. *The memoranda do not mention Migis or her position.* Graves testified that it was decided in late April or early May 1994 that all three positions, including Migis', would be eliminated, and that Migis' position was not addressed because she was on leave at the time and it was Pearle's policy not to address position eliminations affecting on-leave employees. The magistrate judge found that Graves' testimony might explain why Migis was not told that her job was being eliminated, but it did not explain why Heggie was not fully informed of the reductions in the Corporate Systems Group.

The magistrate judge relied also on the testimony of Kelly Keahon, vice president of human resources at the time of the staff reductions. Keahon testified that she told Graves to document carefully his actions and to communicate with Heggie regarding the staff reductions; and that she informed Graves that it was not necessary to include the elimination of Migis' position in the memoranda because that elimination did not have any financial consequences to Pearle during fiscal year 1994. But, when Graves was asked by the court to explain why the memoranda contain no reference to the elimination

of Migis' position, he responded that he should have addressed it. Keahon, however, testified that, if Graves said that the reason he did not refer to Migis in the memoranda was because he made a mistake, that would be inconsistent with what she told him.

The magistrate judge also relied on handwritten notations on the bottom of an organizational chart, made by Graves at one of the initial meetings when the staff reductions were discussed. The notations refer to one Senior Programmer/Analyst and one Programmer/Analyst. Graves testified that the notations indicate that there were preliminary discussions about *retaining* one Senior Programmer/Analyst and one Programmer/Analyst. But, the magistrate judge found that "the weight of the credible evidence" led him to conclude that the notations refer to the positions that were instead targeted for *elimination*, as indicated in the memoranda.

The magistrate judge found further that Pearle's explanation was also undermined by the testimony of Mark McQuay, manager of the Corporate Systems Group and Migis' *supervisor* beginning in early 1994. McQuay testified that Migis was not targeted for elimination in the downsizing effort; that he recommended retaining her; but that Graves was excited that Migis had taken disability, instead of maternity, leave because Graves thought (erroneously) that there was a distinction, and that he would not have been able to eliminate her position had she taken maternity leave. Graves denied making such a statement.

Pearle exhaustively attacks the findings, contending, *inter alia*, that the magistrate judge misinterpreted Graves' notations on the organizational chart and mischaracterized McQuay's testimony. It asserts also that the magistrate judge ignored other evidence, including: that all organizational charts created after May 1994 consistently reflect the elimination of all Programmer/Analyst positions in the Corporate Systems Group, including the one formerly held by Migis; the handwritten notation "upon return" beside Migis' name on the organizational chart, which, according to Pearle, corroborates Graves' testimony that Ragsdale

and Culpepper's positions were to be eliminated as soon as possible, but that Migis' position would be eliminated "upon return" from her leave; and McQuay's testimony regarding his dissatisfaction with Migis' performance. Pearle contends further that the magistrate judge erred by relying on McQuay's testimony regarding Graves' alleged statement about the nature of Migis' leave, because McQuay's testimony is so internally inconsistent and contradictory that no reasonable person would believe it.

*Pearle's contentions are not without substance;* it presented considerable plausible evidence that the elimination of Migis' position was part of a massive reduction in force. But, there is also substantial, plausible evidence to support the magistrate judge's finding that Pearle's explanation was, instead, a pretext for discrimination. It goes without saying that credibility determinations are "peculiarly within the province of the district court" when it sits as a trier of fact. *Kendall v. Block*, 821 F.2d 1142, 1146 (5th Cir.1987); *see also Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 933 (5th Cir.1996) (internal quotation marks and citations omitted) ("Where the court's finding is based on its decision to credit the testimony of one witness over that of another, that finding, if not internally inconsistent, can virtually never be clear error."), *cert. denied,* —— U.S. ——, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997). We will declare testimony incredible as a matter of law only when it "is so unbelievable on its face that it defies physical laws". *United States v. Casteneda*, 951 F.2d 44, 48 (5th Cir.1992) (internal quotation marks and citation omitted). Contrary to Pearle's assertion, McQuay's testimony does not come close to meeting that standard.

In sum, because the magistrate judge's "account of the evidence is plausible in light of the record viewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511.

## B.

Pearle challenges the damages on two grounds: back pay for the one-month period between Migis' accepting the CompuCom offer and beginning work; and compensatory damages of $5,000. Although I agree that the back pay award is not clearly erroneous, I respectfully dissent from affirming the compensatory damages; under our precedent, Migis failed to prove that she is entitled to more than nominal damages for emotional distress.

Under Title VII, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a(a)(1), "a Title VII plaintiff who wins a back pay award may also seek compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." *Landgraf v. USI Film Products,* 511 U.S. 244, 253, 114 S.Ct. 1483, 1491, 128 L.Ed.2d 229 (1994) (internal quotation marks and citation omitted). In awarding the compensatory damages, the district court did not make supporting findings. Pearle maintains that the award should be reversed because Migis did not present any economic, medical, or psychological evidence to support the award.

In *Carey v. Piphus,* 435 U.S. 247, 255–56, 98 S.Ct. 1042, 1047–48, 55 L.Ed.2d 252 (1978), the Court held that compensatory damages such as for emotional harm caused by the deprivation of constitutional rights may be awarded only when the claimant submits proof of actual injury. Although *Carey* refers to damage awards under 42 U.S.C. § 1983, its reasoning applies to claims for emotional harm under 42 U.S.C. § 1981. *Patterson,* 90 F.3d at 938 & n. 11. And, the same standards apply for Title VII emotional distress claims. *Id.* at 940.

Under *Carey,* a claimant must present testimony and/or other evidence to show the nature and extent of emotional harm *caused by the alleged violation. Patterson,* 90 F.3d at 938. *Carey* stated:

We use the term "distress" to include mental suffering or emotional anguish. Although essentially subjective, genuine injury in this respect may be evidenced by one's conduct and observed by others....

[A]n award of damages must be supported by competent evidence concerning the injury.

435 U.S. at 264 n. 20, 98 S.Ct. at 1052 n. 20. "In order to establish intangible loss, we recognize that *Carey* requires a degree of specificity which may include corroborating testimony or medical or psychological evidence in support of the damage award." *Patterson,* 90 F.3d at 940. "Hurt feelings, anger and frustration are part of life. Unless the cause of action manifests some specific discernable injury to the claimant's emotional state, we cannot say that the specificity requirement of *Carey* has been satisfied." *Id.*

The 1991 amendments allowing compensatory damages under Title VII have been interpreted by the EEOC to require physical manifestations in order to recover for emotional harm:

Damages are available for the intangible injuries of emotional harm such as emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life. Other nonpecuniary losses could include injury to professional standing, injury to character and reputation, injury to credit standing, loss of health, and any other nonpecuniary losses that *are incurred as a result of the discriminatory conduct.* Non-pecuniary losses for emotional harm are more difficult to prove than pecuniary losses. *Emotional harm will not be presumed simply because the complaining party is a victim of discrimination. The existence, nature, and severity of emotional harm must be proved.* Emotional harm may manifest itself, for example, as sleeplessness, anxiety, stress, depression, marital strain, humiliation, emotional distress, loss of self esteem, excessive fatigue, or a nervous breakdown. Physical manifestations of emotional harm may consist of ulcers, gastrointestinal disorders, hair loss, or headaches.... The Commission will typically require medical evidence of emotional harm to seek damages for such harm in conciliation negotiations.

*Patterson,* 90 F.3d at 939 (quoting EEOC POLICY GUIDANCE No. 915.002 § II(A)(2), at

10–12) (first emphasis added; second emphasis in original). "Our standard of review for awards based on intangible harms such as mental anguish is deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of witnesses." *Id.* at 937–38 (internal quotation marks and citations omitted). "We ... review the district court's emotional damage award for abuse of discretion." *Id.* at 940.

The *Patterson* case, discussed by the majority, is instructive in evaluating Migis' compensatory damage award. In *Patterson,* the district court awarded Brown $40,000 for emotional distress under § 1981 and awarded Patterson $150,000 for emotional damage, mental pain and suffering under Title VII. *Id.* at 939, 940. The evidence submitted by Brown in support of his claim for emotional harm under § 1981 consisted of the following: he testified that he felt "frustrated" and "real bad" for being judged by the color of his skin; explained that the work environment was "unbearable" and was "tearing my self-esteem down"; and "stated that it 'hurt' and made him 'angry' and 'paranoid' to know that his supervisor referred to [him] as a 'porch monkey' or a 'nigger' and generally thought that he was inferior to white employees." *Id.* at 939.

Our court held that this evidence was insufficient to support anything more than a *nominal* damage award, because Brown did not present evidence with the specificity required by *Carey,* did not testify as to any manifestations of harm listed by the EEOC policy statement, and presented no corroborating testimony or expert medical or psychological evidence of damages caused by his alleged distress; no evidence suggested that Brown suffered from sleeplessness, anxiety, or depression; and, immediately after his constructive discharge, he obtained other employment for a higher wage. *Patterson,* 90 F.3d at 939–40.

As noted, Patterson sued the same employer as did Brown. Patterson's emotional harm award was based on her testimony that her retaliatory firing emotionally scarred her, that she suffered mental anguish during her unemployment, and that she endured a great deal of familial discord arising from having to leave her children while she worked in other areas. *Id.* at 940. Our court stated: "Obviously, the retaliatory discharge caused a substantial disruption in Patterson's daily routine." *Id.* at 941. But, we concluded, again, that the evidence would not permit anything more than *nominal* damages. *Id.* We noted, again, that the record contained none of the listed evidentiary factors in the EEOC policy statement; no corroborating testimony was offered to support Patterson's testimony; no evidence suggested that she was humiliated or subjected to any kind of hostile work environment; there was no expert medical or psychological evidence to support a claim for emotional harm; and there was no proof of actual injury. *Id.*

Migis testified that the elimination of her position was a major inconvenience and burden because of financial obligations; that she suffered from low self-esteem as a result of being terminated and not offered a position for which she felt qualified, and because she had been out of the work arena for several months; that it was "a very discomforting feeling"; that not being allowed to work impacted family finances and that she had to buy used furniture for her child; that she suffered from "general anxiety, stress or anxiety attacks"; that it "caused some hardship on my marriage"; that it was "major stress," and a "[l]ot of crying, sleeplessness"; and that wondering whether she could afford diapers and formula "was not fun."

The majority acknowledges that the evidence of mental anguish consists *solely* of Migis' testimony, but concludes that her testimony of anxiety, sleeplessness, stress, marital hardship, and loss of self-esteem was sufficiently detailed to support $5,000 for mental anguish. Even assuming that the majority correctly interprets *Patterson* as not *requiring* medical evidence or corroborating testimony, I cannot agree that Migis' testimony supports more than a nominal damages award.

First, *Patterson* and the EEOC policy statement require proof of a causal relationship between the discriminatory conduct and the emotional harm. *See Patterson,* 90 F.3d

at 938; *id.* at 939 (quoting EEOC policy statement). Unlike the plaintiff in *Farpella–Crosby v. Horizon Health Care,* 97 F.3d 803, 808–09 (5th Cir.1996), who testified that her emotional distress resulted from her superior's harassment, Migis did not testify that the emotional harm she claims to have suffered resulted from illegal discrimination; indeed, one can conclude from her testimony that her emotional suffering would have been the same had her position been eliminated for non-discriminatory reasons. Unfortunately, and understandably, some form of distress is inevitable with job loss. But, for recovery of more than nominal damages for such distress, the law requires proof that it is caused by illegal discrimination, not just the job loss.

Second, pursuant to *Patterson,* Migis' evidence for mental distress lacks the specificity required by *Carey* and is insufficient to support anything more than a nominal damage award. *See Carey,* 435 U.S. at 266–67, 98 S.Ct. at 1053–54 (plaintiffs entitled to recover "nominal damages not to exceed one dollar" for denial of procedural due process, without proof of actual injury); *Patterson,* 90 F.3d at 941 (vacating Title VII emotional distress award and remanding to district court with instructions to award nominal damages; amount not specified); *Archie v. Christian,* 812 F.2d 250, 252 (5th Cir.1987) (modifying judgment to hold plaintiff entitled to receive one dollar in nominal damages); *Davis v. West Community Hospital,* 755 F.2d 455, 459 (5th Cir.1985) (remanding for entry of judgment for nominal damages of one dollar); *Irby v. Sullivan,* 737 F.2d 1418, 1433 n. 30 (5th Cir.1984) (even if no emotional damages are awarded, plaintiff entitled to nominal damages not to exceed one dollar if he has been victim of intentional racial discrimination). *See also Price v. City of Charlotte,* 93 F.3d 1241, 1246 (4th Cir.1996) (plaintiff's failure to prove compensatory damages for constitutional violation "results in nominal damages typically one dollar"), *cert. denied,* — U.S. ——, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997).

Although Migis' testimony mentioned some of the factors in the EEOC policy statement (sleeplessness, anxiety, stress, marital strain, loss of self-esteem), she admitted, on cross-examination, that she had not mentioned *any* of those factors in her pre-trial deposition. She admitted also that she had not sought counseling or therapy. There is no evidence that she was humiliated or subjected to a hostile work environment. *See Patterson,* 90 F.3d at 941; *see also Bellows v. Amoco Oil Co.,* 118 F.3d 268, 277 n. 28 (5th Cir.1997) (Bellows' testimony that Amoco's alleged discriminatory acts caused him to feel "less than a man" and "ruined his reputation as a man" did not, "without more", sufficiently support an award of damages for emotional harm), *cert. denied,* — U.S. ——, 118 S.Ct. 739, — L.Ed.2d —— (1998); *Annis v. County of Westchester,* 136 F.3d 239 (2d Cir.1998) (plaintiff's testimony that she was humiliated by the gender discrimination she endured and sought counseling for it is insufficient to warrant an award of compensatory damages because "[s]he has not alleged any physical manifestations of her emotional distress" and "introduced no affidavit or other evidence to corroborate her testimony"); *cf. Farpella–Crosby,* 97 F.3d at 808–09 (affirming award of $7,500 compensatory damages based on plaintiff's testimony about hostile work environment, harassment, and abusive treatment, corroborated by co-worker's testimony). She did not present any corroborating testimony and did not offer any expert medical or psychological evidence of damages caused by her claimed distress. *See Patterson,* 90 F.3d at 939. Moreover, approximately two months after she was last compensated by Pearle, she resumed work at a *higher salary* than she received at Pearle. *See id.* at 939–40.

In short, the district court abused its discretion by awarding more than nominal damages to Migis for emotional distress. Therefore, I respectfully dissent from the majority's affirming that award.

### C.

In his fee application, Migis' counsel requested approximately $110,000 for 385.25 hours of work performed by attorneys and legal assistants and $6,400 for costs. *Migis,* 944 F.Supp. at 510. Over Pearle's objections, approximately $81,000 in fees and

$4,300 in costs were awarded. Pearle challenges both; Migis, one item of disallowed costs.

In line with my concurrence in reversing the attorney's fee award and remanding for further proceedings, I agree that the magistrate judge, when adjusting the lodestar, abused his discretion by failing to adequately consider the results obtained as compared to the relief sought.

However, I disagree with the majority's implicit conclusion that, when calculating the lodestar, the magistrate judge did not clearly err by including hours spent on unsuccessful claims and unnecessary discovery in pursuit of irrelevant evidence. Concomitantly, I dissent from allowing costs for those unsuccessful claims.

Finally, and perhaps most importantly, the majority fails to give sufficient guidance for reconsideration of the lodestar adjustment on remand, particularly with respect to Migis' refusal of the settlement offer and the relevance of the fees charged by Pearle's counsel. We should offer guidance on both, especially the settlement offer subissue.

These issues inhabit familiar ground. For many years, that terrain has been thoroughly and painstakingly analyzed, checked, swept, and probed. But, that does not ensure that new booby traps have not been set while courts were not on guard. Perhaps, because the ground is so familiar, courts have become less watchful, less demanding, than they should be. Perhaps, things have become too routine, and courts have grown lax. Perhaps, courts need to return to the basic course, and re-walk this ground. In doing so, the district court's errors loom large and fatal.

### 1.

For starters, it is well to remember that only a *reasonable* fee may be awarded. There is *that* word again—*reasonableness*. Title VII provides, in pertinent part, that "the court, in its discretion, may allow the prevailing party ... a *reasonable* attorney's fee ... as part of the costs". 42 U.S.C. § 2000e–5(k) (emphasis added).

Pursuant to the well-established, and equally well-known, procedure for satisfying the statutory command that the attorney's fee be *reasonable*, the district court determines, and then multiplies, the number of hours *reasonably* expended on the litigation by the *reasonable* hourly rates for the participating lawyers; it may adjust this "lodestar" in the light of the 12 well-known, relevant case-related factors enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). *See Farrar v. Hobby*, 506 U.S. 103, 114–15, 113 S.Ct. 566, 574–75, 121 L.Ed.2d 494 (1992); *e.g.*, *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 323–24 (5th Cir.), *cert. denied*, 516 U.S. 862, 116 S.Ct. 173, 133 L.Ed.2d 113 (1995).

Admittedly, and as noted, "[a] request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983). Nor do we require the district court's *Johnson* factor analysis "to be so excruciatingly explicit ... that decisions of fee awards consume more paper than did the cases from which they arose". *Louisiana Power & Light Co.*, 50 F.3d at 331 (internal quotation marks and citation omitted). On the other hand, when, as here, the fee request is so excessive, especially in the light of the meager results achieved, the request must be given the closest scrutiny.

Hour and rate determinations are reviewed only for clear error, *Louisiana Power & Light Co.*, 50 F.3d at 324; lodestar adjustments, for abuse of discretion. *Id.* at 329. As for the latter, "the district court's lodestar analysis [is examined] only to determine if the [district] court *sufficiently considered* the appropriate criteria". *Id.* (emphasis in original). Of course, the challenger "bears the burden of showing that [a change] is warranted." *Id.*

As reflected in *Farrar*, 506 U.S. at 115, 113 S.Ct. at 575, the *Johnson* factors for the lodestar adjustment *vel non* hardly need repeating: (1) required time and labor; (2) issues' novelty and complexity; (3) skill required to properly litigate them; (4) whether attorney had to refuse other work; (5) his customary fee; (6) whether fee fixed or contingent; (7) whether client or case circum-

stances imposed any time constraints; (8) amount involved and results obtained; (9) experience, reputation, and ability of attorneys; (10) whether case was "undesirable"; (11) type of attorney-client relationship and whether it was long-standing; and (12) awards made in similar cases. *Louisiana Power & Light Co.*, 50 F.3d at 329 (citing *Johnson*, 488 F.2d at 717–19).

In district court, Pearle objected to both the time and rate amounts, relying on (1) inadequacies in billing records; (2) Migis' failure to prevail on her claim that Pearle's refusal to offer her a position in the Product Support Group was discriminatory; (3) unnecessary work; (4) excessive time charged for completion of routine tasks; and (5) lack of novel or complex legal issues. *Migis*, 944 F.Supp. at 511–12.

The district court rejected Pearle's contention that the billing records were inadequate due both to the vagueness of the description of services rendered and to counsel's failure to segregate the time spent on various claims. It found that Pearle had not identified any specific entries that were duplicative, repetitive, or inherently unreasonable, and concluded that the records were "more than adequate". *Id.* at 512.

The district court acknowledged that Migis' claims were based on two different employment decisions, *id.* at 510; but, it concluded that her claims were related. *Id.* Accordingly, it rejected Pearle's contention that 85.5 hours spent on unsuccessful claims should be excluded. *Id.* It also rejected Pearle's contention that 156.75 hours should be excluded because they represented unnecessary or excessive time and "clerical" work. *Id.* at 513.

And, although the district court agreed with Pearle's assertion that the issues were neither novel nor complex, it disagreed that the number of hours invested in the case was *unreasonable*. *Id.* It found significant defense counsel's billing Pearle over $200,000. *Id.* at 514.

The district court refused to award the requested hourly rates of $300 for counsel and $70 for legal assistants, reducing them to $250 for lead counsel, $200 for co-counsel,

and $50 for legal assistants. *Id.* at 514–15. (*Pearle does not challenge these rates on appeal.*)

The resulting lodestar was approximately $90,000. But, the district court found that "[t]he monetary damages awarded to [Migis] simply [did] not justify a fee award" in that amount, because it "would constitute the *type of windfall* repeatedly condemned by the Supreme Court and the Fifth Circuit." *Id.* at 516 (emphasis added). Therefore, based on the results obtained, it reduced the lodestar—*but, by only ten percent! Id.*

Pearle also sought a reduction based on the contingent nature of Migis' fee. Her contingent-fee contract provides for a fee of 45% of the amount recovered. However, it provides also that, if fees are awarded in excess of that 45%, Migis' fee obligation is extinguished and her attorney keeps the fee awarded.

Of course, a contingent-fee arrangement does not automatically limit the fee award, *Blanchard v. Bergeron*, 489 U.S. 87, 92, 109 S.Ct. 939, 943–44, 103 L.Ed.2d 67 (1989). Nevertheless, "[t]he presence of a pre-existing fee arrangement may aid in determining *reasonableness* [because] [t]he fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating the attorney's fee expectation when he accepted the case." *Id.* at 93, 109 S.Ct. at 944 (internal quotation marks and citations omitted; emphasis added). Although the contingent nature of the fee arrangement may be considered in determining whether to reduce the lodestar, a lodestar *enhancement* cannot be based on that factor. *City of Burlington v. Dague*, 505 U.S. 557, 567, 112 S.Ct. 2638, 2643–44, 120 L.Ed.2d 449 (1992).

Along that line, the district court refused to adjust downward based on the contingent nature of the fee; nor would it so adjust because of the case's *desirability* (Pearle claimed that, for applying the "undesirability" *Johnson* factor, the case was, in fact, desirable). *Migis*, 944 F.Supp. at 516–17. As a result, the court determined that Migis was entitled to fees of $80,718.75.

I agree with Pearle that the district court clearly erred by awarding fees to Migis as

the prevailing party on all issues and abused its discretion by not giving due weight to the most critical *Johnson* factor—the relationship between relief sought and obtained—as required by *Farrar*, 506 U.S. at 114, 113 S.Ct. at 574–75.

### a.

*Hensley* states that a "district court . . . should [, *inter alia*,] exclude from [the] initial fee calculation [, the lodestar,] hours that were not reasonably expended", and that the prevailing party's counsel "should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." 461 U.S. at 434, 103 S.Ct. at 1939–40 (internal quotation marks omitted). Pearle's attack on the lodestar concerns unsuccessful claims, discovery as to irrelevant evidence, and inadequate billing records.

### i.

Citing *Hensley*, the Supreme Court stated in *City of Burlington*, 505 U.S. at 565, 112 S.Ct. at 2643: "[T]he statutory language limiting fees to prevailing . . . parties bars a prevailing plaintiff from recovering fees relating to claims on which he lost". *Hensley* provides that, when a plaintiff succeeds on some, but not all, of her claims, "two questions must be addressed": (1) whether "the plaintiff fail[ed] to prevail on claims that were unrelated to the [successful] claims"; and (2) whether "the plaintiff achiev[ed] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award". *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1940.

The object of the first question is to determine the successful and unsuccessful claims, and the degree to which such claims are related; as stated, generally, it can and should be answered in the lodestar calculation prior to any adjustment. *See id.* at 434–35, 103 S.Ct. at 1939–40 (fees should not be awarded for unrelated unsuccessful claims). But, if those claims are so interrelated that no distinction can be made as to the time spent on each, "the district court's focus should shift to the results obtained and adjust the lodestar accordingly". *Louisiana Power & Light Co.*, 50 F.3d at 327 n. 13.

The second question addresses the degree of success achieved on the successful claims and, generally, is more appropriately considered in determining the lodestar adjustment. *See Hensley*, 461 U.S. at 440, 103 S.Ct. at 1943 ("[T]he inquiry does not end with a finding that the plaintiff obtained significant relief. A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole."); *Farrar*, 506 U.S. at 114, 113 S.Ct. at 574–75 (internal quotation marks and citations omitted) ("if . . . plaintiff has achieved only partial or limited success, [the lodestar] may be . . . excessive"; "[w]here recovery of private damages is the purpose of . . . civil rights litigation, a district court, in fixing fees, is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought").

Obviously, the extent to which successful and unsuccessful claims are related is crucial in determining whether fees may be awarded for work on the latter. *Hensley* addresses four situations.

First, when a plaintiff presents "distinctly different claims for relief that are based on different facts and legal theories, . . . work on an unsuccessful claim cannot be deemed to have been expended in pursuit of the ultimate result achieved"; accordingly, "no fee may be awarded for services on the unsuccessful claim". *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940.

Second, when the claims "involve a common core of facts[,] or [are] based on related legal theories[,] [m]uch of counsel's time will be devoted generally to the litigation as a whole, [and] it [will be] difficult to [separate] the hours expended [on each claim]"; in such cases, "the district court should focus on the significance of the overall relief obtained . . . in relation to the hours *reasonably* expended". *Id.* (emphasis added).

Third, when "a plaintiff has obtained excellent results, . . . the fee . . . should not be reduced simply because the plaintiff failed to prevail on every contention." *Id.*

MIGIS v. PEARLE VISION, INC.
Cite as 135 F.3d 1041 (5th Cir. 1998)

And, finally, if "a plaintiff has achieved only partial or limited success, the [lodestar] may be ... excessive[,] ... even whe[n] the ... claims were interrelated, nonfrivolous, and raised in good faith." *Id.* at 436.

Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. *Again, the most critical factor is the degree of success obtained.*

*Id.* (emphasis added).

As the district court and Migis' opening statement acknowledged, her claims were based on two different employment decisions by Pearle: to eliminate her position; and not to offer her another, 944 F.Supp. at 510. Migis was successful on the first, but not the second. Nevertheless, because the district court found that both claims involved common facts or derived from related legal theories, it included in the lodestar all hours spent pursuing both claims.

The majority assumes *arguendo* that Migis is correct in claiming her action cannot be broken into separate claims; and, therefore, it mentions Migis' failure to prevail on her claim of discrimination in Pearle's refusal to offer her a position in the Product Support Group only in its discussion of the lodestar adjustment under the eighth *Johnson* factor (amount involved and result obtained). (In fact, as noted in its discussion of the cost award, discussed *infra*, the majority apparently considers the refusal to offer another position to have been of some evidentiary value for the position elimination claim.) In my view, *Hensley* requires that time spent on the unsuccessful claim should be deducted *prior* to calculating the lodestar, rather than when later considering whether to adjust the lodestar based on the degree of success achieved.

The factual circumstances surrounding the decision to eliminate Migis' position in the Corporate Systems Group and the decision not to offer her a position in the Product Support Group were made at different times and by different decision-makers, are easily distinguishable from an evidentiary and preparation standpoint, and are not so in-

terrelated that it would be difficult to distinguish between the work done on each claim.

Concerning her successful claim (position elimination), Migis relied on her testimony and that of Graves, McQuay and Rodriguez, whom she also deposed. She also deposed Gieseking, Schwartz, and Smith; Smith did not testify at trial, and Gieseking's and Schwartz's trial testimony was curtailed because of the court's *exclusion of non-pregnancy-related evidence, discussed below, and evidence regarding persons who were not decision-makers.*

For her unsuccessful claim (not offered another position), Migis relied primarily on her testimony and that of Boswell and Marshall, whom she also deposed. Although Migis subpoenaed Melissa Kinnear, she neither called her as a witness nor deposed her. Graves testified also about this claim; he and Migis were the only witnesses whose testimony was relevant to both claims. As stated, with the exception of Graves and Migis, none of these witnesses offered *any* testimony that contributed to the success of Migis' position elimination claim.

Migis is not entitled to attorney's fees for the hours spent in pursuing this unsuccessful claim; and, therefore, the district court clearly erred in including them in the lodestar.

ii.

Pearle asserts further that Migis' counsel should not be compensated for *discovery relevant only to general sex (as opposed to pregnancy) discrimination (including general hostility toward gender, and Pearle's managerial attitude toward female and minority employees).* As noted, such evidence was excluded at trial. But, the magistrate judge did not exclude time spent on such discovery; and the majority does not address Pearle's contention.

For example, on 25 January 1996, counsel charged 9.25 hours for "preparation for, and deposing, Mark McQuay, Russell Smith, Rosie Rodriguez, and *Carole Schwartz;* review notes of same and dictation." (Emphasis added.) And, counsel charged 6.75 hours on 22 February 1996 for preparing for, and deposing, *Doris Gieseking* and Barry Bos-

well, and review of notes regarding same. It is impossible to tell from these entries how many of those hours were related to *Gieseking* and *Schwartz*, whose trial testimony was severely curtailed, as noted, after the court refused to allow Migis to elicit testimony from them about sex discrimination unrelated to pregnancy, such as Pearle's attitude toward women generally.

Surely, prior to discovery, Migis' counsel researched the admissibility of such general sex discrimination; it is *not* probative of pregnancy discrimination. *See Todd v. Inn Development & Management, Inc.,* 870 F.Supp. 667, 671 n. 4 (D.S.C.1994) (affidavit stating that employer had a consistent pattern of firing female employees and replacing them with male employees fails to address issue of pregnancy discrimination). *See also Kelly v. Boeing Petroleum Services, Inc.,* 61 F.3d 350, 357–58 (5th Cir.1995) (derogatory remarks about race, sex, and national origin not probative of discrimination on basis of disability); *E.E.O.C. v. Ackerman, Hood & McQueen, Inc.,* 956 F.2d 944, 948 (10th Cir.) (inquiry is "whether ... employer treats pregnancy or pregnancy-related conditions differently than other medical conditions"; thus, appropriate "comparison is ... between pregnant and nonpregnant workers, not between men and women"), *cert. denied,* 506 U.S. 817, 113 S.Ct. 60, 121 L.Ed.2d 28 (1992); *Rauh v. Coyne,* 744 F.Supp. 1181, 1183 (D.D.C.1990) (evidence of racial animus excluded in case alleging discrimination on basis of sex and marital status).

At trial, each time Migis' counsel sought to introduce evidence of general sex discrimination, the magistrate judge ruled that it was not admissible, absent some case authority that other gender-related evidence was relevant in a pregnancy discrimination case. Although counsel stated that he would provide such authority, it does not appear that he did so. In any event, as noted, the evidence was not admitted. Yet time spent on discovery on this area was included in the lodestar. Where is *reason?*

Because these tasks did not contribute to the favorable result on the position elimination claim, the hours devoted to them are not compensable. Accordingly, the district court

clearly erred by including them in the lodestar. *See Hensley,* 461 U.S. at 436, 103 S.Ct. at 1941.

### iii.

Along this line, Pearle maintains that, in order to enable identification of distinct claims, Migis' counsel's records do not adequately describe and disclose the work, and that the court abused its discretion by not requiring Migis' counsel to provide more detail. Again, the majority does not address this contention. Based on my review of the billing records, I agree that it is difficult to determine the number of hours spent on each claim. For example, the 9 June 1996 entry is for 10.75 hours for "continued trial preparation, and outline of testimony for plaintiff, Boswell, Graves, Marshall; lengthy conference with client, and case walk-through; t/c with B. Jones re exhibits; research re maternity leave cases". It is impossible to tell how much of this time involved outlining the testimony of Boswell and Marshall, whose testimony, as noted, was relevant only as to Migis' unsuccessful claim. Other entries suffer from the same deficiency.

Of course, it is within the district court's sound discretion whether additional detail is necessary in order to accurately determine the number of compensable hours for the lodestar. However, it is the duty of the party seeking a fee award to submit evidence supporting the time spent and to "maintain billing time records in a manner that will enable a reviewing court to identify distinct claims". *Hensley,* 461 U.S. at 433, 437, 103 S.Ct. at 1939, 1941. Where the documentation is inadequate, the district court may reduce the fee accordingly. *Louisiana Power & Light Co.,* 50 F.3d at 324. *See also Von Clark v. Butler,* 916 F.2d 255, 259 (5th Cir. 1990) ("Absent a reliable record of the time expended on the prevailing claim, it is within the discretion of the district court to determine a reasonable number of hours that should have been expended in pursuing the claim on which the party prevailed.").

### b.

Concerning the evaluation of the *Johnson* factors in adjusting the lodestar, Pearle

claims, and the majority agrees, that the magistrate judge *failed to give proper weight to the most critical factor:* degree of success obtained. *See Farrar*, 506 U.S. at 114, 113 S.Ct. at 574 (internal quotation marks and citation omitted) (emphasis added) ("the most critical factor in determining the *reasonableness* of a fee award is the degree of success obtained"). As stated, however, further guidance should be provided for reconsideration of the lodestar adjustment on remand. Specifically, the majority addresses neither the relevance of Migis' rejection of the settlement offer nor whether it is appropriate to consider the attorney's fees incurred by Pearle.

In pre-trial disclosures and discovery responses, Migis stated that she sought $25,000 in back pay and $300,000 *each* in compensatory and punitive damages. The 1991 amendments to Title VII provide, however, that the sum of compensatory and punitive damages shall not exceed $300,000. 42 U.S.C. § 1981a(b)(3). In any event, at trial, she sought far less: back pay and benefits; and $50,000 *each* for compensatory damages (humiliation, loss of self-esteem, inconvenience, and anguish) and punitive damages. It hardly bears reminding that she was awarded far, far less than that: only $7,283.32 in back pay and benefits and $5,000 in compensatory damages, and no punitive damages. She also sought, and obtained, a declaratory judgment that Pearle engaged in discriminatory practices.

In that I would hold that Migis is entitled to only nominal compensatory damages, rather than $5,000, this obviously would substantially impact her degree of success. Accordingly, I would hold that, on remand, the district court should reconsider this degree of success factor *after* it re-calculated the lodestar (had my view prevailed, that recalculation would include deducting time spent on unnecessary tasks and on Migis' unsuccessful claim, as discussed *supra*).

But, my view has not prevailed. The majority remands only for reconsideration of the degree of success factor. In that regard, I would offer the following guidance.

Had my view been adopted by the majority, then time spent in pursuit of Migis' unsuccessful claim and on other unnecessary tasks would have been deducted in calculating a new lodestar. Next, the district court, on considering this degree of success factor in adjusting that new (recalculated) lodestar, would have taken into account only the degree of success obtained for the successful claim, avoiding duplication of the considerations used to determine the hours *reasonably* expended when recalculating the lodestar. *See Shipes*, 987 F.2d at 320 ("district court must be careful ... not to double count a *Johnson* factor already considered in calculating the lodestar"). The purpose of this inquiry is to determine whether the (new) lodestar should be adjusted and, if so, how much, in the light of the results obtained in comparison to the relief sought.

But, again, the majority is *not requiring a recalculation* of the lodestar. Therefore, *in adjusting it* on remand, the district court is not faced with this double-counting problem. Accordingly, on remand, the adjustment *should be even greater* than it would have been had a new, smaller lodestar been calculated.

As was the case in *Farrar*, the outcome of this litigation affects only the parties. It did not result in a significant legal pronouncement that will benefit society; instead, it "accomplished little beyond giving [Migis] the moral satisfaction of knowing that a federal court concluded that [her] rights had been violated" and compensating her for a relatively short period of unemployment. *See Farrar*, 506 U.S. at 114, 113 S.Ct. at 574 (internal quotation marks and citation omitted). As noted *supra*, the Supreme Court has stated that, "[w]here recovery of private damages is the purpose of ... civil rights litigation, a district court, in fixing fees, is obligated to give *primary consideration* to the amount of damages awarded as compared to the amount sought." *Id.* at 114, 113 S.Ct. at 575 (emphasis added). In this regard, and as the magistrate judge recognized, although Migis testified that a declaration that Pearle violated the law was equally as important to her as damages, that fact, standing alone, would not justify an award of attorney's fees. *See id.; Migis*, 944 F.Supp. at 516. Accordingly, *primary consideration*

must be given to a comparison of the damages amounts sought and received.

Although the magistrate judge acknowledged, pursuant to *Farrar*, that the degree of success is the most critical factor in determining the *reasonableness* of the fee award, he reduced it by *only ten percent* (from $89,687.50 to $80,718.75), despite the fact that *Migis recovered only a fraction of the damages sought*. Accordingly, despite stating that a $90,000 fee "would constitute the type of windfall repeatedly condemned by [both] the Supreme Court and" our court, the district court nevertheless concluded, somehow, that a $81,000 fee would not. *Migis*, 944 F.Supp. at 516.

And, although the district court complied with *Farrar's* directive to *consider* Migis' limited success, its opinion does not *explain* why such a minor reduction is sufficient to prevent a windfall. *See Louisiana Power & Light Co.*, 50 F.3d at 330. Its opinion reflects, however, that the district court may have been influenced by the settlement amount offered Migis.

The magistrate judge stated that, because Migis received $12,233.32 in damages, and Pearle never offered more than $10,000 to settle, Migis' counsel "should not be unduly penalized because his client pursued a course of action that resulted in a greater recovery." *Migis*, 944 F.Supp. at 516. In that *reason* and *reasonableness* are at stake, I do not understand the district court's rationale. Because I believe that Migis should have recovered only nominal damages for emotional distress, her total damages would be less than the $10,000 offered four months before trial. In any event, it is quite debatable, at least to me, that the relatively small amount awarded over the $10,000 is a "greater recovery", especially when one considers the greater price paid in time and money by the parties, counsel, and federal court system in order for Migis to gain that slight increment. Again, *reasonableness* is lost. As mentioned, the majority does not address the relevance of Migis' refusal to settle.

In *Sheppard v. Riverview Nursing Center, Inc.*, 88 F.3d 1332 (4th Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 483, 136 L.Ed.2d 377 (1996), the Fourth Circuit stated that a court

may consider a plaintiff's rejection of a settlement offer as one of several factors affecting its fee award. *Id.* at 1337. *Sheppard* was a mixed-motives case in which the plaintiff proved that pregnancy discrimination played a part in her discharge, but the employer established that, absent discrimination, it would have reached the same decision.

In such cases, Title VII, as amended by the Civil Rights Act of 1991, provides that the court "may" grant attorney's fees. 42 U.S.C. § 2000e–5(g)(2)(B). Because this is not a mixed-motives case, the fee award is governed by § 2000e–5(k), which, as noted earlier, provides similarly that "the court, in its discretion, may allow the prevailing party . . . a *reasonable* attorney's fee . . . as part of the costs." (Emphasis added.)

In that a fee award is discretionary under both provisions, I see no reason why consideration of settlement offers should not be the same under both. After all, "where a rejected settlement offer exceeds the ultimate recovery, the plaintiff—although technically the prevailing party—has not received any monetary benefits" from her attorney's *post-offer* services. *See Marek v. Chesny*, 473 U.S. 1, 11, 105 S.Ct. 3012, 3017, 87 L.Ed.2d 1 (1985). The same *reasoning* applies where, as here, the award is only slightly greater than the offer. Because I agree with the Fourth Circuit that such consideration will further *Farrar's* concerns about the degree of success achieved by the plaintiff, I would hold that a court may consider a plaintiff's rejection of a settlement offer (as well as a plaintiff's settlement demands) as a factor in making the degree of success and other relevant evaluations for its discretionary, *reasonable* fee award.

This action was filed in February 1995; the offer was made approximately a year later; and trial took place about four months after that. Migis asserts that the settlement offer was *unreasonable* because it was not made until four months before trial and covered not only her claims, but also attorney's fees and costs, and included, as well, non-monetary, prohibitory matters (such as Migis agreeing never to seek employment with ei-

ther Pearle or any affiliated entities in the future). At that time, the fees, at the later allowed $250 hourly rate (which seems quite high for this case), would have totaled $30,-000, and the costs exceeded $2,000. Migis concludes, therefore, that the offer was effectively no offer at all, because it "was less than one-fourth of the *monetary* value of the case at the time the offer was made". (Emphasis in original.) (The offer having been rejected, the ultimate fee award of $81,000 provided an additional $51,000 to Migis' counsel for effort that gained Migis very little, but gained her counsel a great deal.)

Of course, if the fees of $30,000 are deducted from that calculation, the settlement offer, *at least in monetary terms, was more than* Migis' lost pay and benefits. At oral argument in our court, her counsel persisted in including his fees in calculating the "value" of Migis' case. Needless to say, counsel errs by calculating the value of a case, for settlement purposes, *from his*, rather than *his client's*, perspective. Having entered into a contingent-fee agreement, the value of his fees, *for settlement purposes*, is the percentage of his client's recovery that he contracted to accept, not the amount that might be awarded if the case is *not* settled. And, again needless to say, the settlement decision is the client's.

As discussed, Migis' fee agreement permits counsel to keep a fee award if it *exceeds 45%* of Migis' maximum recovery. Surely, both when he took the case, and when the settlement offer was made, her counsel had good *reason* to feel that any recovery would be relatively low: first, as shown, liability *vel non* was a close question; second, Migis' maximum back pay was quantified long before she filed this action (began working for another at higher salary approximately two months after last paid by Pearle and four weeks before action filed); and third, recovery of a large amount on Migis' compensatory and punitive damages claims had a small chance of success. Accordingly, it is quite arguable that this case was fee, *not client*, driven.

Along this line, one possible scenario would be a hope held by Migis and/or her counsel that the fee award would exceed 45% of her recovery; if so, they would both win—she

would keep all of the award and he would have a much larger fee. Surely, the fee-shifting provision in Title VII was not meant for this. Where is *reason*? Where is *reasonableness*?

Obviously, another possible scenario for pressing forward with the case, and running up the *excessive* amount of time and expenses by Migis' counsel, was that Migis, acting on, or against, the advice of counsel, felt that her potential damages far exceeded the $10,000 offered. This, of course, was Migis' choice, however ill-advised and costly. She, *not her attorney* (but, I assume, based on his counsel), rolled the dice. But, when you gamble, you win or you lose. And when the client loses, a contingent fee counsel must lose as well. (Or, at least, should lose. That is not the case here. *Reason* has taken a back seat.)

This is the underlying purpose of *Farrar*'s focus on the degree of success: "to prevent a situation in which a client receives a pyrrhic victory and the lawyers take a pot of gold". *Sheppard*, 88 F.3d at 1339; *see also City of Burlington*, 505 U.S. at 563, 112 S.Ct. at 2642 (federal fee-shifting statutes "were not designed as a form of economic relief to improve the financial lot of lawyers"). Therefore, in order to prevent this windfall to counsel, I think the court, on remand, should give considerable weight to this rejection-of-settlement-offer factor, and, accordingly, greatly adjust the lodestar downward.

To counter Pearle's windfall-charge, Migis points out that Pearle was billed $206,000 in fees and $14,671 in expenses. She asserts that Pearle's attorneys' expenditure of time (1,000 hours) and their fees and expenses (approximately $220,000) are further evidence that her request and the award were *reasonable*. Pearle moved for a protective order against disclosure of documents and testimony by its counsel regarding such fees, on the ground that Migis' attempt to put those fees at issue was groundless and constituted harassment. Although the record contains no ruling on this motion, it apparently was denied, at least in part, in that, at the hearing on the fee application, Migis' counsel was permitted to question defense

counsel extensively about the fees charged Pearle.

The district court's opinion refers also to the fees by Pearle's counsel. 944 F.Supp. at 513–14. Because that reference appears in the section of the opinion rejecting Pearle's contention that the number of hours was *unreasonable* because this case involved no novel or complex issues, it is unclear what, if any, effect it had on the district court's overall *reasonableness* determination. The majority refers to the magistrate judge's notation that Pearle amassed over $200,000 in attorney's fees, but does *not* discuss whether consideration of those fees is appropriate in determining the *reasonableness* of Migis' fees.

I would hold that Pearle's counsel's fees are *not* relevant in determining whether Migis' counsel's fees are *reasonable* in relation to the degree of success obtained. Twenty years ago, this was explained most adequately by the Seventh Circuit in *Mirabal v. General Motors Acceptance Corp.*, 576 F.2d 729 (7th Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 699 (1978):

> [A] given case may have greater precedential value for one side than the other. Also, a plaintiff's attorney, by pressing questionable claims and refusing to settle except on outrageous terms, could force a defendant to incur substantial fees which he later uses as a basis for his own fee claim. Moreover, the amount of fees which one side is paid by its client is a matter involving various motivations in an on-going attorney-client relationship and may, therefore, have little relevance to the value which [plaintiff's attorney] has provided to his clients in a given case.

*Id.* at 731. *See also Samuel v. University of Pittsburgh*, 80 F.R.D. 293, 294 (W.D.Pa.1978) (emphasis added) ("the number of hours required by opposing counsel to defend a claim has little relevance to the *reasonableness* of the number of hours which plaintiffs' counsel devoted to pursuing a cause of action on behalf of a plaintiff in a given case").

This case certainly appears to be a classic example of "the tail (attorney's fees) wagging the dog (the merits)". Attorneys serve clients to *help* (it is assumed) resolve dis-

putes (the sooner the better); clients and cases don't exist to serve—*much less, to save*—attorneys.

It is fervently hoped that, on remand, the re-evaluation of the *Johnson* degree of success factor will result in restoring the proper reality and proportion—will result in restoring *reason* and *reasonableness*—to this case. It is most regrettable that, first, there will not also be a recalculation of the lodestar.

c.

Migis requests fees of $7,500 for this appeal (30 hours at $250 per hour, excluding her cross-appeal), *an amount that would exceed the total amount Migis would recover, had the compensatory damages been reduced from $5,000 to a nominal amount.* Although her counsel was successful (prevailed) in defending on liability, back pay, compensatory damages, and allowed costs, *he was unsuccessful*, to a large extent, as to the attorney's fee award.

The majority does not address this request. Obviously, an award of $7,500 would be *unreasonable* and constitute an additional windfall to counsel.

2.

Among other allowed costs, Migis was awarded those associated with five depositions taken in connection with her unsuccessful not-offered-another-position claim. *Migis*, 944 F.Supp. at 517. The district court did not allow witness and process fees for two witnesses who did not testify at trial, $170.13 for a copy of Migis' deposition videotape (the subject of her cross-appeal), and expenses related to computerized legal research, courier fees, postage, and photocopying expenses. *Id.* at 517–18. Total awarded costs, other than attorney's fees, were $4,297.32. *Id.* at 518. "We will reverse … only on a clear showing of abuse of discretion." *See Fogleman v. ARAMCO (Arabian American Oil Co.)*, 920 F.2d 278, 285 (5th Cir.1991).

a.

Pearle disputes the award of costs for the pursuit of Migis' unsuccessful not-offered-another-position claim. The majority con-

cludes that, "[e]ven assuming that it is feasible to segregate costs by the two claims Migis prosecuted, Pearle Vision's refusal to rehire her in a new position was arguably of evidentiary value to the claim on which she did prevail—discrimination in her termination—even if the refusal to rehire her was not itself found to be a separate Title VII violation." Maj. Op. at 1049.

As stated *supra*, the factual circumstances surrounding Migis' successful position-elimination claim and her unsuccessful not-offered-another-position claim are easily distinguishable from an evidentiary and preparation standpoint. The decisions were made at different times by different decision-makers, and most of the witnesses who testified regarding the unsuccessful claim offered no testimony that contributed to the success of her position-elimination claim. Accordingly, for the same reasons that attorney's fees for the unsuccessful claim should not have been awarded, costs associated with pursuing it are *not reasonable* and should have been disallowed.

b.

I agree that the district court did not abuse its discretion by disallowing Migis' request for $170.13 for her deposition videotape copy. Perhaps, as part of trial preparation, counsel wanted the tape to observe Migis' facial expressions, or other body language, or voice level. But, surely, he was present when she was deposed and could have made those observations then. Perhaps counsel wanted it so that Migis could watch it in order to better prepare to testify. One can only wonder.

But, more importantly, in the light of the small monetary amount at stake, compared to the cost in judicial resources and to the parties in resolving this issue, one can also only wonder—indeed, marvel—why this cross-appeal was taken. At oral argument, Migis' counsel stated it was because of the larger issue—awarding costs for videotapes. *But, the larger issue was not at hand.* Obviously, counsel should have saved this question for when it is at issue; at stake was only a copy of Migis' (the plaintiff's) deposition.

Whatever the reason counsel wanted the copy, the copy was not necessary. And, to say the least, the cross-appeal is most inappropriate. (An adage comes to mind: "whenever someone says, 'it's not the money, it's the principle' ... it's the money!") Accordingly, I would have required Migis' counsel *to show cause* why sanctions should not be imposed.

III.

For the foregoing reasons, I concur in affirming liability, back pay, and denial of the videotape copy cost; and in reversing the attorney's fee and remanding for reconsideration. But, as to that fee, I would offer far more guidance, especially on the settlement-rejection factor. And, I respectfully dissent from the affirmance of the compensatory damages, from allowing attorney's fees and associated costs for the pursuit of Migis' unsuccessful not-offered-another-position claim, and from not requiring the lodestar to be otherwise recalculated on remand to include only the hours *reasonably* expended.

We wring our hands and decry the increase in litigation and attendant costs and other excesses, such as frivolous and exorbitant claims, and sky-high, unrealistic, and otherwise *unreasonable* monetary demands and fees. We bemoan the too often seen lack of civility and professionalism and ethics, as well as the pursuit by some lawyers of, not excellence, but numbing mediocrity, consistent with the heralded "dumbing of America". Yet, we seem unable or, worse still, unwilling to do anything about it. Instead, we ask why we have this lack of both *reason* and *reasonableness*. The answers have been with us from the beginning; two, among many, come quickly to mind: "power fills a vacuum", and "money makes the world go-around". *Reason* and *reasonableness* can be restored; but, only when we are willing to do so.

I close as I began. Perhaps this lengthy, back-to-the-basics analysis will aid in helping spark a new—and much needed—look at Title VII damages and fee awards. Whatever the case, of this I am certain: Title VII was not meant to be used as it has been in this case. It was meant to correct certain dis-

criminatory wrongs and to provide *reasonable* compensation to those injured and, when deemed appropriate, their counsel. This case has gone far, far afield. The result is far from being *reasonable*. In fact, it is *beyond reason;* hence, beyond the law.



**Johnnie GOODEN, Petitioner,**

v.

**DIRECTOR, OFFICE OF WORKER'S COMPENSATION PROGRAMS, U.S. DEPARTMENT OF LABOR; Ito Corporation, Respondents.**

No. 96–60751.

United States Court of Appeals, Fifth Circuit.

March 12, 1998.

Claimant sought benefits for heart attack under Longshore and Harbor Workers' Compensation Act (LHWCA). Administrative law judge (ALJ) denied benefits, and ALJ's decision was deemed final decision of Department of Labor Benefits Review Board (BRB). Claimant appealed. The Court of Appeals, Garwood, Circuit Judge, held that: (1) automatic affirmance of ALJ's decision did not deny claimant's due process rights; (2) ALJ did not err in applying LHWCA's procedure relative to presumption that claim was compensable; and (3) ALJ improperly focused on origins of claimant's underlying heart condition rather than on his ultimate heart attack.

Vacated and remanded.

**1. Constitutional Law** ⊙**301(4)**
**Workers' Compensation** ⊙**1821**
Automatic affirmance of decision of administrative law judge (ALJ) which had been pending for more than one year, pursuant to Omnibus Consolidated Rescissions and Appropriations Act, did not violate LHWCA claimant's due process rights. U.S.C.A. Const.Amend. 5; Longshore and Harbor Workers' Compensation Act, § 1 et seq., 33 U.S.C.A. § 901 et seq.; Omnibus Consolidated Rescissions and Appropriations Act of 1996, § 101, 110 Stat. 1321.

**2. Workers' Compensation** ⊙**1752**
Administrative law judge (ALJ) did not err in applying LHWCA's procedure relative to presumption that claim was compensable, when ALJ blended second and third steps of procedure by considering all evidence presented by both parties once claimant had established prima facie case, rather than first considering employer's evidence alone and then considering both parties' evidence together only if employer's evidence had rebutted initial presumption. Longshore and Harbor Workers' Compensation Act, § 20(a), 33 U.S.C.A. § 920(a).

**3. Workers' Compensation** ⊙**1339**
LHWCA claimant bears initial burden of establishing that: (1) he or she suffered injury, and (2) the accident occurred in course of employment or conditions existed at work that could have caused the harm. Longshore and Harbor Workers' Compensation Act, § 20(a), 33 U.S.C.A. § 920(a).

**4. Workers' Compensation** ⊙**1339**
Once LHWCA claimant has established prima facie case, presumption is created which can be rebutted by employer through substantial evidence establishing absence of connection between injury and employment. Longshore and Harbor Workers' Compensation Act, § 20(a), 33 U.S.C.A. § 920(a).

**5. Workers' Compensation** ⊙**1691**
If employer rebuts presumption that claim comes within LHWCA, then issue of causation must be decided by looking at all evidence of record. Longshore and Harbor Workers' Compensation Act, § 20(a), 33 U.S.C.A. § 920(a).

**6. Workers' Compensation** ⊙**571**
In denying LHWCA benefits due to lack of causation, administrative law judge (ALJ) improperly focused on origins of claimant's

## LOUISIANA POWER & LIGHT CO. v. KELLSTROM     **319**
### Cite as 50 F.3d 319 (5th Cir. 1995)

**PER CURIAM:**

Yvonne Dilworth asks us to decide that the "underlying offense" upon which she was sentenced for harboring her fugitive son should have been his failure to appear for judicial proceedings and not his initial drug offense. Dilworth's son, Frederick Nickles, had pled guilty to distributing crack cocaine within 1,000 feet of an elementary school, and Nickles failed to appear for subsequent court proceedings. After officers found Nickles in hiding at Dilworth's home, she was convicted of harboring a fugitive, *see* 18 U.S.C. § 1071 (Supp. V 1993). The district court applied § 2X3.1 of the Sentencing Guidelines [1] and, using Nickles' drug conviction as the underlying offense,[2] sentenced Dilworth to twenty-seven months in prison and three years of supervised release.[3] Dilworth argues that the district court should have used her son's failure-to-appear offense as the underlying offense for purposes of sentencing.

Reviewing the district court's interpretation of the Sentencing Guidelines de novo, 18 U.S.C. § 3742(e) (1988 & Supp. V 1993); *see also United States v. Lara–Velasquez*, 919 F.2d 946, 953 (5th Cir.1990), we resolve this question of first impression in this Circuit and reject Dilworth's argument. In *United States v. Gonzalez*, 2 F.3d 369 (11th Cir. 1993), the defendant also was convicted of harboring a fugitive who had failed to appear in court on a drug offense. *Id.* at 370. A warrant was issued for the fugitive's failure to appear, and the fugitive was apprehended at the defendant's home. *Id.* When the district court used the fugitive's failure-to-appear charge as the underlying offense in sentencing under U.S.S.G. § 2X3.1, the government argued that the defendant primarily was an accessory to the drug offense and thus should have been sentenced on that basis. *Id.* at 371. The Eleventh Circuit

agreed with the government's contention, holding that the fugitive's "primary goal" had been fleeing punishment for the drug offense, not the failure-to-appear offense. *Id.* at 373.

The bond jumper commits a second offense when he fails to appear for judicial proceedings and it [would be] odd, indeed, to impose what is in this and will be in most cases a significantly lighter penalty on one who harbors the dual offender than on one who hides a suspect from initial arrest.

*Id.* at 372.[4] We agree with the Eleventh Circuit's analysis of this issue. The district court used Nickles' drug offense correctly as the underlying offense in determining Dilworth's base offense level under U.S.S.G. § 2X3.1. Accordingly, we AFFIRM Dilworth's sentence.



# LOUISIANA POWER & LIGHT COMPANY, Plaintiff–Appellee,

v.

## Francis S. KELLSTROM, et al., Defendants,

**Francis S. Kellstrom, Fischbach & Moore, Inc., Fischbach Corporation, L.K. Comstock & Company, Inc., and LKC Inc., Defendants–Appellants.**

### No. 93–3756.

United States Court of Appeals, Fifth Circuit.

April 10, 1995.

Prevailing antitrust plaintiff sought attorney fees and costs. The United States

---

1. Section 2X3.1 provides that the base offense level for a conviction under 18 U.S.C. § 1071 is "6 levels lower than the offense level for the underlying offense . . . ." United States Sentencing Commission, *Guidelines Manual* § 2X3.1 (Nov. 1993).

2. Under § 2X3.1, the "underlying offense" is "the offense as to which the defendant is convicted of being an accessory." U.S.S.G. § 2X3.1, comment. (n.1).

3. Under § 2X3.1, Dilworth's base offense level was limited to 20.

4. Moreover, the guidelines instruct generally that, "where two or more guideline provisions appear equally applicable, but the guidelines authorize the application of only one such provision, use the provision that results in the greater offense level." U.S.S.G. § 1B1.1, comment. (n.5); *see also Gonzalez*, 2 F.3d at 371–72.

District Court for the Eastern District of Louisiana, Marcel Livaudais, Jr., J., entered award from which cross appeals were taken. The Court of Appeals held that: (1) summary documentation of hours expended warranted ten percent reduction of hours claimed; (2) hourly rate approved by district court was reasonable; (3) refusal to further reduce lodestar amount to reflect plaintiff's limited success was not abuse of discretion; (4) plaintiff was entitled to postjudgment interest from date of judgment on merits, rather than from subsequent order quantifying attorney fee award; (5) discovery rule authorizing recovery of expert fees incurred during discovery applies to both parties, not just to prevailing party; (6) rule requiring plaintiff who rejects offer of judgment to pay defendant's postrejection costs if judgment ultimately obtained is for less than offer did not apply to plaintiff who ultimately recovered nothing from offeror, even though plaintiff did recover from other defendants; and (7) failure to award costs and fees for time spent litigating cost and fee application was not abuse of discretion.

Affirmed in part, modified and affirmed in part, and reversed and rendered in part.

Emilio M. Garza, Circuit Judge, concurred in part, dissented in part, and filed opinion.

### 1. Federal Civil Procedure ⇐2737.4

In determining reasonable attorney fees under "lodestar" method, court multiplies reasonable number of hours by reasonable hourly rate, and then adjusts product upward or downward, depending on circumstances of case.

> See publication Words and Phrases for other judicial constructions and definitions.

### 2. Federal Courts ⇐878

District court's determination of reasonable hours and rates, when awarding attorney fees under lodestar approach, is reviewed for clear error.

### 3. Federal Civil Procedure ⇐2742.5

Attorney fee claimant bears burden of producing sufficient documentation, and

court may reduce number of hours awarded if documentation is vague or incomplete.

### 4. Federal Civil Procedure ⇐2742.5

Failure to provide contemporaneous billing statements does not preclude attorney award of fees per se, as long as evidence produced is adequate to determine reasonable hours.

### 5. Federal Civil Procedure ⇐2742.5

District court erred, given attorney fee applicant's summary documentation of hours expended, in failing to determine whether specific hours complained of by opponent were reasonably expended.

### 6. Federal Courts ⇐931

Although remand to trial court is normal when it is determined on appeal that attorney fee award has been improperly calculated, appellate court may exercise its option to modify award itself if record contains sufficient information to allow fair determination of reasonable fee.

### 7. Monopolies ⇐28(9)

Insufficient, summary documentation of hours expended warranted ten percent reduction of hours claimed, for purpose of calculating antitrust plaintiff's attorney fee. Clayton Act, § 4, 15 U.S.C.A. § 15.

### 8. Monopolies ⇐28(9)

Antitrust plaintiff's attorney fees would be denied entirely where record was virtually devoid of any information helpful to determination of whether or how attorney's claimed hours were spent beneficially on litigation. Clayton Act, § 4, 15 U.S.C.A. § 15.

### 9. Monopolies ⇐28(9)

District court did not err in refusing to reduce hours claimed on ground of vagueness, for purpose of calculating antitrust plaintiff's attorney fee, given court's familiarity with case, including quality of attorneys' work over period of several years. Clayton Act, § 4, 15 U.S.C.A. § 15.

### 10. Federal Civil Procedure ⇐2737.1

Prevailing litigant may not recover for hours devoted solely to claims against other parties; when claims against multiple parties share "common core of facts" or "related

**LOUISIANA POWER & LIGHT CO. v. KELLSTROM**     **321**
Cite as 50 F.3d 319 (5th Cir. 1995)

legal theories," however, fee applicant may claim all hours reasonably necessary to litigate those issues.

**11. Monopolies ⇐28(9)**

District court did not err in refusing defendant's request to sift through antitrust plaintiff's fee request in order to eliminate hours spent in litigation against other defendants; plaintiff's claims against all defendants involved common core of facts. Clayton Act, § 4, 15 U.S.C.A. § 15.

**12. Federal Courts ⇐878**

Trial court's determination of reasonable hourly rate, for purpose of calculating attorney fee, is question of fact, reviewed for clear error.

**13. Federal Civil Procedure ⇐2737.4**

To determine reasonable hourly rate, for purpose of calculating attorney fee, court considers attorney's regular rates as well as prevailing rates in community.

**14. Federal Civil Procedure ⇐2737.4**

Attorney fee award should not provide windfall to plaintiff.

**15. Monopolies ⇐28(9)**

Hourly rate approved by district court, for purpose of calculating prevailing antitrust plaintiff's attorney fee, was reasonable, and thus proper even if in excess of rate actually charged to plaintiff. Clayton Act, § 4, 15 U.S.C.A. § 15.

**16. Federal Courts ⇐830**

Lodestar adjustments, for purpose of calculating attorney fee, are reviewed for abuse of discretion; district court's analysis is reviewed only to determine if court sufficiently considered appropriate criteria.

**17. Monopolies ⇐28(9)**

District court's refusal to further reduce lodestar amount to reflect prevailing antitrust plaintiff's limited success, for purpose of calculating attorney fee, was not abuse of discretion; district court expressly considered factor and explained its reasoning. Clayton Act, § 4, 15 U.S.C.A. § 15.

**18. Federal Civil Procedure ⇐2742.5**

District court's application of relevant factors to its lodestar adjustment determination, for purpose of calculating attorney fee, need not be meticulously detailed in order to survive appellate review.

**19. Interest ⇐39(3)**

Prevailing antitrust plaintiff was entitled to postjudgment interest from date of judgment on merits, rather than from subsequent order quantifying attorney fee award. 28 U.S.C.A. § 1961.

**20. Federal Civil Procedure ⇐2741**

Although recovery of expert fees is ordinarily limited to statutorily authorized amounts, discovery rule provides independent basis for recovery of expert fees as part of discovery. 28 U.S.C.A. §§ 1821, 1920; Fed.Rules Civ.Proc.Rule 26(b)(4)(C), 28 U.S.C.A.

**21. Federal Civil Procedure ⇐2741**

Discovery rule authorizing recovery of expert fees incurred during discovery applies to both parties, not just to prevailing party. Fed.Rules Civ.Proc.Rule 26(b)(4)(C), 28 U.S.C.A.

**22. Monopolies ⇐28(9)**

Prevailing antitrust plaintiff could not recover expert fees incurred by defendant in responding to discovery, and thus could be held liable for defendant's fee expenses; fee shifting statute did not apply to expert fees awardable under discovery rule. Clayton Act, § 4, 15 U.S.C.A. § 15; Fed.Rules Civ. Proc.Rule 26(b)(4)(C), 28 U.S.C.A.

**23. Federal Civil Procedure ⇐2725**

Rule requiring plaintiff who rejects offer of judgment to pay defendant's postrejection costs if judgment ultimately obtained is for less than offer did not apply to antitrust plaintiff who ultimately recovered nothing from offeror, even though plaintiff did recover from other defendants. Clayton Act, § 4, 15 U.S.C.A. § 15; Fed.Rules Civ.Proc.Rule 68, 28 U.S.C.A.

**24. Federal Courts ⇐830**

District court's taxation of costs will not be overturned on appeal absent clear abuse

of discretion. Fed.Rules Civ.Proc.Rule 54(d), 28 U.S.C.A.

**25. Federal Civil Procedure ⟋2721**

Although rule directs district court to award costs to prevailing party, court cannot award any costs not authorized by statute. 28 U.S.C.A. § 1920; Fed.Rules Civ.Proc.Rule 54(d), 28 U.S.C.A.

**26. Federal Civil Procedure ⟋2741**

Although party may recover witness fees for days witness spent attending trial prior to testifying, fees for such preliminary days are limited to days witness spent holding himself available to testify.

**27. Federal Civil Procedure ⟋2735**

Absent pretrial court approval of trial exhibits, party may not later request taxation of production costs to its opponent. Fed. Rules Civ.Proc.Rule 16(c)(16), 28 U.S.C.A.

**28. Federal Civil Procedure ⟋2742.1**

Local rule imposing 30–day limit on prevailing party's cost application and supporting memoranda does not apply to applications under discovery rule authorizing recovery of expert fees incurred during discovery, which applies to both parties. Fed.Rules Civ.Proc.Rule 26(b)(4)(C), 28 U.S.C.A.; U.S.Dist.Ct.Rules E.D.La., Rule 5.04E.

**29. Federal Civil Procedure ⟋2735, 2737.4**

District court has discretion to award costs and fees for time spent litigating cost or fee request.

**30. Monopolies ⟋28(9)**

Failure to award costs and fees for time spent litigating antitrust defendant's cost and fee application was not abuse of discretion, given party's only limited success in recovering amount requested. Clayton Act, § 4, 15 U.S.C.A. § 15.

———————

Howard Marks, Koch & Rouse, New Orleans, LA, for Fischbach & Moore, Kellstrom, Fischbach Corp.

Elinor R. Hoffmann, Peter Shimamoto, Coudert Bros., New York City, for Fischbach & Moore.

Arthur D. McGarry, Oles, Morrison & Rinker, Seattle, WA, for Fischbach Corp.

Robert A. Kutcher, Ashley L. Belleau, Nicole S. Tygiers, Bronfin & Heller, New Orleans, LA, for L.K. Comstock & Co., Inc. and LKC, Inc.

Michael R. O'Keefe, Perry R. Staub, Jr., Monroe & Lemann, New Orleans, LA, for appellees.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before WIENER, EMILIO M. GARZA and BENAVIDES, Circuit Judges.

PER CURIAM:

Louisiana Power & Light Co. ("LP & L") sued multiple defendants [1] for antitrust and RICO violations, and the jury rendered a verdict in LP & L's favor against five defendants [2] and against LP & L on the remainder of its claims. Pursuant to 15 U.S.C. § 15 [3] and Fed.R.Civ.P. 54(d), [4] the district court awarded attorneys' fees to LP & L on its successful claims and to the prevailing defen-

---

1. The defendants were Fischbach & Moore, Inc., Fischbach Corp., Francis S. Kellstrom, Commonwealth Electric Co., Howard P. Foley Co., L.K. Comstock & Co., Inc., LKC, Inc., Commonwealth Cos., John D. Keys, Lewis E. Eastman, J.R. Sturgill, Jr., and Paul M. Murphy.

2. Fischbach & Moore, Inc., Fischbach Corp., Francis S. Kellstrom, Commonwealth Electric Co., and Howard P. Foley Co.

3. This section provides:
   [A]ny person who shall be injured in his business or property by reason of anything forbid-

den in the antitrust laws ... shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
15 U.S.C. § 15 (1988).

4. Rule 54(d) provides:
   Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs ....
   Fed.R.Civ.P. 54(d).

**LOUISIANA POWER & LIGHT CO. v. KELLSTROM**     **323**

Cite as 50 F.3d 319 (5th Cir. 1995)

dants on theirs.[5] Defendants Fischbach & Moore, Inc., Fischbach Corp., and Francis S. Kellstrom (collectively "Fischbach"), appeal the award of attorneys' fees to LP & L. Defendants L.K. Comstock & Co., Inc., and LKC, Inc. (collectively "Comstock"), appeal the amount of the district court's taxation of costs against LP & L. We affirm in part, modify and affirm in part, and reverse and render in part.

## I

In its antitrust and RICO suit, LP & L alleged that the defendants had conspired to rig the electrical bids for the Waterford 3 nuclear power plant project. Shortly before trial, Comstock made an offer of judgment to LP & L under Rule 68 of the Federal Rules of Civil Procedure,[6] which offer LP & L refused. Following approximately six years of pretrial preparation and eight weeks of trial, the jury found for LP & L on its bidrigging claims against Fischbach, Commonwealth Electric Co., and the Howard P. Foley Co.[7] but found against LP & L on its claims against Comstock. Although LP & L had requested $15–17 million in damages, the jury awarded it only $500,000.[8]

After trial, LP & L filed an application for an award of $281,668.66 in costs and $5,205,296.96 in fees. Comstock filed an application for costs that eventually totalled $71,264.07. Comstock also moved to amend the judgment to include its attorneys' fees based on its Rule 68 offer of judgment.

After receiving multiple motions to review elements of the various cost and fee applications, the district court held a hearing on all such applications. Fischbach challenged portions of LP & L's fee request, and LP & L challenged Comstock's cost request. The district court took the matter under submission and eventually entered its findings and conclusions, awarding $4,182,893.73 in fees and costs to LP & L and $33,743.47 in costs to Comstock but denying Comstock's Rule 68

and Rule 26 requests and Fischbach's Rule 26 request.

Fischbach appeals the award of fees and costs to LP & L, contending that the district court erred by 1) failing to reduce the number of hours awarded; 2) failing to reduce the hourly rates awarded; 3) failing to reduce the lodestar more than it actually did; 4) awarding postjudgment interest from the date of judgment on the merits, rather than from the date of the final fee award; and 5) awarding fees for LP & L's experts' response to discovery while denying the same to Fischbach. Comstock appeals its award of costs, arguing that the district court erred by 1) refusing to award fees under its Rule 68 offer of judgment; 2) awarding fees for LP & L's experts' response to discovery while denying the same to Comstock; and 3) refusing to award fees and costs for pursuing its cost recovery.

## II

The Fischbach Appeal:

Fischbach challenges several elements of the award of attorneys' fees and costs to LP & L. First, Fischbach asserts that the district court erred in determining the "lodestar" amount by accepting both the total hours and the hourly rates submitted by LP & L. Second, it disputes as inadequate the district court's downward adjustment of the lodestar. Third, Fischbach disagrees with the date chosen by the district court for the start of postjudgment interest. Last, it asserts that the district court should either deny LP & L's costs for experts' response to discovery or grant these costs to both parties.

### A

[1, 2] In addressing Fischbach's assertion that the district court erred in its calculation of the base lodestar, we note that determination of reasonable attorneys' fees involves a

---

**5.** L.K. Comstock & Co. and LKC, Inc., are the only prevailing defendants involved in this appeal.

**6.** *See infra* Part II (Comstock Appeal), A.

**7.** Commonwealth Electric Co. and the Howard P. Foley Co. are not parties to this appeal.

**8.** Under 15 U.S.C. § 15 (1988), this amount was trebled for a total recovery of $1.5 million.

two-step procedure. *See Hensley v. Ecker-hart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Initially, the district court must determine the reasonable number of hours expended on the litigation and the reasonable hourly rates for the participating lawyers. *Id.* Then, the district court must multiply the reasonable hours by the reasonable hourly rates. *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984) (defining base fee to be product of reasonable hours and reasonable rate); *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939 (defining product of hours reasonably expended and reasonable hourly rates as "[t]he most useful starting point"); *Brantley v. Surles,* 804 F.2d 321, 325 (5th Cir.1986) (stating hours multiplied by rate to be normal basis for fee). The product of this multiplication is the lodestar, which the district court then either accepts or adjusts upward or downward, depending on the circumstances of the case. *Brantley,* 804 F.2d at 325. Determinations of hours and rates are questions of fact. *See Bode v. United States,* 919 F.2d 1044, 1047 (5th Cir.1990) (reviewing hours for clear error). Accordingly, we review the district court's determination of reasonable hours and reasonable rates for clear error. *See Blanchard v. Bergeron,* 893 F.2d 87, 89 (5th Cir.1990) (reviewing underlying factual determinations for clear error).

1

Fischbach challenges the district court's allowance of certain hours claimed by LP & L. As noted, the first step in determining reasonable attorneys' fees is an evaluation of the number of hours reasonably expended. *Baughman v. Wilson Freight Forwarding Co.,* 583 F.2d 1208, 1214 (3d Cir.1978). The district court must determine whether the hours claimed were "reasonably expended on the litigation." *Alberti v. Klevenhagen,* 896 F.2d 927, 933–34 (5th Cir.), *vacated on other grounds,* 903 F.2d 352 (5th Cir.1990); *see also Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939 ("The district court also should exclude from this initial fee calculation hours that were not 'reasonably expended.' "). Moreover, "the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended

and hourly rates. The applicant . . . should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941; *see also Bode,* 919 F.2d at 1047 ("[T]he party seeking reimbursement of attorneys' fees . . . has the burden of establishing the number of attorney hours expended, and can meet that burden only by presenting evidence that is adequate for the court to determine what hours should be included in the reimbursement.").

[3] Accordingly, the documentation must be sufficient for the court to verify that the applicant has met its burden. *Id.* "In determining the amount of an attorney fee award, courts customarily require the applicant to produce contemporaneous billing records or other sufficient documentation so that the district court can fulfill its duty to examine the application for noncompensable hours." *Id.; see also Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939 ("The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed."). Thus a district court may reduce the number of hours awarded if the documentation is *vague* or *incomplete. See Alberti,* 896 F.2d at 931 (refusing to accept incomplete documentation "at face value"); *Leroy v. City of Houston (Leroy I),* 831 F.2d 576, 585–86 (5th Cir.1987) (finding clear error and abuse of discretion when district court accepted "faulty records" without making reduction); *cf. Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939 (counseling that "[w]here the documentation of hours is inadequate, the district court may reduce the award accordingly").

Fischbach contends that the district court clearly erred in accepting all of the hours submitted by LP & L. Fischbach first notes that LP & L failed to provide contemporaneous billing records for certain time periods. Specifically, Fischbach points out that LP & L submitted (1) only quarterly summaries for the period from February 1986 to July 1987, totalling $115,070 in requested fees; (2) only month-end summaries for two attorneys during 1987 and 1988, totalling $154,080 in requested fees; (3) no daily time records for November and December 1988, totalling $82,915 in requested fees; and (4) no sup-

## LOUISIANA POWER & LIGHT CO. v. KELLSTROM   325
Cite as 50 F.3d 319 (5th Cir. 1995)

porting documentation at all for the $6,465 in fees of one attorney, J.P. Madigan.

**[4, 5]** Failing to provide contemporaneous billing statements does not preclude an award of fees per se, as long as the evidence produced is adequate to determine reasonable hours. *Heasley v. Commissioner*, 967 F.2d 116, 123 (5th Cir.1992). After painstakingly reviewing the instant record, we conclude that the district court failed to determine properly whether some of the hours submitted were reasonably expended and that LP & L failed to satisfy its burden of proving its entitlement to compensation for some of the hours submitted.

The district court stated that it had not "undertake[n] a dollar-by-dollar or an hour-by-hour analysis" of LP & L's records, but that "[a] just and equitable result can be obtained by following existing case law on what constitutes a 'reasonable' attorney's fee." As to the specific items of which Fischbach complains, this appears to fall short of the standard required of district courts.

The district court is not only required to determine whether the total hours claimed are reasonable, but also whether particular hours claimed were reasonably expended. The court's reference to deeming hours to be reasonably expended is troubling because it strongly suggests that the district court did not abide by this standard. It is not the case that all claimed time is a fortiori reasonably expended if the *total hours* claimed by counsel appear to reflect sound legal judgment and resulted in satisfactory results.

*Alberti*, 896 F.2d at 932. Similarly, we find somewhat troubling the district court's decision to decline a full analysis on the items complained of; therefore, as to those hours, "[i]t does not appear from this record that the district court determined if particular hours claimed were reasonably expended on the litigation." *Id.* at 933.

**[6–8]** Further, LP & L's challenged records do not provide this court with sufficient information to determine whether all of the amounts requested were reasonably expended on this litigation.[9] *See Leroy I*, 831 F.2d at 585 (reversing district court's acceptance of total hours where billing records reflected that "some were reconstructed, after-the-fact summaries"). Despite Fischbach's urging us to eliminate entirely the hours covered by the quarterly and monthly summaries and the period of November to December, 1988, we find that the documentation supports an award of *some* amount of hours. Normally, we would remand to the district court for it to determine an appropriate reduction. Because the record contains sufficient informa-

9. For example, the documentation for the fourth quarter of 1986 consisted of the following summary:

We traveled to New York and deposed defendants Comstock and LKC, Inc. We reviewed extensive documentation concerning Fischbach & Moore's bids to LP & L, and we deposed Fischbach & Moore in Kenner, Louisiana. We deposed Lord Electric Company in New York City; we traveled to Lincoln, Nebraska and deposed Commonwealth Electric Company. We reviewed transcripts of all these depositions when produced.

We brought formal discovery complaints to the Court and argued them to the Magistrate, who ordered each of the defendants to provide supplemental discovery, which we reviewed. The Magistrate also ordered legal memoranda on the discovery of grand jury materials, which we prepared after research. We reviewed the memoranda filed by others.

We conferred with Company personnel and employees and attorneys for Ebasco Services, Inc., concerning interrogatories and requests for documents submitted to LP & L by defen-

dants Fischbach & Moore and Comstock. We reviewed extensive documentation produced by Ebasco and prepared answers and response to defendants' discovery demands. We conferred with opposing counsel and the Magistrate concerning LP & L's production of documents.

We extensively conferred with LP & L's investigator and reviewed reports concerning other price-fixing litigation involving defendants, and we conferred with other attorneys of other injured parties. We prepared bankruptcy pleadings to obtain discovery from E.C. Ernst Company.

A fee total of $23,900 was submitted for this work. Unfortunately, this documentation provides no basis upon which we could determine if $23,900 or $123,900 or $2,390 was reasonably expended for these services. There is no indication of the number of hours expended per task, by whom, for what, and at what rate. Without such basic information, no *Hensley* determinations regarding "the reasonable number of hours spent on the litigation and a reasonable hourly rate" can be made. *See Hensley*, 461 U.S. at 433, 103 S.Ct. at 1939.

tion to allow a fair determination of a reasonable fee, however, we choose to exercise our option to modify the fee award on our own.[10] Therefore, in the exercise of our discretion and after a careful analysis of the record and the determinations of the district court, we deem appropriate a ten percent reduction for inadequate documentation of the hours and fees requested for 1) February 1986 to July 1987, 2) month-end summary entries by Attorneys Slater and Stevenson during 1987 and 1988, and 3) November and December 1988.  As for the request for hours for Attorney Madigan, however, the record is virtually devoid of any information helpful to a determination of whether or how his hours were spent beneficially on this litigation.  We accordingly deny any award of attorneys' fees based on the hours submitted for Attorney Madigan.

Fischbach also challenges several entries as too vague to support a determination whether or how they were spent on this litigation.  The district court may properly reduce or eliminate hours when the supporting documentation is too vague to permit meaningful review.  *See Leroy v. City of Houston (Leroy II)*, 906 F.2d 1068, 1080 (5th Cir.1990) (striking hours as "not illuminating as to the subject matter" or "vague as to precisely what was done"); *Leroy I*, 831 F.2d at 585–86 (reversing when district court accepted all hours from records that were "scanty," completely missing, or lacking in explanatory detail); *see also H.J. Inc. v. Flygt Corp.*, 925 F.2d 257, 260 (8th Cir.1991) (reducing hours for vague entries such as "legal research," "trial preparation," and "met with client").

After reviewing the instant record, we agree that many entries in LP & L's time records are indeed scanty as to subject matter.[11]  Nonetheless, our case law has not precisely defined the appropriate standard, if in fact it is susceptible of being thus defined.  Accordingly, "not illuminating as to the subject matter" or "vague as to precisely what was done" gives the district court sufficient leeway within which to *accept or reject* fee

---

10. *See Leroy I*, 831 F.2d at 585–86 (vacating district court judgment and remanding for entry of amended award); *Cobb v. Miller*, 818 F.2d 1227, 1235 (5th Cir.1987) (reversing district court and rendering judgment on fee award); *see also Home Placement Serv. v. Providence Journal Co.*, 819 F.2d 1199, 1211 (1st Cir.1987) (opting to modify fee award rather than remand).

11. LP & L's records contain vague entries such as "revise memorandum," "review pleadings," "review documents," and "correspondence." Specifically, we find the following hours lack the required specificity to support completely the fees requested:

| | |
|---|---|
| Slater: | 290.75 hours, totalling $66,348.75 in fees |
| Stevenson: | 229.25 hours, totalling $47,442.50 |
| O'Keefe: | 19.7 hours, totalling $3622.50 |
| Lewis: | 0.3 hours, totalling $67.50 |
| O'Brien: | 2.8 hours, totalling $490.00 |
| Staub: | 96.0 hours, totalling $16,140.00 |
| Burns: | 6.0 hours, totalling $960.00 |
| Thomas: | 7.0 hours, totalling $980.00 |
| Rodriguez: | 36.0 hours, totalling $5040.00 |
| McGrew: | 1.3 hours, totalling $182.00 |
| Van Horn: | 0.5 hours, totalling $60.00 |
| Chalker: | 32.0 hours, totalling $3840.00 |
| McAlister: | 1.0 hours, totalling $120.00 |
| Schooley: | 52.0 hours, totalling $5200.00 |
| Brown: | 1.75 hours, totalling $175.00 |
| Friend: | 124.04 hours, totalling $12,404.00 |
| Readinger: | 236.25 hours, totalling $11,812.50 |
| Walker: | 42.15 hours, totalling $2107.50 |
| Pate: | 32.25 hours, totalling $1612.50 |
| Hughes: | 61.75 hours, totalling $2778.75 |
| Carrigan: | 5.0 hours, totalling $225.00 |
| Goodwin: | 33.8 hours, totalling $1521.00 |
| Evans: | 9.05 hours, totalling $407.25 |
| Helwig: | 30.75 hours, totalling $1383.75 |
| Gullo: | 0.35 hours, totalling $15.75 |
| Whittington: | 0.5 hours, totalling $22.50 |
| Fleming: | 4.25 hours, totalling $191.25 |

**LOUISIANA POWER & LIGHT CO. v. KELLSTROM**     **327**
Cite as 50 F.3d 319 (5th Cir. 1995)

applications similar to that submitted by LP & L. Litigants take their chances when submitting such fee applications, as they provide little information from which to determine the "reasonableness" of the hours expended on tasks vaguely referred to as "pleadings," "documents," or "correspondence" without stating what was done with greater precision. *See Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939 (instructing district court to exclude hours not "reasonably expended").

[9] Viewing the time records as a whole, however, and given the district court's familiarity with this case, including the quality of the attorneys' work over a period of several years, we cannot say that the district court clearly erred in refusing to reduce the hours in question for vagueness. These entries may border on inadequacy as a matter of law, but we are mindful that practical considerations of the daily practice of law in this day and age preclude "writing a book" to describe in excruciating detail the professional services rendered for each hour or fraction of an hour. We also recognize that, in this era of computerized timekeeping, many data processing programs limit the amount of input for any given hourly or daily entry. Nevertheless, attorneys who anticipate applying for reimbursement of fees should endeavor to be less terse.

[10] In addition to criticizing LP & L's records as inadequate and vague, Fischbach also complains that the district court failed to exclude hours that LP & L expended litigating against the other defendants. A prevailing litigant may not recover for hours devoted solely to claims against other parties. *See Hensley,* 461 U.S. at 434–35, 103 S.Ct. at 1940 (work on unsuccessful claim not compensable); *Baughman,* 583 F.2d at 1214 (defendant relieved from compensating plaintiff for hours expended litigating against other defendants). But when claims against multiple parties share a "common core of facts" or "related legal theories," a fee applicant may claim all hours reasonably necessary to litigate those issues. *Hensley,* 461 U.S. at 434–35, 103 S.Ct. at 1940.[12]

[11] Proving an antitrust case involves demonstrating collusion among multiple defendants; this requires the plaintiff to prove the same facts and issues against several parties to recover against any one party. *See* 15 U.S.C. § 2 (1988) (defining violation for persons who "combine or conspire"). We are here satisfied that LP & L's claims against the other defendants involved a common core of facts, and that LP & L was thus entitled to claim the hours it spent litigating against the other defendants. Consequently, we conclude that the district court did not err in refusing to sift through LP & L's hours and eliminate those spent in litigation against the other defendants.[13]

2

[12, 13] Next, Fischbach challenges the district court's determination of the hourly rates awarded to LP & L. This too we review for clear error. *Powell v. Commissioner,* 891 F.2d 1167, 1173 (5th Cir.1990) (holding that determination of reasonable rates is question of fact, subject to clear

---

12. *See also City of Riverside v. Rivera,* 477 U.S. 561, 570, 106 S.Ct. 2686, 2692, 91 L.Ed.2d 466 (1986) (finding common core of facts); *Abell v. Potomac Ins. Co.,* 946 F.2d 1160, 1169 (5th Cir. 1991) ("[W]here time spent on unsuccessful issues is difficult to segregate, no reduction of fees is required."), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1944, 118 L.Ed.2d 549 (1992); *Nash v. Chandler,* 848 F.2d 567, 572 (5th Cir.1988) (finding no clear error where unsuccessful claims "highly relevant" to successful claim); *Cobb v. Miller,* 818 F.2d 1227, 1233 (5th Cir.1987) (holding claims against multiple defendants compensable because interrelated).

13. When a plaintiff's claims cannot be disentangled, the district court's focus should shift to the results obtained and adjust the lodestar accordingly. *Hensley,* 461 U.S. at 436–37, 103 S.Ct. at 1941 ("The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success."); *HJ, Inc.,* 925 F.2d at 260 (permitting district court to either cut non-successful hours or reduce lodestar to reflect success); *United States Football League v. National Football League,* 887 F.2d 408, 414 (2d Cir.1989) (holding that district court did not abuse discretion in reducing lodestar rather than cutting non-successful hours), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990). We address this issue *infra* in section B.

error standard); *Islamic Ctr. v. City of Starkville,* 876 F.2d 465, 468 (5th Cir.1989) (using clear error standard to evaluate hourly rates awarded). To determine reasonable rates, a court considers the attorneys' regular rates as well as prevailing rates. *HJ, Inc.,* 925 F.2d at 260 (considering regular rates as well as prevailing rates); *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4, 23 (D.C.Cir.1984) (calling for "reference to the customary billing rate followed by comparison to the prevailing community rate to ensure that the attorney's customary rate is reasonable"), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3488, 87 L.Ed.2d 622 (1985). During the latter part of the instant litigation, LP & L's attorneys reduced the hourly rates they charged by 25% in exchange for a contingent share of any eventual recovery. In its fee application, however, LP & L requested its attorneys' usual rate.[14]

> When an attorney's customary billing rate is the rate at which the attorney requests the lodestar be computed and that rate is within the range of prevailing market rates, the court should consider this rate when fixing the hourly rate to be allowed. When that rate is not contested, it is *prima facie* reasonable. When the requested rate of compensation exceeds the attorney's usual charge but remains within the customary range in the community, the district court should consider whether the requested rate is reasonable.

*Islamic,* 876 F.2d at 469; *see also Powell,* 891 F.2d at 1175 (holding customary billing rate to be *prima facie* reasonable). After due consideration, the district court found that LP & L's requested rate was reasonable.

[14] Fischbach argues that LP & L should not recover any amount in excess of the fees actually paid.[15] Otherwise, Fischbach contends, LP & L will receive a windfall. Attorneys' fees awards should not pro-

vide a windfall to plaintiffs. *See Hensley,* 461 U.S. at 430 n. 4, 103 S.Ct. at 1938 n. 4 (explaining statutory goal of avoiding windfalls to attorneys); *see also Riverside,* 477 U.S. at 580, 106 S.Ct. at 2697 ("Congress intended that statutory fee awards be 'adequate to attract competent counsel, but ... not produce windfalls to attorneys.'" (quoting S.Rep. No. 1011, 94th Cong., 2d Sess. 6 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5908, 5913)). Nevertheless, the actual amount paid in fees is not dispositive on the question of reasonable rates. *See Blum v. Stenson,* 465 U.S. 886, 895–96, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984) (determining that courts should use market rates, not cost-based rates); *Alizadeh v. Safeway Stores, Inc.,* 910 F.2d 234, 238 n. 6 (5th Cir.1990) (suggesting that "attorneys' fees awards are not always purely compensatory in nature"); *Brantley v. Surles,* 804 F.2d 321, 327 (5th Cir.1986) ("That the amount of the fee award exceeds the amount billed by opposing counsel is also not determinative."). In *Blanchard v. Bergeron,*[16] the Supreme Court refused to limit trial judges to the contract between the plaintiff and his counsel. 489 U.S. at 96, 109 S.Ct. at 946. "Should a fee agreement provide less than a reasonable fee ..., the defendant should nevertheless be required to pay the higher [market-based] amount." *Id.* at 93, 109 S.Ct. at 944.

[15] The issue we review on appeal here is not how much the attorneys charged but whether the fees awarded by the district court are reasonable; if they are reasonable, then by definition there will be no windfall. *Id.* at 96, 109 S.Ct. at 946. Moreover, "[t]he established rates represent the opportunity cost of what the firm turned away in order to take the litigation." *Laffey,* 746 F.2d at 24. Our review of the record reveals that both the rates charged and the rates requested were well within the range of prevailing rates in the community. The district court ap-

---

14. LP & L also submitted affidavits from other local attorneys supporting its rate request.

15. Fischbach characterizes LP & L's requested rate as an improper "multiplier" or "contingency enhancement." *See Pennsylvania v. Delaware Valley Citizens' Council,* 483 U.S. 711, 731, 107 S.Ct. 3078, 3089, 97 L.Ed.2d 585 (1987) (holding

enhancements generally inappropriate). The enhancements in these cases, however, refer to requests for multipliers *in excess* of a reasonable rate. Therefore, Fischbach's argument is inapplicable to the facts of this case.

16. 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989).

proved the requested rates, and we find no clear error in this choice.

## B

[16] Fischbach also challenges the district court's adjustment of the lodestar.[17] We review lodestar adjustments for abuse of discretion. *Palmco Corp. v. American Airlines, Inc.,* 983 F.2d 681, 688 (5th Cir.1993) (reviewing award of attorneys' fees for abuse of discretion). "It remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award." *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941; *see also Brantley,* 804 F.2d at 325–26 ("Our concern is not that a complete litany be given, but that findings be complete enough to assume a review which can determine whether the court has used proper factual criteria in exercising its discretion to fix just compensation."); *Nisby v. Commissioners Court,* 798 F.2d 134, 137 (5th Cir.1986) ("When the district court does not explain its reasons for the attorney's fee it awards, we are unable adequately to review the propriety of the fee award."); *Baughman,* 583 F.2d at 1219 (requiring explanation of district court's adjustment of lodestar).

We therefore inspect the district court's lodestar analysis only to determine if the court sufficiently *considered* the appropriate criteria. Moreover, Fischbach bears the burden of showing that further reduction is warranted. *See USFL,* 887 F.2d at 413 ("[A] party advocating the reduction of the lodestar amount bears the burden of establishing that a reduction is justified.").

17. The district court reduced the lodestar 15% for overstaffing and made no other adjustments.

18. 488 F.2d 714 (5th Cir.1974).

19. The factors include: 1) the time and labor required for the litigation; 2) the novelty and complication of the issues; 3) the skill required to properly litigate the issues; 4) whether the attorney had to refuse other work to litigate the case; 5) the attorney's customary fee; 6) whether the fee is fixed or contingent; 7) whether the client or case circumstances imposed any time constraints; 8) the amount involved and the results obtained; 9) the experience, reputation, and ability of the attorneys; 10) whether the case was "undesirable;" 11) the type of attorney-client relationship and whether that relationship was

Adjustment of the lodestar in this Circuit involves the assessment of a dozen factors. Our opinion in *Johnson v. Georgia Highway Express, Inc.*[18] identifies these factors.[19]

[17] Primarily, Fischbach contests the district court's refusal to reduce the lodestar to reflect LP & L's "limited success," the eighth of the *Johnson* factors. In considering this factor, the district court ruled:

The results obtained, though disappointing to plaintiff in quantum, were nonetheless significant. The amount involved, the $15–17 million sought as opposed to $500,000 awarded by the jury is not insignificant for inherent therein is the principle of the matter.... [I]t should be remembered that in this instance the plaintiff is entitled to a mandatory fee shifting award, not a discretionary one based on limited success achieved.

. . .

Significant here is the fact that plaintiff exposed the rapacious avarice of educated executives and professionals.... Such conduct cuts the thread of the fabric of our society and consequences invariably get borne by the citizenry. The Court considers exposure of this antitrust violation and racketeering activity to be an important and highly significant result obtained.[20]

Moreover, in commenting on various cases cited by the parties, the district court mentioned with approval language such as "recovery of the[ ] reasonable attorney's fees must be sustained regardless of the amount of damages awarded."[21]

long-standing; and 12) awards made in similar cases. 488 F.2d at 717–19.

20. The district court's implication that, as to the limited success factor, some distinction exists between mandatory and discretionary fee shifting is, at most, unfortunate surplusage; the portion of the court's findings and conclusions that follow demonstrate beyond cavil that the court did indeed "consider" LP & L's degree of success and implicitly explained why there was no additional lodestar reduction on account of it.

21. Citing *United States Football League v. National Football League,* 887 F.2d 408 (2d Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990). *USFL,* however, does not stand for the proposition that *all* fees requested

Fischbach contends that the district court misapplied the law when it refused to reduce the lodestar for LP & L's limited success. *See Farrar v. Hobby*, —— U.S. ——, ——, 113 S.Ct. 566, 574, 121 L.Ed.2d 494 (1992) (calling the degree of success the most crucial element in determining the amount of a reasonable fee); *Hensley*, 461 U.S. at 440, 103 S.Ct. at 1943 ("A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole.").

But it is one thing to *consider* a factor (which is required) and quite another to *act* upon it (which is discretionary with the district court). In his partial dissent, Judge Garza makes the unqualified statement that the district court "did not even *consider* the magnitude of LP & L's success"—a statement that is puzzling in light of the portion of the district court's opinion that is quoted in the text accompanying note 20 *supra*. When that court's analysis and pronouncements are read in the context of the deferential abuse-of-discretion standard that we must apply when reviewing this issue, we cannot help but disagree with Judge Garza's statement. Not only did the district court expressly advert to the magnitude of LP & L's recovery, reciting the quantums of both the demand and the recovery; that court expressly "considered" the significance of the countervailing, non-pecuniary aspects of LP & L's victory, and also explained, at least implicitly, why it made no additional reduction to the lodestar. If, in its discretion, the district court had made a reasonable reduction of the lode-

star for limited success, we undoubtedly would have affirmed that decision as being a proper exercise of discretion: As we and Judge Garza note, such a reduction is "appropriate" under *Hensley*. But "appropriate" is not synonymous with "required." Inasmuch as the district court here clearly did consider limited success *and* explain its reasons for not further reducing the lodestar therefor, that court cannot be said to have abused its discretion for failure to reduce the lodestar on the basis of that considered factor.

We acknowledge at the outset that, to a degree, the district court's ruling appears to confuse determination of the *right* to recover fees with determination of the *reasonable amount* of that fee. *See Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 793, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989) ("[T]he degree of the plaintiff's overall success goes to the reasonableness of the award ..., not to the availability of a fee award *vel non*."); *Ingalls Shipbuilding, Inc. v. Director, Office of Workers' Compensation Programs*, 991 F.2d 163, 166 (5th Cir.1993) (applying "limited success" analysis to mandatory fee shifting statute);[22] *see also George Hyman Constr. Co. v. Brooks*, 963 F.2d 1532, 1536 (D.C.Cir.1992) (holding that *Hensley* standard regarding amount of reasonable fee applies to all fee shifting statutes, including mandatory ones).[23]

Although the district court found that LP & L's limited victory was "an important and

---

by a prevailing antitrust plaintiff are reasonable; therefore, the language quoted by the district court does not necessarily support its conclusion.

22.  The statute at issue in *Ingalls* was the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 (1988). Like the Clayton Act, *see* 15 U.S.C. § 15 (1988), the LHWCA provides that a successful plaintiff *"shall* be awarded a reasonable attorney's fee ...." 33 U.S.C. § 928(a) (1988) (emphasis added).

23.  Neither case cited by the district court mandates an opposite conclusion. *Sciambra v. Graham News*, 892 F.2d 411 (5th Cir.1990), only discussed the right to fees, not the amount thereof. Indeed, *Sciambra* explicitly declined to address a "limited success" argument because it was not timely made. *Id.* at 417. *United States*

*Football League v. National Football League*, 887 F.2d 408 (2d Cir.1989), *cert. denied*, 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990), does state that the nominal damages received "does not affect the entitlement to an award," but it also states that limited results *"may be a* factor used in reducing a fee award." (emphasis added).

LP & L also urges us to affirm the district court's award because a fee award need not be proportional to the damages to be reasonable. *See Meineke Discount Muffler v. Jaynes*, 999 F.2d 120, 126 (5th Cir.1993) ("[T]he disparity of these amounts ... alone will not support a reversal ...."). The issue here, however, is not whether the award should be reversed because it is *disproportional*, but whether it is *reasonable* in light of *all* factors, one of which is the degree of success obtained.

## LOUISIANA POWER & LIGHT CO. v. KELLSTROM          331
Cite as 50 F.3d 319 (5th Cir. 1995)

highly significant result obtained," the Supreme Court has held that a finding of significant result alone does not satisfy the district court's duty to evaluate the magnitude of that result.

We are unable to affirm the decisions below, however, because the District Court's opinion did not properly *consider* the relationship between the extent of success and the amount of the fee award. The court's finding that 'the [significant] extent of the relief clearly justifies the award of a reasonable attorney's fee' does not answer the question of what is 'reasonable' in light of that level of success. We emphasize that the inquiry does not end with a finding that the plaintiff obtained significant relief. A reduced fee award is *appropriate* if the relief, however, significant, is limited in comparison to the scope of the litigation as a whole.

*Hensley,* 461 U.S. at 438–39, 103 S.Ct. at 1942–43 (emphasis added); *see also Blum,* 465 U.S. at 900, 104 S.Ct. at 1549 (criticizing fee award because although the award "was based in part on the District Court's determination that the ultimate outcome of the litigation 'was of great benefit to a large class of needy people,'" the district court "did not explain ... exactly how this determination affected the fee award"). In that respect, the district court's finding here appears to fall a bit short of the required analysis. The court's analysis also appears to fall short in another respect: LP & L failed to recover at all from several defendants; and if the district court considered this facet of this shortfall in LP & L's success, it did not clearly indicate that it did so. *See supra* n. 15. Nevertheless, we are not prepared to find that the district court failed to *consider* LP & L's relatively limited success; neither are we prepared to hold that the court abused its discretion in refusing to reduce LP & L's lodestar further to reflect less than total success, either monetarily or against all defendants. We find important the fact that degree of success is but one of 12 *Johnson* factors, and that in our deferential testing of the discretion of the court we look only to *consideration* of that factor without requiring that a reduction in lodestar necessarily follow. We, therefore affirm the district court's handling of limited success and its effect—or lack thereof—on the lodestar factor in this case.

[18] Fischbach also asserts generally that the district court failed to consider sufficiently other *Johnson* factors. A district court's *Johnson* analysis, however, need not be meticulously detailed to survive appellate review: "If the district court has articulated and clearly applied the criteria ..., we will not require the trial court's findings to be so excruciatingly explicit in this area of minutiae that decisions of fee awards consume more paper than did the cases from which they arose." *Blanchard,* 893 F.2d at 89; *see also Longden v. Sunderman,* 979 F.2d 1095, 1100 (5th Cir.1992) (finding no abuse when district court discussed each factor); *Cobb v. Miller,* 818 F.2d 1227, 1232 (5th Cir.1987) (refusing to reverse award when, although district court did not analyze every *Johnson* factor, the "district court has utilized the Johnson framework as the basis of its analysis, has not proceeded in a summary fashion, and has arrived at an amount that can be said to be just compensation"). As in the instance of the limited success factor, the district court did not abuse its discretion when it refused to reduce the lodestar further on the basis of its consideration of the other *Johnson* factors.

### C

[19] Fischbach next contends that the district court should have awarded postjudgment interest only from the date of the order quantifying the fee award, rather than from the date of the underlying judgment. 28 U.S.C. § 1961 (1988) provides that postjudgment "interest shall be calculated from the date of the entry of the judgment ...." The question here is whether the judgment on the merits or the supplemental judgment verifying the fee award should be used. In *Copper Liquor, Inc. v. Adolph Coors Co.,* 701 F.2d 542 (5th Cir.1983) (en banc), we stated:

The relevant judgment for purposes of determining when interest begins to run is the judgment establishing the right to fees or costs, as the case may be.... If, as in the usual course, the amount of costs is

later determined by the clerk, interest will nonetheless run from the date of the judgment allowing costs either expressly or by legal implication. If a judgment is rendered that does not mention the right to attorneys' fees, and the prevailing party is unconditionally entitled to such fees by statutory right, interest will accrue from the date of judgment.

*Id.* at 544–45.[24]

In *Kaiser Aluminum & Chemical Corp. v. Bonjorno*,[25] the Supreme Court refused to calculate interest from the date of an original judgment that was invalidated because it was not supported by the evidence. 494 U.S. at 835–36, 110 S.Ct. at 1576. "Where the judgment on damages was not supported by the evidence, the damages have not been 'ascertained' in any meaningful way." *Id.* Fischbach contends that, because attorneys' fees are not quantified at the time of the judgment on the merits, *Kaiser* must have overruled *Copper Liquor*. Since *Kaiser*, three Circuits have addressed this issue. The Seventh and Tenth Circuits held that *Kaiser* does supersede *Copper Liquor*.[26] The Eighth Circuit disagreed,[27] deciding that *Kaiser* did not squarely address the issue in *Copper Liquor*. *Jenkins*, 931 F.2d at 1276 n. 3. We agree with the Eighth Circuit. Because the earlier judgment in *Kaiser* was invalid, the party had no entitlement to damages on that date. Thus, the reasoning in *Kaiser* is consistent with *Copper Liquor*'s mandate that interest should not accrue until the party becomes entitled to the award. Indeed, *Copper Liquor* and *Kaiser* are consistent in that in neither case does interest accrue for amounts later reversed. *See Copper Liquor*, 701 F.2d at 545 ("If a judgment for attorneys' fees is later modified by the

district court or an appellate court, whether the award is increased or reduced, interest on the revised award will run from the date of the original judgment unless, of course, the allowance of any amount is reversed."). We therefore hold that *Kaiser* did not overrule *Copper Liquor*, so that the district court here did not err in awarding postjudgment interest from the date of the judgment on the merits.

### D

[20]  In its final challenge, Fischbach contests the award of $45,330.96 in fees for LP & L's experts' response to discovery. Ordinarily, recovery of expert fees is limited to the statutory amounts authorized under 28 U.S.C. §§ 1821 and 1920. *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 439, 107 S.Ct. 2494, 2496, 96 L.Ed.2d 385 (1987) ("[W]hen a prevailing party seeks reimbursement for fees paid to its own expert witnesses, a federal court is bound by the limit of § 1821(b), absent contract or explicit statutory authority to the contrary."); *see also West Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 84–88, 111 S.Ct. 1138, 1140–41, 113 L.Ed.2d 68 (1991) (limiting witness fees to statutory amounts, absent express statutory authority).

Rule 26(b)(4)(C), however, provides an independent basis for recovery of expert fees as part of discovery. *See* Fed.R.Civ.P. 26(b)(4)(C);[28] *see also Chambers v. Ingram*, 858 F.2d 351, 361 (7th Cir.1988) (affirming award of Rule 26(b)(4)(C) costs as separate from § 1821 witness fees). Accordingly, the district court correctly granted LP & L's request for Rule 26(b)(4)(C) costs.

---

24.  Because LP & L recovered under a mandatory fee shifting statute, it became entitled to fees on the date of judgment on the merits.

25.  494 U.S. 827, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990).

26.  *MidAmerica Fed. Sav. & Loan Ass'n v. Shearson/American Express, Inc.*, 962 F.2d 1470, 1476 (10th Cir.1992) (stating that "[k]ey to the *Kaiser* holding is the date damages are 'ascertained' in a meaningful way"); *Fleming v. County of Kane*,

898 F.2d 553 (7th Cir.1990) (awarding interest from date of award of fees).

27.  *Jenkins v. Missouri*, 931 F.2d 1273, 1276–77 (8th Cir.) (adopting *Copper Liquor* rule), *cert. denied*, 502 U.S. 925, 112 S.Ct. 338, 116 L.Ed.2d 278 (1991).

28.  Rule 26(b)(4)(C) provides:
     [T]he court shall require that the party seeking discovery shall pay the expert a reasonable fee for time spent in responding to discovery . . . . Fed.R.Civ.P. 26(b)(4)(C).

## LOUISIANA POWER & LIGHT CO. v. KELLSTROM
### Cite as 50 F.3d 319 (5th Cir. 1995)

333

[21, 22] But Rule 26(b)(4)(C) applies to both parties, not just to the prevailing party. The district court should also have awarded Rule 26(b)(4)(C) costs to Fischbach. The court considered this argument but found the issue moot, concluding that, even if Fischbach was entitled to these costs, LP & L could have recovered them under the fee shifting provisions of the antitrust laws. *See* 15 U.S.C. § 15 (1988) (allowing recovery of cost of suit). We disagree.

Previously, we have allowed a prevailing antitrust plaintiff to recover all expenses of the litigation. *See, e.g., Copper Liquor, Inc. v. Adolph Coors Co.,* 684 F.2d 1087, 1100 (5th Cir.1982) (holding that "the Clayton Act embraces all the ordinary and reasonable expenses of litigation"), *modified on other grounds on appeal after remand,* 701 F.2d 542 (5th Cir.1983). In *West Virginia University Hospitals, Inc. v. Casey,*[29] however, the Supreme Court ruled that a prevailing plaintiff cannot recover expert fees under a fee shifting statute unless the statute expressly provides for the recovery of expert fees. 499 U.S. at 86–92, 111 S.Ct. at 1141–43 (absent specific statutory authorization, shifting of attorneys' fees does not include expert witness fees). We therefore conclude that expert fees are Rule 26(b)(4)(C) costs and are not recoverable under *Casey.* Consequently, we reverse the district court's denial of Fischbach's entitlement to recover Rule 26(b)(4)(C) costs. And, as Fischbach documented its costs and LP & L did not refute the quantum, we render judgment in favor of Fischbach and against LP & L in the requested amount of $10,994.21 for Fischbach's expert witness expenses.

The Comstock Appeal:

Comstock challenges several elements of the district court's final award of costs and fees. First, it contests the denial of Rule 68 fees. Second, Comstock disputes the final assessment of certain elements of the taxation of costs. Last, it insists that the district court neglected to award fees and costs that Comstock incurred in connection with the instant fee-and-costs portion of the suit.

**29.** 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68

A

[23] Comstock argues that the district court erred in ruling that it should not recover fees and costs from LP & L under Rule 68 of the Federal Rules of Civil Procedure. Interpretation of Rule 68 is an issue of law which we review *de novo. Knight v. Snap–On Tools Corp.,* 3 F.3d 1398, 1404 (10th Cir.1993); *Erdman v. Cochise County,* 926 F.2d 877, 879 (9th Cir.1991). Rule 68 states:

At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party. . . . If within 10 days after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment. . . . If the judgment finally obtained by the offeree is not more favorable than the offer the offeree must pay the costs incurred after the making of the offer. . . .

Fed.R.Civ.P. 68.

The purpose of Rule 68 is to encourage the settlement of litigation by providing an incentive to settle "in those cases in which there is a strong probability that the plaintiff will obtain a judgment but the amount of the recovery is uncertain." *Delta Airlines, Inc. v. August,* 450 U.S. 346, 352, 101 S.Ct. 1146, 1150, 67 L.Ed.2d 287 (1981). Rule 68 requires a prevailing plaintiff to pay the costs of litigation "in the single circumstance where the plaintiff does not accept the defendant's offer of judgment which is more favorable than the judgment the plaintiff ultimately obtains." *Johnston v. Penrod Drilling Co.,* 803 F.2d 867, 869 (5th Cir.1986). Consequently, when a plaintiff rejects a Rule 68 offer of judgment, "he will lose some of the benefits of victory if his recovery is less than the offer." *Delta,* 450 U.S. at 352, 101 S.Ct. at 1150.

If a plaintiff takes nothing, however, Rule 68 does not apply. In *Delta Airlines, Inc. v.*

(1991).

*August,*[30] the Supreme Court limited Rule 68 to cases in which a plaintiff obtains a judgment against the defendant; the rule is not applicable when a defendant actually prevails over the plaintiff. *See* 450 U.S. at 351–52, 101 S.Ct. at 1149–50 (finding Rule 68 "simply inapplicable to this case because it was the defendant that obtained the judgment"); *see also Landon v. Hunt,* 938 F.2d 450, 452 n. 1 (3d Cir.1991) (commenting that defendant could not recover under Rule 68 when plaintiff's claim was dismissed); *Allen v. United States Steel Corp.,* 665 F.2d 689, 697 (5th Cir.1982) (refusing Rule 68 costs to a defendant who prevailed). The Court noted that costs are usually assessed against a losing plaintiff as a normal incident of defeat but that this exception is created so that "a non-settling plaintiff does not run the risk of suffering additional burdens that do not ordinarily attend to a defeat . . . ." 450 U.S. at 352, 101 S.Ct. at 1150.

Comstock contends that it should recover Rule 68 costs because, instead of a take nothing judgment, LP & L recovered $500,-000. Comstock argues that *Delta* is inapplicable because LP & L was not defeated, and it should lose some of the "benefits of victory" for failing to accept Comstock's reasonable offer of judgment.

Here, plaintiff LP & L's recovery was against other defendants, however; plaintiff LP & L took nothing against defendant Comstock. In other words, defendant Comstock actually prevailed totally against plaintiff LP & L. Comstock has not presented any argument that would compel a Rule 68 comparison of its offer of judgment to LP & L and the judgment that LP & L obtained against

other defendants. Rule 68 operates by comparing two clearly defined amounts. *Johnston,* 803 F.2d at 870. This comparison is of the "money or property," including "costs then accrued," set out in the offer and the "judgment finally obtained by the offeree." Fed.R.Civ.P. 68. Accordingly, Rule 68 compares the amount of an offer of judgment, whether made by one defendant or jointly made by multiple defendants,[31] and the amount of the judgment, if any, taken by the offeree against the offeror or offerors. If no judgment is taken by the offeree plaintiff against the offeror defendant or joint offeror defendants, the *Delta* rule applies.

Comstock made an offer of judgment to LP & L, and LP & L took nothing against Comstock. LP & L's recovery against other non-offeror defendants—none of which were joint offerors with Comstock—is irrelevant to the Rule 68 inquiry. Consequently, Comstock cannot recover its fees under Rule 68.[32]

### B

[24, 25] Additionally, Comstock challenges the district court's approval of the clerk of court's final taxation of costs against LP & L, arguing that the clerk erroneously struck certain items. We will not overturn the district court's taxation of costs absent a clear abuse of discretion. *Nissho–Iwai Co. v. Occidental Crude Sales, Inc.,* 729 F.2d 1530, 1551 (5th Cir.1984); *Studiengesellschaft Kohle mbh v. Eastman Kodak Co.,* 713 F.2d 128, 131 (5th Cir.1983). Although Rule 54(d) of the Federal Rules of Civil Procedure directs a district court to award costs to a prevailing party,[33] that court cannot award any costs not authorized by statute. "[E]x-

---

**30.** 450 U.S. 346, 101 S.Ct. 1146, 67 L.Ed.2d 287 (1981).

**31.** We have previously encountered the question of whether recovery against one defendant may apply to a Rule 68 determination with respect to another defendant-offeror. In *Johnston v. Penrod Drilling Co.,* 803 F.2d 867, 870 (5th Cir.1986), two defendants made an unapportioned joint offer of judgment to the plaintiff. We vacated the district court's decision because it had not included the settlement against the first defendant in the Rule 68 calculation for the second defendant. *Johnston* is distinguishable, however, be-

cause the settlement was made with a joint *offeror,* not with an unrelated defendant.

**32.** Comstock also appealed the district court's finding that its Rule 68 offer of judgment was not timely. Our decision regarding the applicability of *Delta* renders that issue moot.

**33.** Rule 54(d) provides:
   Except when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed to the prevailing party unless the court otherwise directs . . . .
   Fed.R.Civ.P. 54(d).

## LOUISIANA POWER & LIGHT CO. v. KELLSTROM   335
Cite as 50 F.3d 319 (5th Cir. 1995)

penditures for those categories of expenses listed in 28 U.S.C. § 1920 may be recovered only if they are allowed by that section." *Copper Liquor, Inc. v. Adolph Coors Co.,* 684 F.2d 1087, 1101 (5th Cir.1982). Section 1920 provides:

> A judge or clerk of any court of the United States may tax as costs the following:
>
> . . .
>
> (3) Fees and disbursements for printing and witnesses;
>
> (4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
>
> . . . .

28 U.S.C. § 1920 (1988). Moreover, "[i]tems proposed by winning parties as costs should always be given careful scrutiny." *Farmer v. Arabian American Oil Co.,* 379 U.S. 227, 235, 85 S.Ct. 411, 416, 13 L.Ed.2d 248 (1964).

[26] Comstock first contends that the district court erred when it refused to allow witness fees for each day that two of its experts attended the trial.[34] It is true that a party may recover witness fees not only for days on which the witness testified, but also for days spent attending the trial beforehand. *See Nissho–Iwai,* 729 F.2d at 1552–53 (allowing fees for days prior to witnesses' testimony). Fees for these preliminary days are limited, however, to days that witnesses spend holding themselves available to testify. *See Hurtado v. United States,* 410 U.S. 578, 584, 93 S.Ct. 1157, 1161, 35 L.Ed.2d 508 (1973) (allowing fees for days spent "in readiness to testify"); *Nissho–Iwai,* 729 F.2d at 1552 (granting fees for days witness expected to, but did not actually, testify). The district court approved its clerk's determination that only a portion of the days Pike and Janik attended the trial were expended in the expectation that they would testify on those days. We find no abuse of discretion in this decision.

[27] Comstock next insists that the district court should have allowed recovery of the costs of defendants' trial exhibits. A district court may authorize the production of trial exhibits if so doing would "facilitate the just, speedy, and inexpensive disposition of the action." Fed.R.Civ.P. 16(c)(16); *see also Johns–Manville Corp. v. Cement Asbestos Prods. Co.,* 428 F.2d 1381, 1385 (5th Cir.1970) (looking to Rule 16 for pretrial authorization of models and charts). Absent pretrial approval of the exhibits, however, a party may not later request taxation of the production costs to its opponent. *Johns–Manville,* 428 F.2d at 1385; *see also Studiengesellschaft,* 713 F.2d at 133 (reversing award of exhibit costs where party had not obtained pretrial authorization). Comstock asserts that the pretrial order authorized the production of its exhibits by requiring exhibits to be "exchanged prior to trial in accordance with this order." We find no such authorization in this language: Requiring the exchange of exhibits prior to trial does not imply authorization of production of those exhibits. Accordingly, the district court did not err in denying recovery by Comstock of the costs of its exhibits.

Comstock also challenges the district court's affirmance of the clerk of court's valuation of Comstock's allowable photocopying charges. On this claim Comstock presents virtually no legal argument; instead, it simply alleges conclusorily that both the clerk and the district court abused their discretion. After reviewing the record, we find that the clerk of court carefully assessed each item in the request. Consequently, we find no abuse of discretion by either the clerk or the district court.

And, like Fischbach, Comstock challenges the district court's simultaneous award of Rule 26(b)(4)(C) costs to LP & L and denial of the same costs to Comstock. It submitted requests for its share of such cost in the sum of $7,254.98; and although LP & L contests the timeliness of Comstock's request and complains in a conclusory manner that Comstock overstated its claim and failed to offer evidence of its method of calculation, the dollar amount itself is not truly disputed.

---

**34.** Comstock's experts, David Pike and E.J. Janik, attended 38 and 11 days of trial, respectively. Pike testified on three days, and Janik testified on one day. The district court actually granted five days for Pike and three days for Janik. This equated to the number of days spent testifying plus travel before and after.

**336**     **50 FEDERAL REPORTER, 3d SERIES**

We have already discussed Rule 26(b)(4)(C) in our review of Fischbach's appeal,[35] and that analysis applies here as well.   Comstock is thus entitled to these costs in the amount requested.

[28]   LP & L responds that, even if Comstock is allowed recovery of Rule 26(b)(4)(C) costs, its request for these costs was not timely under Local Rule 5.04E.[36]   Comstock timely filed its original application for taxation of costs, but did not add its request for Rule 26 costs until nine months later.   Although Local Rule 5.04E imposes a thirty day limit on cost applications and supporting memoranda, this rule specifically refers to costs recoverable by "the party in whose favor judgment is rendered."   Fed.Local Ct. Rules, E.D.La., Rule 5.04E.   We have already noted that Rule 26(b)(4)(C) costs are not limited to prevailing parties; and we hold that Rule 26(b)(4)(C) fees do not fall within the kinds of costs covered by Local Rule 5.04E.   *See also Chambers,* 858 F.2d at 360–61 ("The advisory committee notes to Rule 26(b)(4)(C) state that the court may issue an order to pay fees as a condition to discovery 'or it may delay the order until after discovery.' "   (quoting Fed.R.Civ.P. 26(b)(4)(C)).   Accordingly, we hold that the district court improperly denied Comstock's Rule 26(b)(4)(C) request and render judgment in favor of Comstock and against LP & L in the sum of $7,254.98 to cover those items.[37]

### C

[29, 30]   Comstock's last contention is that the district court erred when it refused to award costs and fees to Comstock for pursuing its cost application.   A district court may award costs and fees for time spent litigating a cost or fee request.   *See Alberti v. Klevenhagen,* 896 F.2d 927, 937–38 (5th Cir.) (affirming taxation of costs for expenses solely

related to fee litigation), *vacated on other grounds,* 903 F.2d 352 (5th Cir.1990).   We shall not, however, disturb a district court's decision regarding fees for cost recovery litigation absent an abuse of discretion.   *See id.; see also Chemical Mfrs. Ass'n v. U.S.E.P.A.,* 885 F.2d 1276, 1283 (5th Cir.1989) (approving compensation for time spent on fee application because amount was within district court's discretion); *Spray–Rite Serv. Co. v. Monsanto Co.,* 684 F.2d 1226, 1250 (5th Cir. 1982) (affirming district court's discretion in awarding fees and costs for time spent litigating its right to fees).   Comstock recovered only part of the costs and fees it requested.   In challenging Comstock's request, LP & L too was only partially successful.   Refusing to tax fees and costs for the instant cost litigation fell well within the district court's proper exercise of its discretion.

### III

For the foregoing reasons, we affirm the district court's determination of LP & L's reasonable hourly rates for its attorneys, but we modify the district court's determination of LP & L's reasonable hours, reducing by 10% the specific portions of those fees challenged by Fischbach as inadequately detailed, and eliminating entirely the portion of the district court's award that allowed $6,465.00 in fees for Attorney Madigan.   We also affirm the district court's (1) 15% overstaffing reduction of LP & L's lodestar amount; (2) award of postjudgment interest from the date of the judgment on the merits; (3) award to LP & L of costs (including Rule 26(b)(4)(C) costs, other expenses, and fees for other attorneys).   Further, we affirm the district court's denial of Rule 68 costs to Comstock, and we affirm the quantum of the district court's costs taxation to Comstock; but we reverse the district court's denial of Rule 26(b)(4)(C) costs to Fischbach and to

---

35.   *See supra* Part II (Fischbach Appeal), D.

36.   Local Rule 5.04E provides:

Within thirty days after receiving notice of entry of judgment, unless otherwise ordered by the court, the party in whose favor judgment is rendered and who claims and is allowed costs, shall . . . file with the Clerk a notice of application to have the costs taxed . . . .

Fed. Local Ct. Rules, E.D.La., Rule 5.04E.

37.   We do not mean to imply that, under all circumstances, a party may file a request for Rule 26(b)(4)(C) costs nine months after judgment on the merits.   The record reflects multiple changes and disputes about the fees extending over a period of many months.   Accordingly, we merely hold that on the specific facts of this case, Comstock may recover its Rule 26(b)(4)(C) costs.

## LOUISIANA POWER & LIGHT CO. v. KELLSTROM    337
Cite as 50 F.3d 319 (5th Cir. 1995)

Comstock, and render judgment therefor against LP & L and in favor of Comstock in the amount of $7,254.98, and in favor of Fischbach in the amount of $10,994.21.

As modified, the award to LP & L against Fischbach is as follows:

| | |
|---|---:|
| Original fee request: | $4,327,276.30 |
| 10% reduction—inadequate documentation: [38] | (35,206.50) |
| Fees disallowed for Attorney Madigan | (6,465.00) |
| | |
| Lodestar | $4,285,604.80 |
| 15% reduction—overstaffing: [39] | (642,840.72) |
| | |
| Reasonable Attorneys Fees: | $3,642,764.08 |
| | |
| Costs | $ 172,246.61 |
| Other expenses | 322,876.90 |
| Fees for other attorneys | 9,585.36 |
| | |
| GROSS AWARD: | $4,147,472.95 |
| | |
| LESS:  Rule 26 costs from LP & L to Fischbach | (10,994.21) |
| | |
| Net Award:  LP & L against Fischbach | $4,136,478.74 |

---

In conclusion we hereby enter judgment in the net sum of $4,136,478.74, plus post-judgment interest, against Fischbach and in favor of LP & L; and we increase the district court's judgment against LP & L and in favor of Comstock by $7,254.98 for its Rule 26 costs.

AFFIRMED in part; MODIFIED and, as modified, AFFIRMED in part; and REVERSED and RENDERED in part.

EMILIO M. GARZA, Circuit Judge, concurring in part, and dissenting in part:

I concur in the above opinion with the exception of Part II.B. In my view, the district court applied the wrong legal standard and abused its discretion in refusing to adjust the lodestar for LP & L's limited success. The district court stated that "recovery of the[ ] reasonable attorney's fees must be sustained regardless of the amount of damages awarded," and explained that cases such as *Farrar v. Hobby*, — U.S. ——, ——, 113 S.Ct. 566, 574, 121 L.Ed.2d 494 (1992) (calling the degree of success the most crucial element in determining the amount of a reasonable fee), and *Hensley v. Eckerhart*, 461 U.S. 424, 440, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983) ("A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole."), did not apply to mandatory fee statutes.[1]  Accordingly, the district court did not even *consider* the magnitude of LP & L's success.[2]  The Supreme Court explicitly has dictated other-

---

**38.** Percentage reduction applicable to (1) $115,-070 reflected in quarterly summaries for period from February 1986 to July 1987; (2) $154,080 reflected in month-end summaries for two attorneys during 1987 and 1988; and (3) $82,915 for charges in November and December 1988, for which no time records were submitted, totaling in the aggregate $352,065.00.

**39.** This reduction was imposed by the district court.

**1.** *See supra*, per curiam opinion, text accompanying note 21.

**2.** The majority finds this statement "puzzling" and suggests that the district court did consider the magnitude of LP & L's success. The district court, however, only "considered" LP & L's limited success as a threshold question, that is, whether a mandatory fee statute permits *any* consideration of limited success. Because the district court answered this question "no," it never reached the question of whether to "act on [the limited success]." It is the failure to reach this secondary question which I challenge and to which I refer here.

wise: *Farrar* and *Hensley* apply to all cases.[3] Because the district court failed to apply the correct legal standard, I would reverse. Moreover, in my view, a recovery of less than five percent of the damages requested and against only five of twelve defendants warrants some reduction of fees. For these reasons, I would hold that the district court abused its discretion in refusing to reduce the lodestar, and either remand to the district court to apply the proper standard and to determine what percentage reduction, if any, is warranted by the record's demonstration of LP & L's limited success, or, alternatively, reduce the lodestar by an additional twenty percent. Because the per curiam opinion affirms the district court's ruling on this point, I respectfully dissent.



## UNITED STATES of America, Plaintiff–Appellee,

### v.

## Renard Leon CHERRY, a/k/a Jimmy Dean, In Custody, Defendant–Appellant.

### No. 94–20456.

United States Court of Appeals, Fifth Circuit.

April 11, 1995.

Defendant was found guilty in the United States District Court for the Southern District of Texas, Lynn N. Hughes, J., of conspiracy to possess and distribute crack cocaine, possession with intent to distribute crack cocaine, and use of firearm during commission of drug trafficking crime. Defendant appealed conviction and sentence. The Court of Appeals, Wisdom, Circuit Judge, held that: (1) misinformation of some of defendant's physical characteristics and discrepancy in address in affidavit supporting warrant were not intentional misrepresentations, and (2) sentencing scheme for crack cocaine, when compared with sentencing scheme for powder cocaine, did not violate equal protection under rational basis test.

Affirmed.

1. Searches and Seizures ⟺112
    In determining whether search warrant establishes probable cause, court must disregard any intentional or reckless misrepresentations made by affiant in affidavit. U.S.C.A. Const.Amend. 4.

2. Searches and Seizures ⟺112
    Statement in warrant affidavit is not false merely because it characterizes or summarizes facts in particular way; if statement can be read as true, it is not misrepresentation. U.S.C.A. Const.Amend. 4.

3. Searches and Seizures ⟺112
    Search warrant is valid, even if it contains misrepresentation, if after striking misrepresentation, there remains sufficient content to support finding of probable cause. U.S.C.A. Const.Amend. 4.

4. Searches and Seizures ⟺112
    For purposes of determining whether affidavit provided probable cause for warrant, informant's inaccurate or incorrect estimation of defendant's physical appearance, as reflected in officer's affidavit, was not intentional misrepresentation; although affidavit misestimated defendant's height by two to three inches and his weight by nearly 100 pounds, defendant was correctly described in many other respects, including his approximate age, his race, and that he had a gold tooth, had short black hair and used a particular alias; officer also correctly described the

---

**3.** See *supra*, per curiam opinion, text accompanying notes 22–23, explaining that the district court's ruling confuses the *right* to recover fees with the determination of the *amount* of that fee, and that a finding of significant result alone does not satisfy the district court's duty to evaluate the

magnitude of that result. As in *Hensley*, the district court's finding that LP & L's success was significant "does not answer the question of what is 'reasonable' in light of that level of success." 461 U.S. at 439, 103 S.Ct. at 1942.

Richard JOHNSON, Jr., and Frank Hill,
Plaintiffs-Appellants-Cross
Appellees,

v.

GEORGIA HIGHWAY EXPRESS, INC.,
Defendant-Appellee-Cross
Appellant.

No. 72-3294.

United States Court of Appeals,
Fifth Circuit.

Jan. 21, 1974.

Plaintiff brought action for damages and a class action for injunctive relief by reason of his discharge from employment allegedly because of race or color. From the action of the District Court, 47 F.R.D. 327, an interlocutory appeal was taken and sustained, 417 F.2d 1122. After remand, the United States District Court for the Northern District of Georgia at Atlanta, Charles A. Moye, Jr., J., entered a final order and made an award of attorneys' fees. Plaintiffs appealed, challenging the award as inadequate. The Court of Appeals, Roney, Circuit Judge, held that where the award did not elucidate factors upon which it was based and showed no correlation to facts and figures submitted by plaintiff and where no differentiation was made between experienced and nonexperienced attorneys representing plaintiff and disallowance of 239.5 to 299.5 of 659.5 hours claimed was unexplained, the case would be remanded for reconsideration in light of guidelines, which the Court promulgated.

Vacated and remanded.

1. Civil Rights ⟜46

Purpose of attorney's fee provision of equal employment opportunities legislation is to effectuate congressional policy against racial discrimination. Civil Rights Act of 1964, §§ 201 et seq., 706(k), 42 U.S.C.A. §§ 2000a et seq., 2000e–5(k).

2. Civil Rights ⟜13.17
   Courts ⟜406.5(20)

It is within discretion of district court whether to award attorney's fees against party in civil rights action, but reviewing court may nonetheless review district court's determination as to reasonable fee. Civil Rights Act of 1964, §§ 201 et seq., 706(k), 42 U.S.C.A. §§ 2000a et seq., 2000e–5(k).

3. Courts ⟜406.5(20)

Reasonableness of award of attorney's fee in civil rights case is to be judged by abuse of discretion standard of review. Civil Rights Act of 1964, § 706(k), 42 U.S.C.A. § 2000e–5(k).

4. Courts ⟜406.9(9)

Where award of attorneys' fee in equal employment opportunities case did not elucidate factors upon which it was based and showed no correlation to facts and figures submitted by plaintiff and where no differentiation was made between experienced and nonexperienced attorneys representing plaintiff and disallowance of 239.5 to 299.5 of 659.5 hours claimed was unexplained, case was remanded for reconsideration in light of prescribed guidelines. Civil Rights Act of 1964, §§ 201 et seq., 706(k), 42 U.S.C.A. §§ 2000a et seq., 2000e–5(k).

5. Civil Rights ⟜46

Guidelines, each of which was to be considered but no one of which was to be controlling, for determination of amount of attorney's fee award in equal employment opportunities case, promulgated. 18 U.S.C.A. § 3006A(d)(1); Civil Rights Act of 1964, §§ 201 et seq., 706(g, k), 42 U.S.C.A. §§ 2000a et seq., 2000e–5(g, k).

6. Civil Rights ⟜46

Statute authorizing attorney's fee award in equal employment opportunities case was not passed for benefit of attorneys but to enable litigants to obtain competent counsel worthy of contest with caliber of counsel available to their opposition and to fairly place economic burden of such litigation, and balance is to be achieved in determining amount.

JOHNSON v. GEORGIA HIGHWAY EXPRESS, INC.   **715**
Cite as 488 F.2d 714 (1974)

18 U.S.C.A. § 3006A(d)(1); Civil Rights Act of 1964, §§ 201 et seq., 706(g, k), 42 U.S.C.A. §§ 2000a et seq., 2000e–5(g, k).

**7. Civil Rights ⟨⟩43**

Plaintiff in equal employment opportunities case has burden of proving his entitlement to award for attorney's fees. Civil Rights Act of 1964, § 706(k), 42 U.S.C.A. § 2000e–5(k).

———⚫———

Elizabeth Rindskopf, Howard Moore, Jr., Atlanta, Ga., Jack Greenberg, William L. Robinson, Morris J. Baller, Charles Stephen Ralston, New York City, for plaintiffs-appellants.

John W. Wilcox, Jr., Thomas M. Kuna, Atlanta, Ga., for defendant-appellee.

Before THORNBERRY, AINSWORTH and RONEY, Circuit Judges.

RONEY, Circuit Judge:

The question on this appeal concerns the adequacy of attorneys' fees awarded by the District Court in a Title VII class action. Plaintiffs challenge as inadequate the $13,500.00 awarded for their alleged 659.5 billable hours accrued during more than four years of litigation. We are called upon to review the award and set appropriate standards to better enable District Courts to arrive at just compensation.

This "across-the-board" action to remedy employment discrimination made unlawful by Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e et seq., was filed February 27, 1968. On June 24, 1968, the District Court entered an order holding that the action could not be maintained as a class action, and upholding defendant's jury demand. Plaintiff took an interlocutory appeal, resulting in this Court's reversing the

District Court on both issues. 417 F.2d 1122 (5th Cir. 1969).

On remand, the case proceeded to trial on the merits. After a three-day trial (Jan. 31–Feb. 3, 1972) the District Court entered a final order on March 2, 1972, finding a variety of discriminatory practices by defendant and granting class relief to plaintiffs. In that order, the court provided that an application for an award of attorneys' fees and costs pursuant to Section 706(k) of Title VII of the Civil Rights Act of 1964 would be entertained.

Pursuant to this ruling, plaintiffs requested an award of $30,145.50. In support of their request they submitted: (1) a schedule of fees based on the affidavits of counsel as to their time spent on this matter, in all 659.5 hours exclusive of trial time;[1] (2) six affidavits from the five attorneys employed by plaintiffs in this action; (3) three exhibits showing in chronological order the daily time spent by three of the plaintiffs' attorneys; and (4) a memorandum of law in support of the motion.

After an appropriate hearing, the District Court filed its order on August 8, 1972, and made the following findings of fact with respect to attorneys' fees:

"1. A hearing on the matter of attorneys' fees in the primary action in this case was held, and evidence presented by both parties, on June 9, 1972.

"2. With respect to the question of attorneys' fees in the primary action, I find that reasonable attorneys' fees, in the Atlanta, Georgia area, for the job performed for the plaintiffs RICHARD JOHNSON, JR. and FRANK HILL, are Thirteen Thousand Five Hundred Dollars ($13,500.00). The above amount in this finding is based, generally, on sixty (60) man days of work at Two Hundred

---

[1] The hours allocated for each plaintiff's attorney were

| | |
|---|---|
| Howard Moore, Jr. | 303 hours |
| Charles S. Ralston | 29 hours |
| Gabrielle K. McDonald | 228 hours |
| Elizabeth R. Rindskopf | 38 hours |
| Morris J. Baller | 61.5 hours |

There were three days of trial attended by Mr. Ralston, Mrs. Rindskopf, and Mr. Baller.

Dollars ($200.00) per day, generally considered to consist of from six (6) to seven (7) productive hours, which amounts to Twelve Thousand Dollars ($12,000.00), and three (3) trial days for two attorneys at Two Hundred Fifty Dollars ($250.00) per trial day per attorney, or One Thousand Five Hundred Dollars ($1,500.00)."

The judgment of the District Court stated that

"The Defendant GEORGIA HIGH-WAY EXPRESS, INC. shall pay to the Plaintiffs in the primary action in the present case reasonable attorneys' fees in the amount of Thirteen Thousand Five Hundred Dollars ($13,500.-00), based on what this Court has determined is reasonable in this locality for the job performed by legal counsel on behalf of the Plaintiffs. Given the experience of counsel for the Plaintiffs at the time these services were performed, the award of this Court is based on sixty (60) man days at the rate of Two Hundred Dollars ($200.-00) per day, or Twelve Thousand Dollars ($12,000.00), and three (3) trial days for two (2) attorneys at the rate of Two Hundred Fifty Dollars ($250.-00) per day per attorney, or One Thousand Five Hundred Dollars ($1,500.00).

"In making this award of reasonable attorneys' fees to the Plaintiffs, I further note that I am aware of the accomplishments of some of the attorneys for the Plaintiffs. At the time when some of these services were rendered, however, they were rendered by attorneys who had been at the bar for only a relatively few years, and there is a relatively standard practice within the Atlanta, Georgia community with respect to the age and experience of attorneys and the compensation involved therein."

Plaintiffs appeal from this judgment. Defendant cross-appeals.

[1]  Section 706(k) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. A. § 2000e–5(k), provides that:

> In any action or proceeding under this subchapter the Court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the cost of the litigation.

The purpose of this provision is to effectuate the congressional policy against racial discrimination. Clark v. American Marine Corp., 320 F.Supp. 709 (E. D.La.1970), aff'd, 437 F.2d 959 (5th Cir. 1971). In discussing a similar provision in Title II, the United States Supreme Court observed that

> If [the plaintiff] obtains an injunction, he does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest priority. If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts. Congress therefore enacted the provision for counsel fees—not simply to penalize litigants who deliberately advance arguments they know to be untenable but, more broadly, to encourage individuals injured by racial discrimination to seek judicial relief . . . .

Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 401–402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968). This Court, as part of its obligation "to make sure that Title VII works,"[2] has liberally applied the attorney's fees provision of Title VII, recognizing the importance of private enforcement of civil rights legislation. See Clark v. American Marine Corp., supra; Rowe v. G. M. Corp., 457 F.2d 348 (5th Cir. 1972); Long v. Georgia Kraft Co., 455 F.2d 331 (5th Cir. 1972); Lee v. Southern Home Sites Co., 444 F.2d 143 (5th Cir. 1971).

[2]  We are mindful that it is within the discretion of the District Court

---

2.  Culpepper v. Reynolds Metals Co., 421 F. 2d 888, 891, n. 3 (5th Cir. 1970).

whether to award attorney's fees against a party. Weeks v. Southern Bell Tel. & Tel., 467 F.2d 95 (5th Cir. 1972); Culpepper v. Reynolds Metals Co., 442 F.2d 1078 (5th Cir. 1971). *See* 6 Moore, Federal Practice ¶ 54.77. This Court, however, may review the District Court's determination as to a reasonable fee. B–M–G Investment Co. v. Continental/Moss Gordin, Inc., 437 F.2d 892, 893 (5th Cir. 1971). It is under this authority that we undertake to review the award in this case.

[3] The reasonableness of the award is to be judged by the abuse of discretion standard of review. Weeks v. Southern Bell Tel. & Tel. Co., *supra*; Culpepper v. Reynolds Metals Co., *supra*. But in utilizing this standard we must carefully review the basis upon which the District Court made its award.

[4, 5] It is at this juncture that we have difficulty with the District Court order. The judgment does not elucidate the factors which contributed to the decision and upon which it was based. No correlation to the facts and figures submitted by the plaintiff is visible. Sixty work days were allotted by the Court with six to seven productive hours per day as the standard. Compensation was computed at $200 per day which averages out to between $28.57 and $33.33 per hour depending on which productivity scale is used. Neither of these figures match the minimum fee scale in Atlanta, Georgia.[3] Furthermore, no differentiation was made by the District Court between the experienced and the non-experienced attorneys representing

plaintiff. Yet, the award was supposedly considered in light of the Atlanta community practices. The District Court order leaves unexplained the disallowance of between 239.5 to 299.5 of the 659.5 hours claimed. Whether they reflected duplicated effort among the attorneys, improperly charged hours, time deemed unessential, or were merely overlooked is not answered in the order.

It is for these reasons that we must remand to the District Court for reconsideration in light of the following guidelines:

(1) *The time and labor required.* Although hours claimed or spent on a case should not be the sole basis for determining a fee, Electronics Capital Corp. v. Sheperd, 439 F.2d 692 (5th Cir. 1971), they are a necessary ingredient to be considered. The trial judge should weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities. If more than one attorney is involved, the possibility of duplication of effort along with the proper utilization of time should be scrutinized. The time of two or three lawyers in a courtroom or conference when one would do, may obviously be discounted. It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers but which a lawyer may do because he has no other help available. Such non-legal work may command a lesser rate. Its dollar value is not enhanced just because a lawyer does it.

---

3. The American Bar Association has recently recommended that state and local associations abandon "minimum" or "suggested" fee schedules which are under attack from the Justice Department as violations of the anti-trust laws. *See* 59 A.B.A.J. p. 1435 (1973), reporting the adoption of the following resolution by the Association's Board of Governors:

In order to avoid possible future dispute or litigation, and

(a) Without the expression of any opinion upon questions of existing legal right or obligation, and

(b) Notwithstanding the most recent opinion issued by this Association's Committee on Ethics and Professional Responsibility with regard to ethical propriety of the voluntary consideration by lawyers of fees customarily charged for particular legal services in given localities;

The American Bar Association recommends that state and local bar associations that have not already done so give serious consideration to withdrawal or cancellation of all schedules of fees, whether or not designated as "minimum" or "suggested" fee schedules.

(2) *The novelty and difficulty of the questions.* Cases of first impression generally require more time and effort on the attorney's part. Although this greater expenditure of time in research and preparation is an investment by counsel in obtaining knowledge which can be used in similar later cases, he should not be penalized for undertaking a case which may "make new law." Instead, he should be appropriately compensated for accepting the challenge.

(3) *The skill requisite to perform the legal service properly.* The trial judge should closely observe the attorney's work product, his preparation, and general ability before the court. The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration.

(4) *The preclusion of other employment by the attorney due to acceptance of the case.* This guideline involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes.

(5) *The customary fee.* The customary fee for similar work in the community should be considered. It is open knowledge that various types of legal work command differing scales of compensation. At no time, however, should the fee for strictly legal work fall below the $20 per hour prescribed by the Criminal Justice Act, 18 U.S.C.A. § 3006A(d)(1), and awarded to appointed counsel for criminal defendants. As long as minimum fee schedules are in existence and are customarily followed by the lawyers in a given community,[4] they should be taken into consideration.

(6) *Whether the fee is fixed or contingent.* The fee quoted to the client or the percentage of the recovery agreed to

is helpful in demonstrating the attorney's fee expectations when he accepted the case. But as pointed out in Clark v. American Marine, *supra,*

[t]he statute does not prescribe the payment of fees to the lawyers. It allows the award to be made to the prevailing party. Whether or not he agreed to pay a fee and in what amount is not decisive. Conceivably, a litigant might agree to pay his counsel a fixed dollar fee. This might be even more than the fee eventually allowed by the court. Or he might agree to pay his lawyer a percentage contingent fee that would be greater than the fee the court might ultimately set. Such arrangements should not determine the court's decision. The criterion for the court is not what the parties agreed but what is reasonable.

320 F.Supp. at 711. In no event, however, should the litigant be awarded a fee greater than he is contractually bound to pay, if indeed the attorneys have contracted as to amount.

(7) *Time limitations imposed by the client or the circumstances.* Priority work that delays the lawyer's other legal work is entitled to some premium. This factor is particularly important when a new counsel is called in to prosecute the appeal or handle other matters at a late stage in the proceedings.

(8) *The amount involved and the results obtained.* Title VII, 42 U.S.C.A. § 2000e–5(g), permits the recovery of damages in addition to injunctive relief. Although the Court should consider the amount of damages, or back pay awarded, that consideration should not obviate court scrutiny of the decision's effect on the law. If the decision corrects across-the-board discrimination affecting a large class of an employer's employees, the attorney's fee award should reflect the relief granted.

(9) *The experience, reputation, and ability of the attorneys.* Most fee scales reflect an experience differential with

4. See n. 3, *supra.*

the more experienced attorneys receiving larger compensation. An attorney specializing in civil rights cases may enjoy a higher rate for his expertise than others, providing his ability corresponds with his experience. Longevity *per se*, however, should not dictate the higher fee. If a young attorney demonstrates the skill and ability, he should not be penalized for only recently being admitted to the bar.

(10) *The "undesirability" of the case.* Civil rights attorneys face hardships in their communities because of their desire to help the civil rights litigant. See NAACP v. Button, 371 U.S. 415, 443, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Sanders v. Russell, 401 F.2d 241 (5th Cir. 1968). Oftentimes his decision to help eradicate discrimination is not pleasantly received by the community or his contemporaries. This can have an economic impact on his practice which can be considered by the Court.

(11) *The nature and length of the professional relationship with the client.* A lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office. The Court may appropriately consider this factor in determining the amount that would be reasonable.

(12) *Awards in similar cases.* The reasonableness of a fee may also be considered in the light of awards made in similar litigation within and without the court's circuit. For such assistance as it may be, we note in the margin a list of Title VII cases in this and other Circuits reviewed in the consideration of this appeal.[5]

These guidelines are consistent with those recommended by the American Bar Association's Code of Professional Responsibility, Ethical Consideration 2–18, Disciplinary Rule 2–106. They also reflect the considerations approved by us in Clark v. American Marine Co., *supra*.

[6] To put these guidelines into perspective and as a caveat to their application, courts must remember that they do not have a mandate under Section 706(k) to make the prevailing counsel rich. Concomitantly, the Section should not be implemented in a manner to make the private attorney general's position so lucrative as to ridicule the public attorney general. The statute was not passed for the benefit of attorneys but to enable litigants to obtain competent counsel worthy of a contest with the caliber of counsel available to their opposition and to fairly place the economical burden of Title VII litigation. Adequate compensation is neces-

5. *Fifth Circuit:* Peters v. Missouri Pacific R.R. Co., 483 F.2d 490 (5th Cir., 1973); Weeks v. Southern Bell Tel. & Tel., 467 F.2d 95 (5th Cir. 1972); Rowe v. G.M. Corp., 457 F.2d 348 (5th Cir. 1972); Long v. Georgia Kraft Co., 455 F.2d 331 (5th Cir. 1972); Culpepper v. Reynolds Metals Co., 442 F.2d 1078 (5th Cir. 1971); Clark v. American Marine Corp., 320 F.Supp. 709 (E.D.La.1970), aff'd 437 F.2d 959 (5th Cir. 1971); Drew v. Liberty Mutual Ins. Co., 480 F.2d 69 (5th Cir., 1973); Franks v. Bowman Transp. Co., (N.D.Ga. June 29, 1972); Bing v. Roadway Express, (N.D.Ga. May 19, 1972), vacated, 485 F.2d 441 (5th Cir. 1973); Baxter v. Savannah Sugar Refining Corp., 350 F.Supp. 139 (S.D.Ga.1972); LeBlanc v. Southern Bell Tel. & Tel., 333 F.Supp. 602 (E.D.La.1971); Humphrey v. Southwestern Portland Cement, 5 F.E.P. Cases 897 (W.D.Tex. 1973).
*First Circuit:* United States v. Gray, 319 F.Supp. 871 (D.R.I.1970).

*Fourth Circuit:* Lea v. Cone Mills, Inc., 467 F.2d 277 (4th Cir. 1972); Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971).
*Sixth Circuit:* Manning v. International Union, 466 F.2d 812 (6th Cir. 1972).
*Seventh Circuit:* Bowe v. Colgate-Palmolive, 416 F.2d 711 (7th Cir. 1969); Batiste v. Furnco Construction, 350 F.Supp. 10 (N.D.Ill.1972).
*Eighth Circuit:* Parham v. Southwestern Bell Tel. Co., 433 F.2d 421 (8th Cir. 1970); Vogel v. T.W.A., 346 F.Supp. 805 (W.D.Mo. 1971).
*Ninth Circuit:* Schaeffer v. San Diego Yellow Cabs, Inc., 462 F.2d 1002 (9th Cir. 1972); Malone v. N. A. Rockwell Corp., 457 F.2d 779 (9th Cir. 1972); Rosenfield v. Southern Pacific Co. (C.D.Calif. Dec. 2, 1971).
*Tenth Circuit:* Barela v. United Nuclear Corp., 462 F.2d 149 (10th Cir. 1972); Evans v. Sheraton Park Hotel (D.C.D.C. Dec. 27, 1972); Brito v. Zia Co. (D.C.N.M.1972).

sary, however, to enable an attorney to serve his client effectively and to preserve the integrity and independence of the profession. The guidelines contained herein are merely an attempt to assist in this balancing process.

[7] We are mindful of the difficult job of the trial judge in cases of this kind, and that in all probability his decision will be totally satisfactory to no one. The cross-appeals taken in this case are witness to the usual view of parties litigant to such an award. The trial judge is necessarily called upon to question the time, expertise, and professional work of a lawyer which is always difficult and sometimes distasteful. But that is the task, and it must be kept in mind that the plaintiff has the burden of proving his entitlement to an award for attorney's fees just as he would bear the burden of proving a claim for any other money judgment.

In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees. Although a settlement generally leaves every litigant partially dissatisfied, so does a judicial award for attorney's fees.

By this discussion we do not attempt to reduce the calculation of a reasonable fee to mathematical precision. Nor do we indicate that we should enter the discretionary area which the law consigns to the trial judge.

By remand of this case, we voice no observation or intimation as to the correctness of the amount awarded. We merely vacate the award and remand for reconsideration in the light of this opinion, and for the entry of an order fixing a reasonable fee which reflects the considerations which led to it. In sum, we hold it to be an abuse of discretion not to consider the factors we approved in Clark v. American Marine Co., and which we amplify here, and that a meaningful review requires a record that reflects such consideration.

Vacated and remanded.

Louis Perez CERDA, Petitioner-Appellant,

v.

UNITED STATES of America, Respondent-Appellee.

No. 73–2077.

United States Court of Appeals, Ninth Circuit.

Nov. 7, 1973.

Motion to vacate conviction and sentence. The United States District Court for the Central District of California, Irving Hill, J., denied petition, and defendant appealed. After remand, 462 F.2d 943, the Court of Appeals, Duniway, Circuit Judge, held that government counsel did not deprive defendant of his opportunity to interview informant in violation of trial court's express order granting priority to defense counsel, nor did it deprive defendant of informant's testimony by delaying a warning as to possible prosecution until conclusion of interview, that Government was not required to grant informant immunity so as to allow him to testify on behalf of defendant, and that Government was not deprived of its right to contradict informant's affidavits by out-of-court statements which were lawfully obtained.

Affirmed.

1. Criminal Law ⟠997.15(4)

Finding in proceeding on motion to vacate conviction and sentence that Government had made maximum reasonable effort to locate informant for trial and had made no misrepresentation on that subject to court was supported by record. 28 U.S.C.A. § 2255.

2. Criminal Law ⟠997.15(8)

Findings in proceeding on motion to vacate judgment and sentence that informant was not subject to any pending prosecution or potential prosecution and was not motivated by any desire to escape such prosecution, that no narcotic

APP0702

erty or the Adjoining Property.[24] RE-
VERSED and REMANDED.



Sylvester McCLAIN, on his own behalf
and on behalf of a class of similarly
situated persons; Buford Thomas, on
his own behalf and on behalf of a
class of similarly situated persons;
Patrick Ross, on his own behalf and
on behalf of a class of similarly situ-
ated persons; Mary Thomas, on her
own behalf and on behalf of a class of
similarly situated persons; Eddie K.
Mask, on his own behalf and on be-
half of a class of similarly situated
persons; Leroy Garner, on his own
behalf and on behalf of a class of
similarly situated persons; Sherry
Calloway Swint, on her own behalf
and on behalf of a class of similarly
situated persons; Walter Butler, on
his own behalf and on behalf of a
class of similarly situated persons;
also known as A; Florine Thompson,
on her own behalf and on behalf of a
class of similarly situated persons;
Clarence Owens, on his own behalf
and on behalf of a class of similarly
situated persons; also known as C;
Clifford R. Duirden, on his own behalf
and on behalf of a class of similarly
situated persons; Earl Potts, on his
own behalf and on behalf of a class of
similarly situated persons; Roald
Mark, on his own behalf and on be-
half of a class of similarly situated
persons, Plaintiffs–Appellants–Cross
Appellees,

v.

**LUFKIN INDUSTRIES, INC.,**
**Defendant–Appellee–**
**Cross Appellant.**

No. 05–41417.

United States Court of Appeals,
Fifth Circuit.

Feb. 29, 2008.

**Background:** African-American employ-
ees brought class action to recover, on
disparate impact and disparate treatment
theories, for alleged racial discrimination
in the workplace. The district court certi-
fied employees' disparate-impact claims,
187 F.R.D. 267, but declined to certify a
disparate-treatment class. After bench tri-
al, the United States District Court for the
Eastern District of Texas, Howell Cobb, J.,
entered judgment in favor of employees on
their disparate-impact claims, and both
parties appealed.

**Holdings:** The Court of Appeals, Edith H.
Jones, Chief Judge, held that:

(1) although one employee's Equal Em-
ployment Opportunity Commission
(EEOC) complaint failed to exhaust
employees' class disparate-impact
claims, exhaustion was sufficient in
light of second employee's EEOC com-
plaint;

(2) the class failed to exhaust claims con-
cerning employer's alleged discrimina-
tory assignment of newly hired black
employees to company's foundry divi-
sion;

(3) the district court did not clearly err in
finding subjective decision-making in
employer's promotion system;

---

**24.** Accordingly, we do not address the effect
to be given Appellants' legal assertion that BP

Products is solidarily liable with the other
defendants on this determination.

McCLAIN v. LUFKIN INDUSTRIES, INC.                                    **265**
Cite as 519 F.3d 264 (5th Cir. 2008)

(4) the district court did not clearly err in finding a statistically significant disparate impact in promotions;

(5) the district court neither abused its discretion nor clearly erred in adopting a formula-driven approach to calculating the back-pay award;

(6) even if the strict time limits imposed by the district court on the presentation of evidence amounted to an abuse of discretion, employer failed to demonstrate that it suffered reversible prejudice;

(7) the district court did not abuse its discretion in denying class certification of employees' disparate-treatment claims;

(8) the district court's remedial injunction was unenforceable for lack of specificity; and

(9) the district court failed to conduct proper lodestar-fee and *Johnson* analyses in awarding attorneys fees to employees.

Affirmed in part, reversed in part, and vacated and remanded in part.

**1. Civil Rights ⬡1513**

Failure to exhaust is not a procedural "gotcha" issue; it is a mainstay of proper enforcement of Title VII remedies. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**2. Federal Courts ⬡776**

Court of Appeals reviews *de novo* the district court's conclusion concerning Title VII plaintiffs' exhaustion of administrative remedies. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**3. Civil Rights ⬡1513**

Title VII requires employees to exhaust their administrative remedies before seeking judicial relief. Civil Rights Act of

1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**4. Civil Rights ⬡1513, 1515**

Private sector employees seeking relief under Title VII must first satisfy the exhaustion requirement by filing an administrative charge with the Equal Employment Opportunity Commission (EEOC) which enables the EEOC to investigate and, if appropriate, negotiate a resolution with an employer. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**5. Civil Rights ⬡1530**

Only after administrative efforts terminate may an employee sue an employer in federal court under Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**6. Civil Rights ⬡1515, 1516**

Courts should not condone Title VII lawsuits that exceed the scope of Equal Employment Opportunity Commission (EEOC) exhaustion, because doing so would thwart the administrative process and peremptorily substitute litigation for conciliation. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**7. Civil Rights ⬡1515, 1516**

Competing policies underlie judicial interpretation of the exhaustion requirement in a Title VII action; on one hand, the scope of an Equal Employment Opportunity Commission (EEOC) charge should be liberally construed for litigation purposes because Title VII was designed to protect the many who are unlettered and unschooled in the nuances of literary draftsmanship, while on the other hand, the primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in an attempt to achieve non-judicial resolution of employment discrimination claims. Civil Rights

Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**8. Civil Rights** ⟜1516

To reconcile the policies underlying judicial interpretation of the exhaustion requirement in a Title VII action, the Court of Appeals construes an Equal Employment Opportunity Commission (EEOC) complaint broadly but in terms of the administrative EEOC investigation that can reasonably be expected to grow out of the charge of discrimination, using a "fact-intensive" analysis of the administrative charge that looks beyond the four corners of the document to its substance. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**9. Civil Rights** ⟜1516

Title VII lawsuit may include allegations like or related to allegations contained in the Equal Employment Opportunity Commission (EEOC) charge and growing out of such allegations during the pendency of the case before the Commission. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**10. Civil Rights** ⟜1517

Although neither Equal Employment Opportunity Commission (EEOC) complaint filed by first African-American employee, which specifically complained of disparate treatment, referred to a "cultural problem" that extended to all parts of employer's business, and nowhere referred to disparate impact or any neutral employment policy of employer, nor an investigation into similar claims by a different federal agency, the Office of Federal Contract Compliance Programs (OFCCP), was sufficient to exhaust employees' class disparate-impact claims against employer, exhaustion was sufficient in light of second employee's EEOC complaint; second employee's complaint alleged that he was constructively discharged, denied promotional

and training opportunities, and overloaded with work because of his race. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**11. Civil Rights** ⟜1140, 1516

Employee's allegations in an Equal Employment Opportunity Commission (EEOC) complaint of a "cultural problem" at his or her workplace are insufficient to exhaust disparate-impact claims; "cultural problem" is a vague term that cannot be understood as a neutral employment policy. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**12. Civil Rights** ⟜1516

Actual scope of the Equal Employment Opportunity Commission's (EEOC's) investigation is clearly pertinent to an exhaustion inquiry in a Title VII action. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**13. Civil Rights** ⟜1516

Scope of an employee's judicial complaint for an employer's violation of Title VII is limited to the scope of the Equal Employment Opportunity Commission (EEOC) investigation which can reasonably be expected to grow out of the charge of discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**14. Civil Rights** ⟜1517
**Federal Civil Procedure** ⟜184.25

In class action brought by African-American employees to recover, on disparate impact and disparate treatment theories, for alleged racial discrimination in the workplace, the class failed to exhaust claims concerning employer's alleged discriminatory assignment of newly hired black employees to company's foundry division; neither named plaintiff, each with 20 or more years at the company, had

worked in the foundry division, neither could or did complain to the Equal Employment Opportunity Commission (EEOC) about the foundry's hiring practices, and the EEOC would not reasonably have investigated discriminatory assignment of new foundry division employees based on either plaintiff's charge. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**15. Civil Rights ⇔1140**

To establish a prima facie case of discrimination under a disparate-impact theory, a Title VII plaintiff must show: (1) an identifiable, facially neutral personnel policy or practice, (2) a disparate effect on members of a protected class, and (3) a causal connection between the two. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**16. Civil Rights ⇔1140**

Title VII plaintiff asserting disparate-impact claims ordinarily must demonstrate that each particular challenged employment practice causes a disparate impact. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**17. Federal Courts ⇔858**

Court of Appeals would review for clear error the district court's finding that employer's decision-making process was subjective, for purposes of Title VII plaintiffs' disparate-impact claims. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**18. Civil Rights ⇔1548**

District court did not clearly err in finding subjective decision-making in employer's promotion system, for purposes of African-Americans' disparate-impact claims; although collective bargaining agreement (CBA) putatively governed promotions for hourly employees, with seniority the main criterion for promotion, there

was evidence that promotions were not rigidly awarded according to seniority, that two black employees were personally bypassed for promotions in favor of less senior white employees, that CBA contained clause allowing employer to fill positions on the basis of ability, that ability determinations were not governed by objective standards, and that managers were allowed to apportion training opportunities subjectively, and CBA did not govern promotions in the salaried ranks, most of which were awarded through an interview process that apparently was not covered by any guidelines, criteria, or documentation. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**19. Federal Courts ⇔850.1**

Reviewing court oversteps the bounds of its duty under Federal Rule of Civil Procedure setting forth clearly erroneous standard of review for findings of fact if it undertakes to duplicate the role of the lower court. Fed.Rules Civ.Proc.Rule 52(a), 28 U.S.C.A.

**20. Civil Rights ⇔1140**

Title VII permits a plaintiff asserting disparate-impact claim to demonstrate that the elements of the employer's decision-making process are not capable of separation for analysis and thus that the process should be analyzed as one employment practice. Civil Rights Act of 1964, § 703(k)(1)(B)(i), 42 U.S.C.A. § 2000e–2(k)(1)(B)(i).

**21. Federal Courts ⇔858**

District court's finding of fact, that employer's practices were incapable of separation, for purposes of employees' disparate-impact claims, would be reviewed for clear error. Civil Rights Act of 1964, § 703(k)(1)(B)(i), 42 U.S.C.A. § 2000e–2(k)(1)(B)(i).

**22. Civil Rights ⚡1548**

District court did not clearly err in finding that employer's promotion practices were incapable of separation for review, for purposes of African-American employees' Title VII disparate-impact claims; although employer listed various ways in which its employment practices were analytically separable, the court's express findings precluded separation according to those factors. Civil Rights Act of 1964, § 703(k)(1)(B)(i), 42 U.S.C.A. § 2000e–2(k)(1)(B)(i).

**23. Federal Courts ⚡823**

Appellate court owes great deference to the findings of the trial court with respect to duly admitted expert testimony.

**24. Federal Courts ⚡823**

Court of Appeals reviews for abuse of discretion the district court's decision to credit one expert over another.

**25. Federal Courts ⚡858**

Court of Appeals reverses a district court's factual finding that an employment decision was the product of unlawful discrimination only if it is clearly erroneous.

**26. Civil Rights ⚡1548**

In establishing statistically significant disparate impact in promotions, for purposes of employees' Title VII claims, actual applicant flow data are superior and should be used if available; where actual data are unreliable, however, the district court may permit parties to analyze potential applicant flow data. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**27. Civil Rights ⚡1544**

In selecting an appropriate pool and performing regression analysis in Title VII disparate-impact cases, a plaintiff's regression analysis need not include all measura-

ble variables. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**28. Civil Rights ⚡1544**

Plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination by a preponderance of the evidence. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**29. Civil Rights ⚡1548**

  **Evidence ⚡571(1)**

District court did not clearly err in finding a statistically significant disparate impact in promotions, for purposes of African-American employees' Title VII disparate-impact claims; employees' expert found a disparity in salaried promotions of 2.02 standard deviations, and employer did not persuasively explain why a standard deviation of that magnitude should have been accorded reduced significance under the particular circumstances of the case. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**30. Federal Courts ⚡858, 871**

District court's calculation of Title VII plaintiffs' back-pay award is reviewed for clear error. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**31. Civil Rights ⚡1571**

Complexity of the case is the determining factor in what method the district court should utilize to formulate a back-pay award in a Title VII case. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**32. Civil Rights ⚡1571**

Whenever possible, back pay should be awarded individually and tailored to the actual victims of discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**33. Civil Rights** ⟨key⟩**1574**

If the class in an employment discrimination lawsuit is small, the time period short, or the effect of the discrimination straightforward, individual determinations of each claimant's position but for the discrimination are possible, for purposes of awarding back pay; if, however, the class is large, the promotion or hiring practices are ambiguous, or the illegal practices continued over an extended period of time, a class-wide approach to the measure of back pay may be necessary. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**34. Civil Rights** ⟨key⟩**1574**

District court neither abused its discretion nor clearly erred in adopting a formula-driven approach to calculating the back-pay award in African-American employees' class action alleging racial discrimination in the workplace; size of class, which consisted of more than 700 plaintiffs, and inherent uncertainty of the individual claims, in light of the lack of a practical way to determine through individual hearings which jobs the class members would have bid on and obtained but for the discriminatory procedures employer had in place, contraindicated the use of an individualized approach. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**35. Civil Rights** ⟨key⟩**1574**

In awarding class-wide back-pay damages in a Title VII employment discrimination case, the accepted way to apportion damages among a class of plaintiffs who outnumber the lost promotion spots is to compute the total additional wages attributable each year to each promotion and divide the value among the class members. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**36. Federal Civil Procedure** ⟨key⟩**1992**

District court has broad discretion in managing its docket and structuring the conduct of a trial.

**37. Federal Civil Procedure** ⟨key⟩**1951**

District court may maintain the pace of a trial by setting time limits on counsel.

**38. Federal Civil Procedure** ⟨key⟩**2251**

District judge has special latitude in applying time limits in a bench trial, since the court often has become familiar with the case long before trial begins and can readily comprehend the evidence presented.

**39. Federal Civil Procedure** ⟨key⟩**2251**

District court's discretion in imposing time limits on the presentation of evidence in a bench trial has its limits.

**40. Federal Courts** ⟨key⟩**904**

Even if the strict time limits imposed by the district court on the presentation of evidence during bench trial of African-American employees' class action alleging racial discrimination in the workplace amounted to an abuse of discretion, employer failed to demonstrate that it suffered reversible prejudice, despite its assertion that the mere 20 hours allowed to each side made it difficult to mount a defense against employees' generalized claims of subjective decision-making and racial discrimination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**41. Federal Courts** ⟨key⟩**892**

Even if strict time limits imposed by the district court on the presentation of evidence amount to an abuse of discretion, the court's error is presumed harmless until shown to be prejudicial.

**42. Federal Courts ⟺817**

Court of Appeals reviews the district court's class-certification decision for abuse of discretion.

**43. Federal Courts ⟺776**

Whether the district court applied the correct legal standard in reaching its class-certification decision is reviewed by the Court of Appeals *de novo*.

**44. Federal Civil Procedure ⟺184.10**

District court did not abuse its discretion in denying class certification of African-American employees' disparate-treatment claims against employer; the court expressed concern about plaintiffs' disavowal of monetary damages, and, if the price of a disparate-treatment class both limits individual opt outs and sacrifices class members' rights to avail themselves of significant legal remedies, it is too high a price to impose. Fed.Rules Civ.Proc. Rule 23(b)(2), 28 U.S.C.A.

**45. Federal Courts ⟺814.1**

Court of Appeals reviews a district court's fashioning of injunctive relief for abuse of discretion.

**46. Civil Rights ⟺1561, 1564**

District court's remedial injunction, entered in class action brought by African-American employees to recover for racial discrimination in the workplace, was unenforceable for lack of specificity; injunction included such vague directives as "cease and desist all racially biased assignment and promotion practices," "create and implement a program to ensure that black employees receive an equitable proportion of promotions," and "take all necessary steps to remedy the effects of past discrimination," and an order framed in such broad generalities failed to afford notice to employer of its proscribed or required conduct. Civil Rights Act of 1964, § 701 et

seq., 42 U.S.C.A. § 2000e et seq.; Fed. Rules Civ.Proc.Rule 65, 28 U.S.C.A.

**47. Federal Courts ⟺830, 878**

District court's determination of attorneys fees is reviewed for abuse of discretion, and the findings of fact supporting the award are reviewed for clear error.

**48. Federal Civil Procedure ⟺2737.4**

First step in determining statutorily authorized attorneys fees is to calculate a "lodestar" amount by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate.

See publication Words and Phrases for other judicial constructions and definitions.

**49. Federal Civil Procedure ⟺2737.4**

In determining statutorily authorized attorneys fees, after calculating the "lodestar" the court must consider whether the lodestar should be adjusted upward or downward, depending on the circumstances of the case and the factors set forth in the Fifth Circuit's *Johnson* decision.

**50. Federal Civil Procedure ⟺2742.5**

In awarding statutorily authorized attorneys fees, the district court must explain with a reasonable degree of specificity the findings and reasons upon which the award is based, including an indication of how each of the *Johnson* factors was applied.

**51. Civil Rights ⟺1597, 1598**

District court failed to conduct proper lodestar-fee and *Johnson* analyses in awarding attorneys fees to African-American employees in their class action to recover for racial discrimination in the workplace; court slashed employees' request for an interim award of $6.5 million, which covered 12,387.9 hours of work performed and nearly $1 million in out-of-pocket costs, summarily stating that one individu-

McCLAIN v. LUFKIN INDUSTRIES, INC.            **271**
Cite as 519 F.3d 264 (5th Cir. 2008)

al's reported hours were "excessive and not necessary" and that her rates were not "usual and customary," and court offered no reason to deny all compensation for time spent on lengthy mediation effort, to deny compensation to a second individual for his attendance at one employee's separate suit against employer, to apply a blanket reduction of 25% to all of the billable hours reported by employees' counsel, and to reduce the hourly rates requested by employees' counsel.  Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

———

Teresa F. Demchak, Morris J. Baller (argued), Goldstein, Demchak, Baller, Borgen & Dardarian, Oakland, CA, Timothy Borne Garrigan, Stuckey, Garrigan & Castetter, Nacogdoches, TX, for Plaintiffs–Appellants–Cross–Appellees.

Douglas E. Hamel (argued), Christopher Velle Bacon, Vinson & Elkins, Houston, TX, for Lufkin Industries, Inc.

Appeals from the United States District Court for the Eastern District of Texas.

Before JONES, Chief Judge, and HIGGINBOTHAM and CLEMENT, Circuit Judges.

EDITH H. JONES, Chief Judge:

In this complex Title VII class action against Lufkin Industries, Inc. ("Lufkin"), African–American plaintiffs allege that Lufkin's practice of delegating subjective decision-making authority to its managers with respect to initial assignments and promotions disparately affected them.  After a bench trial, the district court issued a judgment in favor of the employees.  After sifting through numerous issues, we reach results that are unfortunately inconclusive of the litigation.  We affirm in part, reverse in part, and vacate and remand in part.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Lufkin, a large manufacturing corporation located in Lufkin, Texas, is divided into four production divisions:  Foundry, Trailer, Oil Field, and Power Transmission.  The company employs approximately 1,500 hourly and salaried workers, and the hourly workers have been unionized for many years.

Only two of the representative plaintiffs in this class action filed EEOC complaints.  Sylvester McClain ("McClain"), the named plaintiff, began working in Lufkin's Trailer division in 1972.  In January 1995, he complained to the EEOC that his supervisor, Arden Jinkins ("Jinkins"), had discriminated against him based on his race.  Among other things, McClain complained that Jinkins tried to have him demoted.  Buford Thomas ("Thomas"), a Lufkin employee since 1979, filed his EEOC charge in February 1997, a year after he was allegedly constructively discharged.  Thomas complained of being denied promotional and training opportunities because of his race while working in the Power Transmission and Oil Field divisions.  The EEOC issued right-to-sue letters on both charges.

McClain and Thomas sued Lufkin for employment discrimination in violation of Title VII and 42 U.S.C. § 1981.  The plaintiffs asserted that systematic racial discrimination pervades Lufkin's initial job assignments, training, promotions, and compensation.  The district court certified the plaintiffs' disparate-impact claims as a class action involving 700 current and former Lufkin employees.  The class was described as:

All Black persons employed for any period of time by defendant Lufkin Industries on or after March 6, 1994, to date, whose compensation, remuneration, benefits, job assignments, promotional opportunities, career advancements and other terms and conditions of employment have been, may have been, or may become, adversely affected by defendant Lufkin Industries' past or present systems of administering hiring, wages, salaries, job assignments, training, evaluations, promotions, demotions, terminations, layoffs, recalls, and rehires.

*McClain v. Lufkin Indus., Inc.*, 187 F.R.D. 267, 277–78 (E.D.Tex.1999). The court, however, declined to certify a disparate treatment class. Two claims went to trial: (1) discrimination against blacks in Lufkin's assignment of newly hired employees; and (2) racially discriminatory promotion practices that rested on largely subjective decision-making criteria carried out by a largely white supervisory corps.

Protracted pretrial proceedings in this case included two class certification hearings, two interlocutory appeals to this court, and a two-year mediation effort. When the case finally went to bench trial, the court strictly limited each party to twenty hours for the presentation of its case. Ultimately, the district court found that Lufkin's practice of delegating subjective decision-making authority to its white managers with respect to initial assignments and promotions resulted in a disparate impact on black employees in violation of Title VII. The court awarded the plaintiffs over $3.4 million in back pay, as well as attorneys' fees and injunctive relief. Both parties appeal.

## II. DISCUSSION

Lufkin contends that the named plaintiffs failed to exhaust EEOC administrative remedies and lack standing to represent the class. Lufkin also contends that the district court erred in finding that Lufkin's promotion practices are subjective and incapable of separation for analysis and that they had a statistically significant disparate impact on black employees. Lufkin challenges the court's calculation of the back pay award according to a class-wide formula. Finally, Lufkin asserts that the cumulative effect of various errors, including the limited presentation of evidence, requires us to vacate the judgment.

For their part, the plaintiffs argue that the district court erred in refusing to certify a disparate treatment class, in failing to award appropriate injunctive relief, and in reducing their attorneys' fees. We turn first to Lufkin's contentions.

### A. Lufkin's Arguments

#### 1. Failure to Exhaust EEOC Remedies

[1] As a threshold matter, Lufkin argues that the district court should have dismissed the plaintiffs' initial-assignment and promotion claims for failure to exhaust administrative remedies and for lack of standing to represent a broadly defined class. Failure to exhaust is not a procedural "gotcha" issue. It is a mainstay of proper enforcement of Title VII remedies. Lufkin contends that McClain and Thomas complained to the EEOC about their individual disparate treatment by the company, but not about their hiring nor about any neutral employment practices on which a disparate-impact case depends. The scope of their administrative claims governs the scope of the class claims. *Vuyanich v. Republic Nat'l Bank*, 723 F.2d 1195, 1201 (5th Cir.1984); *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir.1983). Consequently, Lufkin asserts, the EEOC was never presented with disparate-impact class claims concerning Lufkin's hiring and promotional practices,

and the administrative process was circumvented.

[2]   The district court ruled that plaintiffs had exhausted their administrative remedies via McClain's January 1995 letter to the EEOC. *See* 29 C.F.R. § 1601.12(b); *Fellows v. Universal Rests., Inc.*, 701 F.2d 447, 451 (5th Cir.1983). The court also held that a contemporary administrative proceeding pertaining to Lufkin by the Office of Federal Contract Compliance Programs ("OFCCP") sufficiently fulfilled the purposes of exhaustion. This court reviews *de novo* the district court's conclusion concerning exhaustion. *See Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir.), *cert. denied*, —— U.S. ——, 127 S.Ct. 299, 166 L.Ed.2d 154 (2006).

[3–5]   Title VII requires employees to exhaust their administrative remedies before seeking judicial relief. *Id.* Private sector employees must satisfy this requirement by filing an administrative charge with the EEOC. *Id.* at 788 n. 6. The charge enables the EEOC to investigate and, if appropriate, negotiate a resolution with an employer. Only after administrative efforts terminate may the employee sue the employer in federal court.

[6–9]   Courts should not condone lawsuits that exceed the scope of EEOC exhaustion, because doing so would thwart the administrative process and peremptorily substitute litigation for conciliation. Nevertheless, competing policies underlie judicial interpretation of the exhaustion requirement. *See id.* at 788–89. On one hand, the scope of an EEOC charge should be liberally construed for litigation purposes because Title VII "was designed to protect the many who are unlettered and unschooled in the nuances of literary draftsmanship." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970). On the other hand, the "primary

purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in [an] attempt to achieve nonjudicial resolution of employment discrimination claims." *Pacheco*, 448 F.3d at 788–89. To reconcile these policies, this court construes an EEOC complaint broadly but in terms of the administrative EEOC investigation that "can reasonably be expected to grow out of the charge of discrimination." *Sanchez*, 431 F.2d at 466. We use a "fact-intensive analysis" of the administrative charge that looks beyond the four corners of the document to its substance. *Id.* In sum, a Title VII lawsuit may include allegations "like or related to allegation[s] contained in the [EEOC] charge and growing out of such allegations during the pendency of the case before the Commission." *Id.*

Among this court's numerous rulings on exhaustion of EEOC claims, we find most relevant the recent *Pacheco* opinion, which held that an employee failed to exhaust a disparate-impact claim because his EEOC charge alleged only disparate treatment and identified no neutral employment policy. 448 F.3d at 792. Although Pacheco's administrative charge complained that he had not been promoted because of racial discrimination, his subsequent lawsuit alleged both disparate treatment and disparate impact. *Id.* at 786–87. This court affirmed the dismissal of the disparate-impact allegations because:

a disparate-impact investigation could not reasonably have been expected to grow out of Pacheco's administrative charge because of the following matters taken together: (1) it facially alleged disparate treatment; (2) it identified no neutral employment policy; and (3) it complained of past incidents of disparate treatment only.

*Id.* at 792.

[10]   In this case, both the district court and the plaintiffs rely principally on

McClain's January 1995 letter to establish administrative exhaustion. Like Pacheco, McClain specifically complained to the EEOC of disparate treatment and past incidents of discrimination against himself. His three-page letter to the EEOC describes "discriminatory treatment that I have been receiving for some time," and "discriminatory acts against me by Mr. Jinkins." McClain alleged that Jinkins, his supervisor, racially discriminated against him and tried to have him demoted or fired on false charges of unsatisfactory performance.

[11] McClain's letter nowhere refers to any neutral employment policy of Lufkin. Yet, according to *Pacheco*, "the cornerstone of any EEO[C] disparate-impact investigation" is a neutral employment policy. 448 F.3d at 792. Plaintiffs argue that a disparate-impact investigation could have grown out of McClain's letter because he alluded to a "cultural problem" that extended to all parts of Lufkin's business. A "cultural problem," however, is a vague term that cannot be understood as a neutral employment policy. *See, e.g., id.* at 790. *Compare Marshall v. Fed. Express Corp.*, 130 F.3d 1095, 1098 (D.C.Cir.1997) ("A vague or circumscribed EEOC charge will not satisfy the exhaustion requirement for claims it does not fairly embrace."), *with Gomes v. Avco Corp.*, 964 F.2d 1330, 1335 (2d Cir.1992) (disparate-impact investigation "would reasonably have flowed" from an EEOC complaint that referenced an eight-year track to promotion). McClain's letter not only failed to identify any neutral employment policy, but also said nothing about discriminatory hiring at Lufkin.

[12] This limited interpretation of McClain's letter is confirmed by the actual scope of the EEOC's investigation, which is clearly pertinent to an exhaustion inquiry. *See Fine v. GAF Chem. Corp.*, 995

F.2d 576, 578 (5th Cir.1993); *Fellows*, 701 F.2d at 451. Responding to the January 1995 letter, the EEOC sent McClain a proposed formal charge of discrimination in August 1996, in which the agency summarized his claim as follows:

> I have been subjected to different terms and conditions of employment by being denied comparable training, access to supplies and equipment needed to do a satisfactory job; given unsatisfactory evaluations.

The charge then repeats McClain's complaint of demotion. The plaintiffs also cite another of McClain's written statements to the EEOC, in which he suggests that other evidence could be disclosed to support his discrimination claim. In context, this sentence refers only to Lufkin's disparate treatment of McClain alone.

[13] The district court attempted to fortify its conclusion that exhaustion occurred by taking into account an investigation by the OFCCP into "similar claims to those now before the court." The court seemed to think that an investigation by another federal agency can exhaust claims that must be handled by the EEOC and that Lufkin was effectively notified of its exposure to disparate-impact claims by responding to the OFCCP investigation. The district court cited no authority in support of its exhaustion bootstrapping, and we are aware of none. Further, no such Title VII shortcut to exhaustion or notification exists. Since 1970, the caselaw has explained that "the 'scope' of the judicial complaint is limited to the 'scope' of the *EEOC investigation* which can reasonably be expected to grow out of the charge of discrimination." *Sanchez*, 431 F.2d at 466 (emphasis added); *see also Pacheco*, 448 F.3d at 792 ("[T]he plaintiff's administrative charge will be read somewhat broadly, in a fact-specific inquiry into what *EEOC investigations* it can reasonably be

expected to trigger." (emphasis added)); *Fellows*, 701 F.2d at 450–51. The district court erred by utilizing OFCCP's investigation as a basis for inferring EEOC administrative exhaustion.

Although McClain's EEOC complaint and the OFCCP investigation failed to exhaust the employees' class claims, Buford Thomas's EEOC complaint carries part of the requisite burden. Thomas alleged to the EEOC that he was constructively discharged, denied promotional and training opportunities, and overloaded with work because of his race. He specifically stated that "[r]espondent has similarly discriminated against other black African Americans." Thomas's complaint, viewed in light of the recent *Pacheco* decision, presents a close question of exhaustion directed at a discriminatory, albeit neutral, company policy authorizing subjective promotion decisions. We conclude, however, that exhaustion was sufficient. Significantly, Lufkin did not contend otherwise in the trial court.[1]

**[14]** Lufkin, instead, forcefully urged that the class failed to exhaust claims concerning Lufkin's alleged discriminatory assignment of newly hired black employees to the Foundry division. Hourly work in the Foundry division is hot and heavy to a far greater extent than in the company's other production divisions. But neither Thomas nor McClain, each with twenty or more years at Lufkin, had worked in the Foundry division and neither man could or did complain to the EEOC about Foundry

hiring practices. We are persuaded that the EEOC would not reasonably have investigated discriminatory assignment of new Foundry division employees based on either McClain's or Thomas's charge. *Eastland v. Tenn. Valley Auth.*, 714 F.2d 1066, 1067–68 (11th Cir.1983) (class representatives could not assert initial assignment claims because all had been hired years before); *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir. 1983) (EEOC investigation limited to promotion and harassment). Because of this deficiency, we must vacate the judgment awarding damages and injunctive relief against Lufkin based on discriminatory initial assignments to the Foundry division.[2]

Lufkin's liability will next be examined in regard to the class's promotion-discrimination claim.

### 2.  *Failure to Isolate a Specific Employment Practice*

**[15, 16]** The district court identified Lufkin's subjective decision-making process in awarding promotions as the employment practice that caused a disparate impact on black employees. To establish a prima facie case of discrimination under a disparate-impact theory, a plaintiff must show: (1) an identifiable, facially neutral personnel policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777,

---

1.  Because exhaustion was satisfied, we need not here decide whether exhaustion is a jurisdictional or claim prerequisite. *See Pacheco*, 448 F.3d at 788 n. 7. *See generally Arbaugh v. Y&H Corp.*, 546 U.S. 500, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (employee numerosity requirement in 42 U.S.C. § 2000e(b) is an element of a Title VII claim and not a jurisdictional requirement).

2.  Caselaw also raises considerable doubt that McClain and Thomas would have had standing to assert the class hiring claims of Foundry division workers. *See E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); *Vuyanich*, 723 F.2d at 1200 (plaintiffs who alleged injury from hiring and termination practices could not represent class arising from other bank employment practices).

**276**          **519 FEDERAL REPORTER, 3d SERIES**

101 L.Ed.2d 827 (1988). Ordinarily, a plaintiff must demonstrate that each particular challenged employment practice causes a disparate impact. Yet, Title VII provides that "if the complaining party can demonstrate to the court that the elements of [the employer's] decision making process are not capable of separation for analysis, the decision making process may be analyzed as one employment practice." 42 U.S.C. § 2000e–2(k)(1)(B)(i).

Lufkin challenges two factual findings underlying the court's liability determination: that its decision-making process is subjective; and that its decision-making process could not be separated for analysis into components that were objective and non-racially biased. We address each in turn.

### a. Subjective Decision Making

[17]   Lufkin argues that its promotion system is in fact overwhelmingly objective, and that the district court's finding of subjective decision making lacks support. We review this finding for clear error. *See Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir.2000).[3]

In *Watson*, the Supreme Court defined subjective decision making as employment decisions "based on the exercise of personal judgment or the application of inherently subjective criteria." 487 U.S. at 988, 108 S.Ct. 2777. The Court indicated that a system which incorporates a mixture of subjective and objective criteria should generally be treated as subjective. *Id.* at 989, 108 S.Ct. 2777 ("However one might distinguish 'subjective' from 'objective' criteria, it is apparent that selection systems that combine both types would generally have to be considered subjective in nature.").

[18]   At Lufkin, promotions within the hourly ranks are putatively governed by a Collective Bargaining Agreement ("CBA") between Lufkin and three unions. Under the CBA, the company must post bid sheets for each new hourly opening. Seniority is the main criterion for promotion. However, plaintiffs offered evidence that promotions are not rigidly awarded according to seniority. Class members Sylvester McClain and Florine Thompson testified that they were personally bypassed for promotion in favor of a less senior white employee. Plaintiffs presented additional evidence that approximately half of all promotions were not awarded to the most senior bidder.

Moreover, the Collective Bargaining Agreement ("CBA") contains an ability clause that allowed Lufkin to fill positions on the basis of ability, regardless of seniority. The evidence indicates that ability determinations were not governed by objective standards. Paul Perez, Lufkin's Vice President of Human Resources, agreed that the ability determination was subjective. McClain testified that supervisors did not always truly evaluate ability when awarding promotions under the ability clause, but simply gave the position to the candidate they favored. Billy Webb, the union's chief spokesman, testified that the union had taken issue with the ability provision in past contract negotiations because it did not think that the ability clause was always administered fairly. The CBA also provides for a ten-day trial period following promotion. According to the testimony of one of its managers, Lufkin has no written guidelines or formal tests for determining which employees pass this trial period.

---

**3.** In reviewing the court's findings, we consider evidence adduced during the bench trial but not the class certification hearings. The class certification hearings provided Lufkin limited opportunity for examination on matters going to the merits.

Plaintiffs also offered evidence that Lufkin permitted its managers to apportion training opportunities subjectively, a process that disadvantaged black employees who sought promotions. Perez testified that the CBA does not govern employees' daily work assignments, and he acknowledged that daily job assignments are not made on the basis of seniority. Perez testified that there are no written policies determining who is to receive on-the-job training, and Lufkin does not track how such training is allocated among employees. In addition, McClain testified that white employees were given more training in areas that were relevant to the jobs he sought. McClain explained that when "white managers and supervisors . . . see a man they want to put on a particular job, . . . they'll tap him" for training after his shift, or for external training. According to McClain, the employee who received the extra training would be the most qualified and would therefore receive the promotion once the job became available.

The district court also heard testimony that Lufkin's allegedly objective measures for determining which employees were eligible to bid, such as attendance and discipline records, are subject to variance and manipulation. Lufkin has a computer program that tracks attendance, but both McClain and Thompson testified that the system was manipulable. If an employee was absent or tardy and the supervisor did not want the employee to lose credit, Thompson stated that the supervisor could non-schedule the employee or use the employee's vacation days to skew the records. With respect to discipline records, Steve Reynolds, a Lufkin supervisor, testified

that there are no written criteria for determining when a rule violation should be "written up." He stated that this decision is left to individual supervisors.

The evidence also supported that Lufkin engaged in subjective decision making when awarding promotions in the salaried ranks. Salaried positions are not governed by the CBA, and company managers admitted that they were unaware of any guidelines, criteria, or documentation for the process of making promotions to salaried positions. Rather, most promotions in the salaried ranks are awarded through an interview process.[4]

[19] In light of this evidence, we are not left with the definite and firm conviction that the district court erred in finding subjective decision making in Lufkin's promotion system. *See United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Although Lufkin offered some testimony during the bench trial that would tend to refute the court's finding, it was within the province of the district court to accord this testimony less credibility than that of the class members and their experts. "The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Accordingly, we cannot say the court's finding of subjective decision making in promotions amounted to clear error.

### b. Not Capable of Separation for Analysis

[20] Lufkin also challenges the district court's finding that its promotion practices

---

4. The testimony of the plaintiffs' expert, Dr. Richard Martell, an Industrial Organization Psychologist, also supports the finding of subjective decision making. Dr. Martell testified that the personnel policies, procedures, and practices at Lufkin were "decidedly subjec-

tive." After discussing Lufkin's promotion practices in some detail, Martell ultimately concluded that Lufkin is "awash in a sea of subjectivity that cuts across all manufacturing divisions."

are not capable of separation for review. Lufkin argues that if the court had isolated the objective factors in promotions—*e.g.* Lufkin's bidding practices and seniority— the court could not have found a discriminatory impact. As explained above, Title VII permits a plaintiff to demonstrate that the elements of the employer's decision-making process are not capable of separation for analysis and thus that the process should be analyzed as one employment practice. 42 U.S.C. § 2000e–2(k)(1)(B)(i). This court has not addressed the precise conditions under which employment practices are "not capable of separation for analysis." But "where a promotion system uses tightly integrated and overlapping criteria, it may be difficult as a practical matter for plaintiffs to isolate the particular step responsible for the observed discrimination." *See Munoz v. Orr,* 200 F.3d 291, 304 (5th Cir.2000). Some guidance is also provided by trial court decisions interpreting the provision. In *Stender v. Lucky Stores, Inc.,* the district court held:

> Where the system of promotion is pervaded by a lack of uniform criteria, criteria that are subjective as well as variable, discretionary placements and promotions, the failure to follow set procedures and the absence of written policies or justifications for promotional decisions, the court is not required to "pinpoint particular aspects of [the system]" that are unfavorable to [the protected group].

803 F.Supp. 259, 335 (N.D.Cal.1992) (citation omitted); *see also Butler v. Home Depot, Inc.,* No. C–94–4335 SI, 1997 WL 605754, at *13 (N.D.Cal. Aug. 29, 1997) (unreported) (where employer delegated decisions to store managers who made subjective judgments about candidate's qualifications without written criteria, decision-making process not capable of separation for analysis); *Schallop v. N.Y. State Dept. of Law,* 20 F.Supp.2d 384, 402

(N.D.N.Y.1998) (entire process may be characterized as a single employment practice when employment decisions are made based on variable, subjective criteria); *Bannister v. Dal–Tile Int'l, Inc.,* No. 3:02–CV–2498, 2003 WL 21145739, at *2 (N.D.Tex. May 14, 2003) (plaintiff not required to pinpoint specific employment practices where the factors of a defendant's decision-making process are "so interwoven that they are incapable of separation").

[21, 22] There is no indication that the district court applied incorrect legal principles in determining that Lufkin's practices were incapable of separation. This finding of fact must be reviewed for clear error. *See Kona,* 225 F.3d at 601. Lufkin lists various ways in which its employment practices were analytically separable, but the court's express findings preclude separation according to those factors.

Lufkin argues, for example, that the plaintiffs' expert could have separated the challenged employment practices from its legitimate seniority system. The expert included in his analysis numerous promotions that contributed to the statistical shortfall in black promotions, even though these jobs were indisputably awarded to the most senior candidate. This argument ignores the district court's finding that Lufkin affords management considerable discretion in deciding whether to follow seniority in promotions. Plaintiffs could not statistically analyze the actual practice they challenge—subjective and discretionary application of the seniority provisions—by excluding promotion based on seniority. Seniority, the court found, was likely to have been irrelevant to the promotion.

Lufkin also contends that the plaintiffs should have separated out instances in which candidates were properly denied

promotions because of unsatisfactory attendance. This argument, too, runs afoul of the court's finding that managers have substantial discretion in applying attendance rules. In such a system, a denial of promotion for poor attendance is not helpful to Lufkin where promotions may also have been awarded following non-uniform interpretation of employee attendance rules.

Finally, Lufkin contends that its "paper bid sheets provided additional information that plaintiffs could have separated for analysis."[5] To the contrary, the district court rejected the bid data, which Lufkin prepared for purposes of this litigation, as unreliable and incomplete; ample evidence supports this finding.

Lufkin has not suggested any viable way, consistent with the court's findings, in which the plaintiffs could have separated the promotion criteria for review nor has it shown the district court clearly erred in so finding.

### 3. *Statistically Significant Disparate Impact in Promotions*

Lufkin maintains that the plaintiffs failed to demonstrate a statistically significant disparate impact against black employees in promotions. At trial, plaintiffs provided statistical evidence of discrimination through the report of their expert, Dr. Richard Drogin. After constructing hypothetical pools of employees who would be eligible for promotion, Dr. Drogin found that during the class period, black employees received 127 fewer hourly promotions and 8.85 fewer salaried promotions than

should have been expected given their representation in these pools. Dr. Drogin determined that these differences were statistically significant at 7.61 standard deviations for hourly promotions and at 2.02 standard deviations for salaried promotions. In rebuttal, Lufkin offered the statistical analysis of Dr. Mary Baker. Dr. Baker conducted her calculations using bid data from Lufkin's paper bid sheets, and concluded that there was no statistically significant disparity in the promotion of blacks to hourly or salaried positions. Faced with this battle of experts, the district judge credited the testimony of Dr. Drogin over that of Dr. Baker.

[23–25]  Our role in reviewing this decision is limited. An appellate court owes great deference to the findings of the trial court with respect to duly admitted expert testimony. *Cleveland ex rel. Cleveland v. United States*, 457 F.3d 397, 407 (5th Cir. 2006). We review for abuse of discretion the district court's decision to credit one expert over another. *Id.* And we reverse a district court's factual finding that an employment decision was the product of unlawful discrimination only if it is clearly erroneous. *See Bazemore v. Friday*, 478 U.S. 385, 398, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986); *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

[26]  With these standards in mind, we turn to Lufkin's specific contentions. First, Lufkin argues that Dr. Drogin's analysis is legally insufficient because he did not use "actual" applicant lists and bid

---

5.  Specifically, Lufkin argues that the plaintiffs could have used the bid sheets to analyze separately whether blacks bid for jobs at some lesser rate than whites; whether blacks were ineligible for promotion more often than whites because promotion required movement to a higher rated job; whether blacks received fewer promotions because they did

not pass a test or declined promotion; whether blacks were disqualified by the requisite minimum qualifications for master classifications or salaried positions more often than whites; and whether Lufkin's practice of promoting only candidates who sign the bid sheets adversely impacts blacks.

sheets to: (1) construct the availability pools; (2) consider potentially non-discriminatory explanations for the promotions; and (3) factor in qualifications of potential applicants. Lufkin is correct, of course, that actual applicant flow data are superior, and should be used if available. *See Anderson v. Douglas & Lomason Co.,* 26 F.3d 1277, 1286–87 (5th Cir.1994). But as discussed above, the district court expressly found that the bid data were incomplete and unreliable, noting that more than half of the promotions were missing from the bid database which Lufkin prepared in anticipation of this litigation. Where actual data are unreliable, courts often permit parties to analyze potential applicant flow data. *See, e.g., Malave v. Potter,* 320 F.3d 321, 326–27 (2d Cir.2003); *Berger v. Iron Workers Reinforced Rodmen Local 201,* 843 F.2d 1395, 1414 (D.C.Cir.1988); *Hameed v. Iron Workers Local 396,* 637 F.2d 506, 512 n. 6 (8th Cir.1980); *Lewis v. Bloomsburg Mills, Inc.,* 773 F.2d 561, 568 (4th Cir.1985). The district court did not err in allowing plaintiffs to do so in this case.

[27, 28] Lufkin argues that even if the bid sheets were unavailable, Dr. Drogin's regression analysis would still be insufficient because his hypothetical applicant pools do not take into account other minimum qualifications of applicants, such as education. However, in selecting an appropriate pool and performing regression analysis in Title VII cases, the Supreme Court has taught that a plaintiff's regression analysis need not include "all measurable variables." *See Bazemore,* 478 U.S. at 400, 106 S.Ct. 3000 ("[I]t is clear that a regression analysis that includes less than 'all measurable variables' may serve to prove a plaintiff's case."); *see also Mozee*

v. Am. Commercial Marine Serv. Co., 940 F.2d 1036, 1045 (7th Cir.1991). A plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather his or her burden is to prove discrimination by a preponderance of the evidence. *Bazemore,* 478 U.S. at 400, 106 S.Ct. 3000. We are satisfied that Dr. Drogin's regression analysis was sufficiently refined for plaintiffs to meet this burden.

[29] Finally, Lufkin argues that a disparity in salaried promotions of only 2.02 standard deviations does not support the district court's finding of disparate impact. This court has rejected the contention that a disparity of two or three standard deviations is categorically insufficient to support an inference of adverse impact. *See Rendon v. AT&T Techs.,* 883 F.2d 388, 397–98 (5th Cir.1989).[6] And Lufkin has not persuasively explained why a standard deviation of this magnitude should be accorded reduced significance under the particular circumstances of this case. We therefore affirm the district court's finding of a statistically significant disparate impact in promotions.

*4. Class–Wide Back–Pay Formula*

[30] Lufkin also challenges the class-wide back-pay award. The district court's calculation of a back pay award is reviewed for clear error. *Shipes v. Trinity Indus.,* 987 F.2d 311, 316–17 (5th Cir.1993).

*a. Class–Wide Formula or Individual Hearings*

[31–33] Lufkin complains that the district court erred by using a formula to calculate the award rather than computing damages on an individual basis. The complexity of the case is the determining fac-

---

6. Other courts have reached the same conclusion. *See, e.g., Palmer v. Shultz,* 815 F.2d 84, 96–97 (D.C.Cir.1987); *Coleman v. Exxon*

*Chem. Corp.,* 162 F.Supp.2d 593, 616 (S.D.Tex.2001).

tor in what method the district court should utilize to formulate a back-pay award. *Pettway v. Am. Cast Iron Pipe Co.,* 494 F.2d 211, 261 (5th Cir.1974). Whenever possible, back pay should be awarded individually and tailored to the actual victims of discrimination. *United States v. U.S. Steel Corp.,* 520 F.2d 1043, 1055–56 (5th Cir.1975). If the class is small, the time period short, or the effect of the discrimination straightforward, individual determinations of each claimant's position but for the discrimination are possible. *Pettway,* 494 F.2d at 261. If, however, the class is large, the promotion or hiring practices are ambiguous, or the illegal practices continued over an extended period of time, a class-wide approach to the measure of back pay may be necessary. *Id.; see also Shipes,* 987 F.2d at 318.

[34]   In this case, the district court concluded that the size of the class and the inherent uncertainty of the individual claims contraindicates the use of an individualized approach. We agree. We are not persuaded that the district court could "easily" make individualized inquiries for each of the more than 700 plaintiffs in this case, as Lufkin contends. Further, as in *Pettway,* there is no practical way to determine through individual hearings which jobs the class members would have bid on and obtained but for the discriminatory procedures Lufkin had in place. *See Pettway,* 494 F.2d at 260. Class members outnumber promotion vacancies; jobs become available over time; the vacancies involve different pay rates; and a determination of who was entitled to a vacancy would have to be made by an evaluation of seniority and ability at that time. *Id.* (citing identical factors in approving the for-

mula approach).[7]   "[W]here employees start at entry level jobs in a department and progress into a myriad of other positions and departments on the basis of seniority and ability over an extended period of time, exact reconstruction of each individual claimant's work history, as if discrimination had not occurred, is not only imprecise but impractical." *Id.* at 262. An individualized process of determining actual damages for each plaintiff in this case would result in the "quagmire of hypothetical judgments" that courts should avoid. *Id.* at 260. Accordingly, the district court neither abused its discretion nor clearly erred in adopting the formula-driven approach.

#### b.   Specific Methodology

While Lufkin levies various attacks on the district court's methodology for determining the back-pay award, these need not all be considered. With the elimination of a finding of class discrimination in initial assignments to the Foundry, the damage award must be vacated and remanded.

[35]   On remand, the district court will be dealing solely with damages attributable to approximately 127 lost promotions in hourly pay grades and nine lost salaried employment promotions. The accepted way to apportion damages among a class of plaintiffs who outnumber the lost promotion spots is to compute the total additional wages attributable each year to each promotion and divide the value among the class members. *See United States v. City of Miami,* 195 F.3d 1292, 1299–1302 (11th Cir.1999); *Dougherty v. Barry,* 869 F.2d 605, 614–15 (D.C.Cir.1989) (Ginsburg, J.); *Hameed v. Iron Workers Local 396,* 637 F.2d 506, 520–21 (8th Cir.1980). The dis-

---

7.   Lufkin argues that the court could readily make these determinations by reviewing the bid sheet database. This argument ignores

the district court's finding that the bid sheet database was incomplete and unreliable.

**282**          **519 FEDERAL REPORTER, 3d SERIES**

trict court should adapt this method with whatever modifications will both expediently and fairly apportion the lost wages among class members working in the multiple divisions of Lufkin.

What the court may not do is return to Dr. Drogin's lost wages calculations given our disposition of this case. Dr. Drogin estimated annual hourly wage disparities between black and white workers and black and non-white workers and made a similar racial comparison for salaried workers. The conclusions in this section of his report were intended to demonstrate the systemic effects of racially discriminatory Foundry assignments throughout workers' careers. Whether or not such conclusions would be supportable for both hiring and promotion claims, they do not pertain to the class claim that is now limited to lost promotions. Dr. Drogin's figures would come close to compensating each class member for the full value of lost promotions, where plainly each class member had at best a possibility of progressing up the ladder. The district court is free to consider any additional evidence that the parties may offer on this issue.

### 5. Limitation on the Presentation of Evidence and Trial Location

[36–39]  Lufkin argues that given the complexity of the issues involved in this case, the district court's imposition of rigid time limits on the presentation of evidence deprived Lufkin of a fair trial. A district court has broad discretion in managing its docket and structuring the conduct of a trial. *Sims v. ANR Freight Sys., Inc.,* 77 F.3d 846, 849 (5th Cir.1996). It may maintain the pace of the trial by setting time limits on counsel. *Id.* Moreover, a judge has special latitude in applying time limits in a bench trial, since the court often has

become familiar with the case long before trial begins and can readily comprehend the evidence presented. *Id.* at 850. Nevertheless, discretion has its limits. *See id.* at 849; *see also Kelly v. Boeing Petroleum Servs., Inc.,* 61 F.3d 350, 358 (5th Cir. 1995). "When the manner of the presentation of information … is judicially restricted to the extent that the information becomes incomprehensible then the essence of the trial [is] destroyed." *Sims,* 77 F.3d at 849.

[40, 41]  In this case, we do not doubt that it was difficult for Lufkin to mount a defense against generalized claims of subjective decision making—claims that implicated all of its divisions and spanned almost a decade—in the mere twenty hours the district court allowed each side. But even if the strict time limits amounted to an abuse of discretion, the district court's error is presumed harmless until shown to be prejudicial. *See Ruiz v. Estelle,* 679 F.2d 1115, 1129 (5th Cir.1982); *see also Sims,* 77 F.3d at 849–50 (declining to reverse where the complaining party did not establish there was a reasonable probability that the outcome of the case would be different upon retrial). Lufkin has not persuaded us that it suffered reversible prejudice. Lufkin's related claim of "cumulative error" fails because it is essentially rendered moot by the pervasive effect of our appellate ruling.

### B. Plaintiffs' Arguments

#### 1. Disparate Treatment Class Certification

[42, 43]  Plaintiffs contend that the district court erred in denying class certification of their 42 U.S.C. § 1981 disparate-treatment claim seeking declaratory, injunctive, and equitable back pay.[8] *See Al-*

---

**8.** Plaintiffs characterize the district court's

decision as a "dismissal" of their disparate-

*lison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415–16 (5th Cir.1998) (equitable monetary relief, i.e., back pay, available in (b)(2) class actions). The district court declined to certify the class under Rule 23(b)(2) because individual claims for monetary relief would have predominated, and it concluded that the class representatives would be "inadequate" if they dropped the class members' demand for compensatory and punitive damages in order to protect the "predominance" of nonmonetary claims. *See* FED.R.CIV.P. 23(b)(2). This court reviews the district court's class-certification decision for abuse of discretion. *See Allison*, 151 F.3d at 408. Whether the court applied the correct legal standard in reaching its decision is reviewed *de novo. Id.*

[44] The district court did not abuse its discretion. *See Pegues v. Miss. State Employment Serv.*, 699 F.2d 760, 763 (5th Cir.1983) ("Implicit in this deferential standard of review is the recognition of the essential factual nature of the certification inquiry and the district court's inherent power to manage and control pending litigation."). Motivated by *Zachery v. Texaco Exploration & Production, Inc.*, 185 F.R.D. 230 (W.D.Tex.1999), the district court expressed concern about the plaintiffs' disavowal of monetary damages. In *Zachery*, the putative class representatives also dropped their demand for compensatory and punitive damages in order to achieve Rule 23(b)(2) certification. *Id.* at 233. As a result, class members would not have had the right to opt out of the class and might be barred from bringing individual damage claims. *Id.* at 243 (citing *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984)). Noting this serious conflict of interest, the court refused to impose upon the class members the decision by named treatment claim; however, the district court clarified that "a disparate treatment claim

plaintiffs to forfeit the compensatory and punitive damages claim. *Id.* at 244–45. We agree with *Zachery* and with the district court's conclusion here that if the price of a Rule 23(b)(2) disparate treatment class both limits individual opt outs and sacrifices class members' rights to avail themselves of significant legal remedies, it is too high a price to impose. There was no error, much less abuse of discretion, in this certification denial.

### 2. *Vague Remedial Injunction*

[45] Plaintiffs argue that the district court's remedial injunction lacks specificity, fails to remedy the discriminatory exercise of subjective decision-making practices, and includes no provision to ensure Lufkin's compliance. Lufkin agrees that the injunction is unenforceable for lack of specificity, but urges us to reject the additional injunctive relief that plaintiffs now request. We review a district court's fashioning of injunctive relief for abuse of discretion. *Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 62 F.3d 690, 693 (5th Cir.1995).

[46] The injunction at issue is identical to one the district court included in a preliminary order in January 2005. Lufkin appealed the injunction immediately after the preliminary order. We dismissed the appeal, stating that "[b]efore this matter is ripe for appellate review, the district court must identify the specific steps the defendant must take to implement and comply with the injunction." Despite this instruction, the district court included the original injunction verbatim in the final amended judgment.

The court's injunction lacks the detail required under Federal Rule of Civil Procedure 65(d). The injunction includes such

has not been 'dismissed' because a disparate treatment claim was never certified."

vague directives as "cease and desist all racially biased assignment and promotion practices," "create and implement a program to ensure that black employees receive an equitable proportion of promotions," and "take all necessary steps to remedy the effects of past discrimination." An order framed in these broad generalities fails to afford notice to Lufkin of its proscribed or required conduct and is therefore unenforceable. We vacate and remand for the court to try again.

This task will not be simple. Where, as here, Title VII does not require plaintiffs to pinpoint the specific practices that caused the discriminatory effect, it is especially difficult to craft an adequate remedial order that will eliminate discrimination without hobbling Lufkin's legitimate promotion policies. We leave to the district court the task of reviewing afresh the propriety of the injunction, and if it is found necessary, of balancing plaintiffs' requests for stronger measures to ensure Lufkin's compliance with the imprecision of the liability finding.

### 3. Attorneys' Fees

[47]  Plaintiffs contend that the district court abused its discretion by reducing their fees without conducting lodestar and *Johnson* analyses or making factual findings to support the reduction. A district court's determination of attorneys' fees is reviewed for abuse of discretion, and the findings of fact supporting the award are reviewed for clear error. *Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir.1990).

[48–50]  The first step in determining statutorily authorized attorneys' fees is to calculate a "lodestar" amount by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Rutherford v. Harris County, Tex.*, 197 F.3d 173, 192 (5th Cir.1999). The court must then consider whether the lodestar should be adjusted upward or downward, depending on the circumstances of the case and the factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974). A district court must "explain with a reasonable degree of specificity the findings and reasons upon which the award is based, including an indication of how each of the *Johnson* factors was applied." *Von Clark*, 916 F.2d at 258.

[51]  In this case, the plaintiffs sought an interim award of attorneys' fees, costs and expenses approximating $6.5 million, covering 12,387.9 hours of work performed and nearly a million dollars in out-of-pocket costs. The district court slashed their request and summarily stated that Ms. Demchak's reported hours were "excessive and not necessary" and that the rates she requested were not "usual and customary" for employment discrimination cases in the geographical area. The court offered no reason to deny all compensation for time spent on the lengthy mediation effort; to deny compensation to Mr. Garrigan for his attendance at plaintiff Roald Mark's separate suit against Lufkin; to apply a blanket reduction of 25% to all of the billable hours reported by plaintiffs' counsel; and to reduce the hourly rates requested by plaintiffs' counsel. Because of these deficiencies, we must vacate the fee award and remand for the district court to conduct proper lodestar-fee and *Johnson* analyses, and award counsel a reasonable reimbursement.

### III.  CONCLUSION

The district court struggled to complete its work in this wide-ranging, complex discrimination case. Nevertheless, the sum of the foregoing discussion leaves much to be reconsidered. First, we vacate the judgment insofar as it holds Lufkin liable

## TRAFALGAR CORP. v. MIAMI COUNTY BD. OF COM'RS    285
Cite as 519 F.3d 285 (6th Cir. 2008)

for a claim, unexhausted before the EEOC, that the company discriminatorily assigned newly hired African Americans to the Foundry division. Second, we affirm the judgment of Lufkin's liability to the class for the discriminatory impact of its subjective promotional policies. Because of this split decision, we must vacate and remand the damage award for further proceedings consistent with the foregoing discussion, as well as the award of injunctive relief and attorneys' fees.

AFFIRMED IN PART, REVERSED IN PART, VACATED AND REMANDED IN PART.



**TRAFALGAR CORPORATION; Bruce Geisinger; and Mark Geisinger, Plaintiffs–Appellants,**

v.

**MIAMI COUNTY BOARD OF COMMISSIONERS and Concord Township, Miami County, Ohio, Defendants–Appellees.**

No. 06–3578.

United States Court of Appeals, Sixth Circuit.

Argued: Sept. 10, 2007.

Decided and Filed: March 3, 2008.

**Background:** Landowner brought action against county board of commissioners and township, seeking to compel approval of zoning change and commencement of appropriation proceedings. The United States District Court for the Southern District of Ohio, Michael R. Merz, Magistrate

Judge, 2006 WL 689112, dismissed action. Landowner appealed.

**Holdings:** The Court of Appeals, Boyce F. Martin, Jr., Circuit Judge, held that:

(1) issue preclusion barred landowner's takings claim, and

(2) claim preclusion barred landowner's equal protection claim.

Affirmed.

**1. Eminent Domain ⌕308**

Issue preclusion barred takings claim brought by landowner against county board of commissioners and township, seeking to compel approval of zoning change and commencement of appropriation proceedings; state court had previously determined that landowner could not make out claim for compensation, since it had failed to present sufficient evidence that it had been deprived of all economically viable uses of land. U.S.C.A. Const. Amend. 5; 28 U.S.C.A. § 1738.

**2. Zoning and Planning ⌕727**

Claim preclusion barred equal protection claim brought by landowner against county board of commissioners and township, seeking to compel approval of zoning change and commencement of appropriation proceedings; landowner's previous state court actions had included complaints based on alleged discrimination arising out of board's refusal to re-zone property at issue. U.S.C.A. Const.Amend. 14; 28 U.S.C.A. § 1738.

———

**ARGUED:** Michael P. McNamee, McNamee & McNamee, Beavercreek, Ohio, for Appellants. Robert J. Surdyk, Surdyk Dowd & Turner, Dayton, Ohio, Steven G. LaForge, Isaac, Brant, Ledman & Teetor, Columbus, Ohio, for Appellees.

# BICKEL & BREWER
**ATTORNEYS AND COUNSELORS**   Dallas | New York                     www.bickelbrewer.com

## James S. Renard

Born in Independence, Kansas and raised in Dallas, Mr. Renard received his bachelor of science degree, summa cum laude, from Southern Methodist University in 1978, where he was elected to Phi Beta Kappa, was a National Merit Scholar, and was awarded the Alpha Lambda Delta Senior Book Award for the highest grade point average at the university.

Mr. Renard received his juris doctor degree with honors from The University of Texas at Austin School of Law in 1981. In 1979 and 1980, he was the Fall Hildebrand Moot Court Team Champion, and in 1979, was also Outstanding Advocate. While in law school, Mr. Renard was a member of the Order of Barristers and the Board of Advocates. Mr. Renard is a member of the American Bar Association, the State Bar of Texas, the Texas Bar Foundation, the Dallas Bar Association and the Dallas Bar Foundation. He is admitted to practice before the United States District Court for the Northern District of Texas and the Court of Appeals for the Second, Third, Fifth, Seventh, Ninth, Eleventh and Federal circuits. Mr. Renard speaks frequently at legal and various industry seminars and symposiums.

Mr. Renard has been voted one of Dallas' top lawyers in a survey of his peers conducted by D Magazine. For the past several years, he has been voted one of "The Best Lawyers in Texas" in a survey of his peers published in Texas Monthly.

Contact: jsr@bickelbrewer.com

Case 3:08-cv-01551-B   Document 182-8   Filed 04/08/10   Page 102 of 105   PageID 11337

# BICKEL & BREWER

**ATTORNEYS AND COUNSELORS**   Dallas | New York                    www.bickelbrewer.com

## Dunham Biles

Mr. Biles, born and raised in the Willamette Valley of Oregon, received his bachelor of arts degree from the University of Pennsylvania and his juris doctor degree from the University of Chicago.

Mr. Biles previously worked for Bickel & Brewer. Prior to rejoining the firm in 2006, Mr. Biles gained extensive experience in litigating complex commercial matters and conducted jury and non-jury trials and mediations. Mr. Biles is a member of the State Bars of Arizona and Texas and is admitted to practice before the Ninth Circuit Court of Appeals.

Contact: cdb@bickelbrewer.com

## BICKEL & BREWER
**ATTORNEYS AND COUNSELORS**    Dallas | New York          www.bickelbrewer.com

## Jack Ternan

Raised in Plano, Texas, Mr. Ternan attended Georgetown University and in May 2004 received a bachelor's degree in government and history. In May 2007, Mr. Ternan received his juris doctor degree from the University of Texas School of Law. In law school, Mr. Ternan became a Blackstone Fellow, interned at the Texas Supreme Court, and served as a senior editor for the Texas Review of Law and Politics.

Mr. Ternan is admitted to practice in Texas and before the United States District Court for the Northern District of Texas.

Contact: jgt@bickelbrewer.com

APP0727



# FRANK FINN
## ATTORNEY AND COUNSELLOR

| | |
|---|---|
| 1722 Routh Street, Suite 1300 | Of Counsel |
| Dallas, Texas  75201-2533 | Thompson & Knight, LLP |
| Phone: 214-969-1266 | Texas Bar #07028000 |
| Fax: 214-969-1751 | email: frank.finn@tklaw.com |

**Experience:** Frank Finn is a Senior Lawyer officing at the Thompson & Knight, LLP quarters. He joined that firm in 1956. His varied litigation practice consists of complex litigation primarily in the areas of aviation, bankruptcy and creditors' rights, business relations, class actions, including l0b5 securities cases, contracts, environmental issues, franchises, insurance and reinsurance contracts, oil and gas contracts, oil and gas pricing, patent and trademark matters, personal injury cases, pipeline matters, real estate transactions, sales and use taxation matters; trucking and transportation matters; and oil and gas and energy-related issues and disputes including refinery operation and attendant disputes. He is a member of the International Court of Aviation and Space Arbitration, Paris, France, the ADR Section of the American, State and Dallas Bar Associations; and an approved Arbitrator for the NASD Regulation, Inc. He has served as a court-appointed Special Master of Discovery and Pre-Trial matters in District Courts of Texas and currently has a full-service mediation and arbitration practice.

**Prof.Activities/**
**Memberships:** Mr. Finn is a member of the College of the State Bar of Texas; American Memberships: Arbitration Association; American Board of Trial Advocates, Dallas Chapter (President, 1972-75); Research Fellow, The Southwestern Legal Foundation; Chairman 1972-76, the Federation of Corporate and Insurance Counsel, Defense Research Institute, Texas Association of Defense Counsel and Dallas Association of Defense Counsel; and SMU Air Law Symposium (Director and Planning Membership). He has been actively involved in the City of Dallas Environmental Quality Committee (Vice Chairman and Secretary 1972-75); Dallas Chamber of Commerce Environmental Quality Committee (Vice Chairman and Chairman 1972); of counsel, Committee on Laws Affecting the Inner City, 1976-77; Planning and Program Director, Alternative Dispute Resolution, University of Texas School of Law, Adjunct Professor, Procedure I, Texas Wesleyan School of Law, Irving, Texas 1991-92; an Adjunct Professor, Trial Advocacy, Texas Wesleyan

School of Law, Irving, Texas 1993-96; and is currently a Fellow, Texas Bar Foundation; Fellow, Dallas Bar Foundation, and a Designated State Representative, Center for Public Resources, Inc. ADR Committee.

**Speeches/**
**Publications:** Mr. Finn has been a frequent contributor to programs and publications at law schools and legal seminars in the United States and abroad in various Publications: areas, including litigation, arbitration, mediation and judicial selection. Among others, he has been a major contributor with ADR programs, including "The Coin Toss - To Be or Not To Be Ethical (I've Never Knowingly Told a Completely Honest Person a Total Lie)," Alternative Dispute Resolution Conference Mediating Across the Goal Line; "Discovery in Military Crash Litigation (Defendant's Viewpoint)," Journal of Air Law and Commerce; "Environmental Litigation and the In- House Engineer," Journal of the Air Pollution Control Association; and "Selection, Preparation & Examination of Experts," Learning From the Masters. Mr. Finn has not had any publications in the last ten (10) years.

**Education**
**& Experience:** Mr. Finn received a BA (Economics) from the University of Notre Dame in 1949 and a J.D. from The University of Texas School of Law in 1956. He was admitted to practice law in Texas in 1956. He is also admitted to practice in the United States District Courts for the Northern, Eastern, Southern and Western Districts of Texas, and the United States Court of Appeals for the Fifth Circuit and the U.S. Supreme Court and the Federal Circuit Court of Appeals and the Supreme Court of the United States. His background includes two years with the Federal Bureau of Investigation in Washington, D.C. Mr. Finn has not, as of this date, testified at trial or in deposition in any case in the last four (4) years.

**Noteworthy**
**Representations**
**And Activities** Ray Hunt and Hunt Oil in their Yemen acquisition; Hunt/Exxon in their refinery and pipeline construction in Yemen; United States Steel in regards to their pumps in the Colombian oil fields; Bell Helicopter in their sales and operations in Iran; United States Steel in regards to various refinery and pipeline accidents in the U.S.; Delta Airlines - in litigation growing out of Delta crashes at DFW Airport; over 500 mediations and arbitrations and as a Special Master and Facilitator of Settlements; Director and Co-Counsel in patent litigation in the Eastern District of Texas, Sherman and Marshall Divisions; father and mentor to my three children who are lawyers (two of whom have been and/or are now judges in Dallas County Courts); and finally, the University of Notre Dame, The Athletic Department and Coach Lou Holtz in the matter of Tim Brown and alleged libel and slander.